**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| Steven B. Brincefield, on behalf of the Morton G. Thalhimer, Inc. Employee Stock Ownership Plan, and derivatively on behalf of Morton G. Thalhimer, Inc. as Trustee of the Steven B. Brincefield Revocable Trust; | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. __3:17cv718____ |
| Lance T. Studdard, | ) ) | |
| Paul F. Silver, | ) ) | |
| C. Lee Warfield, III, | ) ) | |
| Evan M. Magrill, | ) ) | |
| David R. Dustin, Jr., | ) ) | |
| Jeffrey S. Bisger, | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| Morton G. Thalhimer, Inc., | ) ) | |
| Nominal Defendant. | ) | |

**VERIFIED COMPLAINT**

Plaintiff, Steven B. Brincefield ("Brincefield"), on behalf of the Morton G. Thalhimer, Inc.

Employee Stock Ownership Plan ("ESOP" or "Plan"), and derivatively on behalf of Morton G.

Thalhimer, Inc. ("Thalhimer" or the "Company"), and as Trustee of the Steven B. Brincefield

Revocable Trust, by his undersigned counsel, states as follows for his Verified Complaint against Defendants.

## INTRODUCTION

1.     This action is filed under the Employee Retirement Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq*., and is brought by Plaintiff under ERISA § 502(a)(2), 29 U.S.C. §§ 1109 and 13132(a)(2) against the fiduciaries of the ESOP sponsored by Thalhimer to enjoin acts and practices that violate the provisions of Title I of ERISA; to require Defendants to reimburse the ESOP for the losses resulting from their violations of ERISA; to restore to the ESOP any profits and fees made and received by Defendants; to enjoin Defendants from further depleting the value of the ESOP; to remove Defendants Studdard, Magrill, Warfield and Dustin as ESOP Trustees; and to obtain other appropriate equitable and legal remedies in order to redress the Defendants' violations of Title I of ERISA and enforce its provisions against parties in interest to the ESOP who benefitted at the ESOP's expense.

2.     The ERISA violations alleged herein arise from the ESOP's imprudent purchase of the Company's stock for more than 30% over and above of the stock's fair market value and without a proper valuation of the stock. The ESOP stock purchase benefitted Defendants at the expense of the ESOP.

3.     This action is also a shareholder derivative action asserting claims on behalf of Thalhimer pursuant to Rule 23.1 of the Federal Rules of Civil Procedure to redress the damages to Thalhimer relating to the ERISA violations, and other damages relating to the officers and directors' conversion of the Company's assets, breaches of fiduciary duty, and the Defendants' common law conspiracy and statutory conspiracy against Thalhimer.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

5.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the events or omissions giving rise to the claims occurred in this District, the ESOP is administered in this District, and Thalhimer is headquartered in this District.

## PARTIES

7.      Brincefield brings this action on behalf of the ESOP. Thalhimer, along with two of its wholly-owned subsidiaries, MGT Construction Management, Inc. ("MGT Construction") and TGM Realty Investors, Inc. ("TGM Realty"), adopted the Plan effective January 1, 2003. The Plan was amended and restated effective January 1, 2011. There are approximately 407 participants or beneficiaries of the ESOP. The ESOP owns the controlling interest in Thalhimer.

8.      Plaintiff Brincefield brings the shareholder derivative claims on behalf of Thalhimer, a Virginia Corporation with its principal offices located in Henrico County, Virginia. Thalhimer is the region's leading commercial real estate firm, doing business as Cushman & Wakefield / Thalhimer. Thalhimer has four wholly-owned subsidiaries (collectively the "Company") and additional ownership interests in numerous other real estate companies. Thalhimer has one class of stock – namely, the common stock.

Brincefield was an employee of Thalhimer for 38 years. He participated in the ESOP and was vested in shares of Thalhimer common stock as a participant. Brincefield retired from

Thalhimer in 2012, and he remains as a participant in the ESOP. He has received some distributions from the ESOP since retiring, and he is still vested in shares of Thalhimer common stock through the ESOP. Brincefield has owned Thalhimer common stock outright since 1985, and he owns 17,460 shares of Thalhimer common stock as the trustee of the Steven B. Brincefield Revocable Trust. Brincefield never sold any of his common stock to the ESOP. Brincefield was a shareholder at the time of the actions complained of in this Verified Complaint.

9.     Defendant, Lance T. Studdard ("Studdard"), is the purported "Independent Trustee" of the ESOP, also known as the "Special Trustee." He was hired by Thalhimer's Board of Directors (the remaining Defendants) for the purpose of assessing the fairness of the purchase of Company stock from minority shareholders in 2016. The Board of Directors re-hired Studdard to, among other things, oversee the "unwinding" of the same transaction in order to protect Defendants from personal liability under ERISA. Therefore, Studdard is not independent and is conflicted. Studdard is a fiduciary with respect to the ESOP, pursuant to ERISA § 3(21)(A); 29 U.S.C. § 1002(3)(21)(A), and is a party in interest pursuant to ERISA 3(14)(A), 29 U.S.C. § 1002(3)(14)(A). Studdard holds himself out as an expert in fiduciary duties of ESOP trustees and other fiduciaries.

10.     Defendant, Paul F. Silver ("Silver"), was an officer and director of Thalhimer at all relevant times. He was Thalhimer's President during 1995-2011, its Chief Executive Officer ("CEO") during 1997-2016, and has been the Company's Chairman since 2011. Silver was also an officer and/or director of MGT Construction from on or before 2002 until 2012. Silver was a Trustee of the ESOP during 2004-2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the

Plan at all relevant times. Silver is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(3)(21)(A), and is a party in interest pursuant to ERISA § 3(14)(A), 29 U.S.C. §§ 1002(3)(14)(A) and (H). Silver is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2004, Silver sold 136,188 shares of Thalhimer stock to the ESOP for $5,146,544.50. In 2011, Silver sold 47,142 shares of Thalhimer stock to the ESOP for $1,237,477.50.

11.     Defendant, C. Lee Warfield, III ("Warfield"), was an officer and director of Thalhimer at all relevant times. Warfield has been Thalhimer's President since 2011. He was promoted to CEO in December 2016 and remains the President. Warfield was also an officer and/or director of MGT Construction from on or before 2004 until 2013. Warfield has been a Trustee of the ESOP since 2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times. Warfield is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(3)(21)(A), and is a party in interest pursuant to ERISA § 3(14)(A), 29 U.S.C. §§ 1002(3)(14)(A) and (H). Warfield is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2016, Warfield sold 47,142 shares of Thalhimer stock to the ESOP for $1,744,254.00.

12.     Defendant, Evan M. Magrill ("Magrill"), was an officer and director of Thalhimer at all relevant times. Magrill is Thalhimer's Executive Vice President. Magrill has been an officer and/or director of MGT Construction since 2007, and is the current Chairman of MGT Construction. Magrill has been a Trustee of the ESOP since 2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times.

He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times. Magrill is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(3)(21)(A), and is a party in interest pursuant to ERISA § 3(14)(A), 29 U.S.C. §§ 1002(3)(14)(A) and (H). Magrill is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2016, Magrill sold 47,142 shares of Thalhimer stock to the ESOP for $1,744,254.00.

13.     Defendant, David R. Dustin ("Dustin"), was an officer and director of Thalhimer at all relevant times. Since 1999, Dustin has held various accounting positions at the Company, including Corporate Controller. He was a Senior Vice President and Treasurer during 2011-2014, and has been Thalhimer's Chief Financial Officer since 2014. Dustin also has been an officer and director of MGT Construction since 2011, and is MGT Construction's current Treasurer and Secretary. Dustin has been a Trustee of the ESOP since 2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times. Dustin is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(3)(21)(A) and is a party in interest pursuant to ERISA § 3(14)(A), 29 U.S.C. §§ 1002(3)(14)(A) and (H). Dustin is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2016, Dustin sold 1,500 shares of Thalhimer stock to the ESOP for $55,500.00.

14.     Defendant, Jeffrey S. Bisger ("Bisger"), was a director of Thalhimer during 1995-2011. Bisger is an Executive Vice President of Thalhimer, and he is also an officer and director of Thalhimer Realty. Bisger was a Trustee of the ESOP during 2004-2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all

relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times. Bisger is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(3)(21)(A), and a party in interest pursuant to ERISA § 3(14)(A), 29 U.S.C. §§ 1002(3)(14)(A) and (H). Bisger is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2004, Bisger sold 136,188 shares of stock to the ESOP for $5,146,544.50. In 2011, Bisger sold 47,142 shares of stock to the ESOP for $1,237,477.50.

15.     For purposes of this Verified Complaint, Defendants Silver, Warfield, Magrill, Dustin, and Bisger are referred to collectively as the "Director Defendants."

## DERIVATIVE STANDING

16.     As required by VA. CODE ANN. § 13.1-672.1, Plaintiff gave the directors of Thalhimer the first opportunity to obtain the desired action from the directors and institute suit against Silver, Bisger, Warfield, Magrill, and Dustin, as directors and officers of the Company and its subsidiary corporations and as managers and officers of the Company's subsidiary limited liability companies, to recover damages to the Company caused by their actions. Plaintiff, through his counsel, sent a detailed demand letter to the President of Thalhimer, Defendant Warfield, on April 19, 2017. *See* Exhibit A.

17.     Specifically, Plaintiff made a written demand upon the Company to investigate and take appropriate legal action against Director Defendants for their mismanagement of the Company and their self-dealing transactions, including the massive drop in the value of the Company, causing the Company to incur substantial debt and otherwise participating in the June 2016 ESOP transaction where the ESOP paid over 30 percent more than fair market value for the stock, causing the Company to pay millions of dollars to "unwind" the transaction,

7

overcompensating themselves, usurping corporate opportunities, misrepresenting the value of the Company to shareholders to entice them to sell their stock to the ESOP so they could use the resulting accumulated cash to further over-compensate themselves, usurping corporate opportunities, engaging in self-dealing loans, and providing shareholders with false and misleading information. The demand letter contained more than enough information for the Board of Directors to begin their investigation because it attached a draft copy of the complaint containing the vast majority of the facts in this Verified Complaint.

18.     Fifty-eight days after receiving this demand letter, the Director Defendants held Thalhimer's annual shareholder meeting and made self-serving statements about the allegations in the derivative demand letter to the shareholders. The Director Defendants nominated a slate of new directors they had chosen, including three purportedly independent directors. The Trustees of the ESOP, Defendants Magrill, Warfield and Dustin, voted the majority shares to approve the slate of directors. The Director Defendants informed the shareholders that the Board of Directors can appoint disinterested directors to a special litigation committee to investigate the allegations set forth in the derivative demand letter.

19.     On July 17, 2017, one day before the 90-day statutory period expired, counsel for Brincefield, John Craddock, Esq., received a letter from counsel for the special litigation committee, Gary Bryant, requesting specific information regarding some of the self-dealing transactions contained in the derivative demand letter. During a telephone conversation, John Craddock informed Gary Bryant that the financial statements contained the information he was seeking and that the Director Defendants have all of the requested information. Since that time, Brincefield has received no further information from the special litigation committee or the Company.

20.     More than 90 days have passed since service of the demand letter and the commencement of this lawsuit.

21.     This action is not a collusive one to confer jurisdiction on this Court.

22.     Plaintiff Brincefield can and will fairly and adequately represent the interests of the other shareholders who are similarly situated, including the ESOP.

## BACKGROUND INFORMATION

### A. The Director Defendants Have Absolute Dominion And Control Over Thalhimer

23.     Plaintiff Brincefield joined Thalhimer in 1974 after obtaining a Master of Science Degree in Real Estate and Urban Land Development from Virginia Commonwealth University ("VCU").

24.     Brincefield's success at Thalhimer was recognized quickly. Less than seven years after he started working for the Company, he was named Vice President. Three years later, in 1984, he was named Senior Vice President, became a stockholder, and was appointed to the Board of Directors. After 38 extraordinarily successful years, Brincefield retired from Thalhimer in 2012.

25.     At his retirement celebration, Thalhimer recognized that Brincefield, through his tenacity, wisdom, and leadership, grew Thalhimer's Property Management division to over 20 million square feet of space under management and generated many millions of dollars in revenue for the Company.

26.     At all relevant times, Thalhimer had no independent directors or officers. Defendants Silver and Bisger dominated the Company during 2002-2011. They consolidated control in the executive committee and the CEO. They controlled the appointment of the executive committee, and the directors and officers. Before 2004, Defendants Silver and Bisger owned a controlling interest in the Company (collectively they owned 77% of the Company's stock). In

2004, Silver and Bisger sold the majority interest (50.2%) of the common stock in the Company to the ESOP, but continued to control the Company as ESOP Trustees. In 2011, Silver and Bisger transitioned control over the Company to Defendants Magrill, Warfield, and Dustin by appointing them ESOP Trustees. However, Magrill, Warfield, and Dustin remain beholden to Silver and Bisger. Now Silver, Bisger, Magrill, Warfield, and Dustin dominate the Company and control the decisions relating to the ESOP.

**B.  Thalhimer Elects "S" Corporation Status**

27.     In 1998, Thalhimer decided to elect "S" Corporation status. The election required the consent of all Thalhimer stockholders.

28.     Thalhimer entered into a Stockholder Agreement on February 26, 1998, with all of its stockholders, including Silver, Bisger, and Brincefield (the "1998 Stockholder Agreement"). A copy of the 1998 Stockholder Agreement is attached as Exhibit B.

29.     The 1998 Stockholder Agreement provides that:

a.      Thalhimer is required to make minimum tax distributions quarterly for each calendar year during which the Company is an "S" Corporation (the "Minimum Distribution").

b.      The shareholders are required to vote their stock so as to cause the Company to make the Minimum Distribution.

c.      It is binding upon, and inures to the benefit of, the parties and their respective legal representatives, successors, and assigns.

d.      It "shall not be amended or modified in any way except by a written instrument executed by the parties hereto."

e.   It shall be terminated in any year in which the Company is not an "S" Corporation. But, if the Company loses its S Corporation status inadvertently, the 1998 Shareholder Agreement will be fully reinstated should the Company again become an S Corporation.

30.   When Silver transmitted copies of the fully-executed 1998 Stockholder Agreement to the shareholders, he attached a memorandum that advised: "This agreement should be kept in your permanent file regarding the corporation's election as a Subchapter S Corporation and the Corporation's commitment to distribute to each stockholder, or pay on behalf of each stockholder, estimated Federal and State income taxes on a quarterly basis." Silver copied the Company's file on the memorandum.

31.   Thalhimer became an S Corporation in 1998, and remains an S corporation today. Its status as an S corporation has never changed since 1998. The Company always classified the Minimum Distributions as one of its major capital expenditures, and it consistently made the Minimum Distributions, without exception, from the inception of the 1998 Stockholder Agreement until June 30, 2016.

### C.  The ESOP Was Established To Benefit The Director Defendants

32.   Effective January 1, 2003, Thalhimer adopted the ESOP. The purpose represented to the employees in the Plan -- "to enable you to share in the growth of the Company and to accumulate a beneficial interest in stock of the Company" -- was not the ESOP's true purpose. There were several purposes of the ESOP, all aimed at enriching the Director Defendants.

33.   One purpose of the ESOP was to create a market and a financing mechanism to buy out the Director Defendants' shares of Company stock at favorable prices.

34.     Another purpose of the ESOP was to redirect the cash "liberated by ESOP tax favors" to key Thalhimer executives (including Defendants Silver, Bisger, Magrill, and Warfield) through discriminatory executive benefits, such as the stock incentive plan, life insurance policies, and deferred compensation packages. Those benefits would be tied to performance. If the Company was to become 100% ESOP-owned, the Company would no longer have to make the Minimum Distributions required by the 1998 Stockholder Agreement. Then, the cash could accumulate in the Company rather than in the ESOP, which would further enhance the key executives' performance and, thus, their monetary benefits.

35.     Another benefit for Defendants Silver, Bisger, Magrill, and Warfield was that they would become ESOP beneficiaries with the additional advantage of being highly-compensated and early participants (meaning they would obtain a larger percentage of the ESOP than other employees).

36.     Put simply, the goal was for Thalhimer to become a "Tax-Free Cash Warehouse" for the benefit of Defendants Silver, Bisger, Magrill, and Warfield.

37.     The Director Defendants used their positions as controlling shareholders and directors to amend Thalhimer's Articles of Incorporation and Bylaws to effectuate the plan and to ensure they maintained tight control of the Company, including decisions relating to the price the ESOP would pay for their shares of stock, their compensation and executive benefits, their loans to and from the Company, and the Company's investment in other real estate entities which they owned.

38.     Defendants Silver, Bisger, Magrill, and Warfield implemented the plan. At some point, Dustin was brought into the fold and helped implement the plan. All of the Defendant Directors participated in and benefitted from the "Tax-Free Cash Warehouse" to the detriment of

the ESOP. This would be accomplished via a three-step process, each of which caused separate and distinct injuries to the Company:

a. In the first step, the ESOP purchased approximately 51% of the shares of common stock in the Company from Silver and Bisger for approximately $10 million. After this leveraged ESOP transaction, the ESOP owned a controlling interest in the Company, and Silver and Bisger remained in control of the Company as the ESOP Trustees.

b. In the second step, the ESOP accumulated cash, tax-free, from distributions the Company was required to make to all shareholders pursuant to the 1998 Stockholders Agreement. After approximately seven years, the ESOP used the accumulated cash to purchase Silver's and Bisger's remaining shares of Company stock, at which time Silver and Bisger transitioned control of Thalhimer to Magrill, Warfield, and Dustin by appointing them as ESOP Trustees. Silver and Bisger remained active executive employees of the Company. The plan included stock incentives for Magrill and Warfield that vested in 2011.

c. In the third step, after the ESOP accumulated additional cash over approximately five more years, Magrill, Warfield, and Dustin sold their shares of Thalhimer stock to the ESOP and continued to control the Company as ESOP Trustees.

## (a) The 2004 ESOP Transaction (Step 1)

39.     In June 2004, Defendant Silver pressured Plaintiff Brincefield to sell his shares of Thalhimer stock to the ESOP. Silver warned that the value of Brincefield's stock would drop

significantly due to the loan that would be taken out to fund the forthcoming ESOP transaction. Nevertheless, Brincefield declined to sell his stock. In retaliation, Silver and Bisger removed Brincefield from the Executive Committee.

40.     In September 2004, the ESOP acquired 272,376 shares of Thalhimer common stock from Silver and Bisger at a price of $37.79 per share, totaling $10,293,089 (the "2004 ESOP Transaction").

41.     Silver and Bisger appointed themselves as Trustees of the ESOP.

42.     Upon completion of the 2004 ESOP Transaction, the ESOP became bound to the 1998 Stockholder Agreement as a successor-in-interest to Silver and Bisger. The Trustees were required to comply with the 1998 Stockholder Agreement.

43.     Since completion of the 2004 ESOP Transaction, the ESOP has owned the majority interest of common stock in Thalhimer.

44.     Under the terms of the Plan, the ESOP is administered by Trustees who are appointed by the Company's Board of Directors. The ESOP Trustees exercise most of the voting rights of the ESOP, the controlling stockholder, including the right to vote to elect the Board of Directors. ESOP participants and former participants, however, are entitled to direct the manner in which the voting rights on the allocated stock are to be exercised with respect to a few major vote pass-through issues, such as a corporate merger or dissolution.

45.     Thalhimer established a Restricted Stock Plan in 2004 to benefit key executives in conjunction with the 2004 ESOP Transaction, including Magrill and Warfield.

46.     Thalhimer also entered into deferred compensation agreements with key executives, including Magrill and Warfield in conjunction with the 2004 ESOP Transaction. The

Company purchased life insurance to provide for future payments under the deferred compensation agreements.

### (b) The 2011 ESOP Transaction (Step 2)

47.    After purchasing Silver's and Bisger's stock in the 2004 ESOP Transaction, the ESOP accumulated cash, tax-free, as planned.

48.    On November 7, 2008, the ESOP purchased 18,939 Thalhimer shares (from the Company) for $796,006 (a price of $42.03 per share).

49.    In September 2011, Silver and Bisger sold their remaining shares of Thalhimer stock (94,284 total shares) to the ESOP at a price of $26.25 per share, for a total value of $2.47 million (the "2011 ESOP Transaction"). Silver and Bisger loaned money to the Company to fund this transaction. The ESOP issued 10-year notes to Silver and Bisger, and the Company unconditionally guaranteed payment and pledged substantially all of the Company's assets as collateral for the notes.

50.    In tandem with the 2011 ESOP Transaction, a shift in power occurred:  Silver and Bisger stepped down as Trustees, appointing Magrill, Warfield, and Dustin to replace them as the new ESOP Trustees. However, Silver maintained his position as Chairman and CEO of Thalhimer, and Bisger maintained his position as Executive Vice President and Chairman of Thalhimer Realty. Both Silver and Bisger continued to substantially influence the decisions of the Board of Directors (now comprised of Silver, Warfield, Magrill, and Dustin) and the ESOP Trustees.

51.    Thalhimer, MGT Construction, and Thalhimer Realty amended and restated the ESOP on July 12, 2011, made retroactively effective on January 1, 2011.

52.    As part of the 2011 ESOP Transaction, the Company entered into new deferred compensation agreements with key executives including Magrill and Warfield. As it had done in

2004, the Company purchased life insurance to provide for future payments under the new deferred compensation agreements.

53.    Following the purchase of Silver's and Bisger's remaining shares of stock, the ESOP continued to accumulate cash to eventually purchase Magrill and Warfield's shares of stock, all in accordance with the 2003 plan.

### (c) The 2016 ESOP Transaction – Thalhimer Attempts To Become 100% ESOP-Owned (Step 3)

54.    In March 2016, Magrill informed Brincefield that Thalhimer was considering becoming 100% ESOP-owned, supposedly because the Company could save $2 million per year in tax distributions. Magrill told Brincefield that if Brincefield did not sell his stock, Brincefield could wake up one day and find his stock worth one-half its value.

55.    Brincefield told Magrill that he was not interested in selling his stock.

56.    On May 19, 2016, Thalhimer held a Stockholder Meeting. At that time, there were 11 individual stockholders remaining, including Magrill, Warfield, Dustin, and Brincefield. At the meeting, Magrill informed the stockholders that the ESOP planned to purchase the remaining minority stockholders' shares, thereby making the ESOP a 100% owner of the Thalhimer stock (the "2016 ESOP Transaction"). He identified June 30, 2016, as the target date for closing the 2016 ESOP Transaction

57.    Magrill also informed the stockholders that the Board of Directors had hired an "Independent Trustee" to represent the ESOP for the transaction. Magrill did not tell the stockholders the name of the "Independent Trustee." He told them the next steps involved Thalhimer providing 2016 financial information to the "Independent Trustee" who would then negotiate the transaction price and related terms with Magrill, the ownership representative.

58.     Also at the May 19, 2016, Stockholder Meeting, Warfield informed the minority shareholders that it was a good time for them to sell their stock because, among other things, the share price was strong ($34.42 per share) and they would be "selling minority interest at a majority ownership price" (the ESOP was the clear majority owner already owning 71% of the outstanding shares). Put simply, to persuade the minority shareholders to sell their stock, Warfield pitched that they would be getting more than fair market value for their shares (*i.e.*, no discounts for lack of control). Warfield also emphasized the risks of continued ownership in order to induce the shareholders to sell their stock.

59.     Brincefield could not attend the May 19, 2016, Stockholder Meeting. He met with Magrill on or about June 7, 2016, to discuss the proposed sale. During their discussion, Magrill told Brincefield that the Company would not pay any more tax distributions after the sale was completed. Brincefield reminded Magrill that the Company was obligated to make the Minimum Distributions under the 1998 Stockholder Agreement. Brincefield, as Trustee of the Steven B. Brincefield Revocable Trust, is the successor-in-interest to Brincefield, individually, pursuant to the 1998 Stockholder Agreement.

60.     Later that day, Magrill reiterated in an e-mail message that the Company would not make any distributions for any reason.

61.     On June 15, 2016, Dustin sent a letter to Brincefield reporting: "we have received an offer of $37.00 / share from the Independent ESOP Trustee to acquire the outstanding Thalhimer stock owned by the minority stockholders." Dustin's letter stated that the "offer" was 7.5% above the December 31, 2015, per share valuation. Brincefield (and the other non-director shareholders) received no information as to how the price was determined. Dustin did not provide Brincefield with a copy of the Stock Purchase Agreement. Instead, he stated that Brincefield would have an

opportunity to review it at closing. Dustin gave Brincefield a five-day deadline expiring on June 20, 2016, to decide whether to sell his shares at the offered price.

62.     The fact that the Trustee made an offer for 7.5% more than the $34.42 majority per share price, which the Director Defendants stated was "strong" and a "majority ownership price" one month earlier, indicates that the Defendants did not actually negotiate the sales price.

63.     Brincefield informed Dustin that he was not interested in selling his stock. The other non-director shareholders agreed to sell their stock ("Non-Director Sellers").

64.     On June 16, 2016, Magrill again tried to convince Brincefield to sell his shares, warning that the loan Thalhimer planned to obtain to finance the ESOP stock purchase would significantly devalue Brincefield's stock. Magrill again threatened that Thalhimer would stop making quarterly tax distributions to Brincefield after the 2016 ESOP Transaction because if it continued making the distributions to Brincefield, it would also have to make millions of dollars in corresponding distributions to the ESOP. Magrill also threatened that if Brincefield did not sell his stock to the ESOP, Brincefield would be personally responsible for paying income taxes on his share of Thalhimer's profits (because the Company is an S corporation).

65.     Brincefield responded that he was not interested in selling his shares, and that Thalhimer was required to continue making the Minimum Distributions pursuant to the 1998 Stockholders Agreement. His attorney sent Thalhimer's attorney a copy of the 1998 Stockholders Agreement on June 20, 2016.

66.     Thalhimer's attorney responded the same day and asserted that the 1998 Stockholders Agreement had expired by operation of statute because it was an agreement among shareholders that "contains no express intention that the term of the Agreement remain valid in excess of 10-year period set forth in Va. Code § 13.1-671.1 (I) [*sic*] and would, therefore, be no

longer in effect. Over the past several years the Company has made distributions to its shareholders sufficient to cover quarterly taxes but is not required to do so." Thalhimer's attorney then confirmed Magrill's threat to Brincefield about halting the required Minimum Distributions, informing counsel for Brincefield that the Company would not make any future Form K-1 distributions to Brincefield.

67.     On June 30, 2016, the ESOP purchased the Company stock held by all of the remaining minority stockholders except Brincefield. The three ESOP Trustees (Magrill, Warfield, and Dustin) were among the stockholders who sold their stock to the ESOP.

68.     After the 2016 ESOP Transaction closed, Brincefield and the ESOP were the only remaining common stockholders of Thalhimer.

### D. After The 2016 ESOP Transaction Closed, The Director Defendants Refused To Pay The Minimum Distributions To Brincefield And The ESOP

69.     To increase the pressure on Plaintiff Brincefield to sell his stock, Magrill followed through on his threat to stop paying Brincefield the Minimum Distributions. As a result, Brincefield was forced to pay $40,000 for estimated quarterly taxes on his *pro rata* share of Thalhimer's profits in September and December 2016; otherwise, he risked incurring significant tax penalties.

70.     Thalhimer did not provide Brincefield with the financial information that Brincefield needed to determine the correct amount of the tax liability.

71.     The ESOP would have benefitted from the millions of dollars in Minimum Distributions that it should have continued receiving after July 2016. It could have accumulated that money tax-free, and used it to invest in marketable securities, or to pay to vest additional shares of stock.

72. By discontinuing the Minimum Distributions, the cash that would otherwise have been distributed to the ESOP instead accumulated in the Company tax-free. This, of course, would result in higher performance results for each of the Director Defendants which, in turn, would enable them to meet the performance goals of their key executive incentives (such as the deferred compensation plan) which were established in 2003 as part of their scheme. The artificially enhanced performance results would also likely correspond with higher salaries and bigger bonuses.

73. The Director Defendants personally benefitted from the decision to cease making the Minimum Distributions, to the detriment of Brincefield and the other ESOP beneficiaries.

**E. <u>Thalhimer Refused To Provide Brincefield With Critical Information And Misled Him</u>**

74. After the 2016 ESOP transaction was complete, Magrill continued to attempt to convince Brincefield to sell his stock.

75. In order to negotiate the purchase price, Brincefield needed accurate information about the value of the Company. He also needed financial information relating to accounting errors the Company made in 2014 and 2015, which caused him to incur additional tax liabilities, so that Brincefield's accountant could determine his proper tax situation. Brincefield also needed information about the Defendant Directors' decision to cease making the Minimum Distributions, despite the clear requirement of the 1998 Stockholder's Agreement.

76. On September 13, 2016, Brincefield made a formal request for this information to Thalhimer pursuant to his rights as a shareholder.

77. On September 23, 2016, Thalhimer responded to Brincefield's request through its counsel. The Company refused to provide any records outside of a few select documents that, in accordance with the Virginia Stock Corporation Act, must be provided to a shareholder upon

request.[1] Despite the fact that obtaining information to value one's shares of stock, obtaining information from an S corporation to address tax issues, and obtaining information relating to distributions are widely recognized as "proper purposes" for inspecting corporate records under corporate law, Thalhimer disingenuously argued it was not providing any other records because Brincefield did not make his request in "good faith," and because Brincefield did not have "a proper purpose" for requesting the records.

78.     In his September 23, 2016 letter, counsel for Thalhimer reiterated his earlier assertion that the 1998 Stockholder Agreement "expired" under Virginia Code § 13.671.1(I).[2] This assertion made no sense because the 1998 Stockholder Agreement expressly provides that the duration of the Agreement is as long as Thalhimer is an S Corporation – and Thalhimer has remained an S Corporation at all times since 1998.

79.     The September 23, 2016, letter from Thalhimer's attorney also presented a new argument: the Company had made tax distributions to shareholders after the 1998 Shareholder Agreement had purportedly expired, pursuant to a 2013 purported stockholder agreement; however, the attorney admitted that Brincefield did not execute that agreement. His new assertion was that because the shareholders who were parties to the 2013 purported stockholder agreement were no longer shareholders (due to the 2016 ESOP Transaction), no further tax distributions were required. This argument made no sense for several reasons:  (1) the Company had always made the Minimum Distributions, including during 2008-2012 when the 1998 Stockholder Agreement, at least according to Thalhimer's counsel, was supposedly expired; (2) Brincefield was not a party

---

[1]     Thalhimer did not assert that any of the documents were confidential.

[2]     VA. CODE ANN. § 13.671.1(I) provides: "The duration of an agreement authorized by this section shall be as set forth in the agreement, except that the duration of an agreement that became effective prior to July 1, 2015, remains 10 years unless the agreement provided otherwise or is subsequently amended to provide otherwise."

to the 2013 Stockholder Agreement; therefore, the 2013 purported stockholder agreement is invalid under VA. CODE ANN. § 13.671.1(B), which requires that all shareholders who are shareholders at the time of the agreement must sign the agreement; and (3) in each year during 1998-2015, the Company had classified the amount necessary to pay the Minimum Distributions as a "Capital Requirement."

80.     Thalhimer and its attorney refused to provide Brincefield with the 2013 purported shareholder agreement, despite Brincefield's (and his counsel's) several requests and undeniably proper purposes.

81.     On September 30, 2016, by and through his counsel, Brincefield responded to Thalhimer's illogical arguments.

82.     On October 10, 2016, Thalhimer, by its counsel, doubled down on its previously made illogical assertions.

83.     The nonsensical assertions made by Thalhimer's counsel made one thing clear: the Director Defendants who were responsible for providing the information were giving Brincefield the proverbial "run-around."

84.     The following week, Magrill revealed to Brincefield that the SunTrust loan to the Company for the 2016 ESOP Transaction prohibits any distributions, including tax distributions. Upon information and belief, the Director Defendants did not provide a copy of the 1998 Stockholders Agreement to SunTrust before closing on the loan on June 30, 2016, even though Brincefield's attorney had provided it to Thalhimer's attorney over one week before closing on June 20, 2016.

F. **Brincefield Discovers Some Of The Information The Director Defendants Concealed From Him**

85.     During January and February 2017, Brincefield learned that the Director Defendants were hiding critical information from him (the sole shareholder other than the ESOP, which is controlled by the Director Defendants) and the other ESOP beneficiaries. This information includes, but is not limited to: (1) the fact that the value of Brincefield's stock and the ESOP's stock had plummeted by at least 30%; (2) the ESOP paid at least 30% more than fair market value for the stock in the 2016 ESOP Transaction; and (3) the Defendants were engaging in conflicted transactions with the ESOP in order to cover up their wrongdoing.

86.     On or about January 7, 2017, an employee who had sold his stock to the ESOP in the 2016 ESOP Transaction ("Brincefield's Former Colleague") informed Brincefield that the appraisal for the stock for the 2016 ESOP transaction was overvalued by at least 30%. He stated that all of the shareholders who had sold their stock to the ESOP were now being required to return 30% of the proceeds they received from that sale. Even though the Non-Director Sellers had relied on Defendant Directors' representations as to the stock value and had relied on Magrill to represent them in the sale, they were being required to sign agreements stating that they would return the money within 10 days because they were (supposedly) jointly and severally liable under the Purchase Agreement (which they were not permitted to review until closing). The Director Defendants blamed the problem on the president of MGT Construction, Michael Logan ("Logan"), who admitted to participating in accounting schemes that were designed to enhance Logan's bonus payments relative to receivables that were not actually collected, but were presented as having been collected in the subsidiary's accounting records. The Director Defendants stated they discovered the fraudulent scheme in October 2016 (after Brincefield's September 30, 2016, request for records relating to accounting errors in 2014-2015).

87.     All of the decision makers (the Defendants) who came up with the cover-up plan were conflicted ESOP Fiduciaries who sought to avoid personal liability at the expense of the ESOP and Thalhimer. The Director Defendants used their control as conflicted directors to implement the plan on behalf of Thalhimer and Studdard used his power to vote as the conflicted controlling shareholder of Thalhimer. The cover-up plan was not fair to Thalhimer or the ESOP. Defendants shut out Brincefield and gave him false and misleading information.

88.     On January 11, 2017, Dustin e-mailed Brincefield with a very different story than what the Director Defendants had told Brincefield's Former Colleague. Dustin simply stated: "As information for your 2016 tax planning, Thalhimer is now forecasting a tax loss in 2016. We had several construction projects that have been unprofitable. We are sorting through the issues and overall impact. We plan to have your [Form] K-1 to you at the end of March and expect audited financials completed around the end of April."

89.     On January 30, 2017, Brincefield telephoned Magrill and inquired about the extent of MGT Construction's financial problems and Thalhimer's anticipated 2016 loss. Magrill's responses were vague at best; he stated only that there were construction losses on a couple of jobs, and that the Company was looking into things. At the end of their telephone call, Magrill said Brincefield should make a formal request for information if he wanted to know more.

90.     That evening, Brincefield, by and through his counsel, made another shareholder demand to inspect Thalhimer's corporate records in light of the 30% reduction in the value of the Company, the Defendants' ERISA violations, and the false and misleading statements made by Dustin and Magrill. Brincefield also reiterated his previous request for records in the new demand letter.

91.     On February 2, 2017, Thalhimer's counsel sent additional copies of some records that the Company had previously provided, along with a small selection of Board of Directors records from 2016 (just 49 out of 529 pages) that the Company had not previously produced.[3]

92.     The newly-produced Board Meeting Minutes stated that Thalhimer had made significant and material misstatements in its financial statements. Despite this revelation, Thalhimer produced <u>no</u> financial information for the period after May 2016, other than the vague references to overstatement of profits and understatement of liabilities contained in a few carefully word-smithed Board of Directors meeting minutes.

93.     On February 6, 2017, counsel for Brincefield sent a letter to counsel for Thalhimer demanding additional information and pointing out that the Company's directors and their advisors should have known that the $37 per share valuation was above fair market value, notwithstanding the alleged "recent discovery" of the accounting fraud.

94.     In response, on February 6, 2017, counsel for Thalhimer sent a letter that apparently was intended to be the cover letter for the documents he had sent on February 2, 2017. In the cover letter, he denied any wrongdoing by Thalhimer's officers and directors, and stated that, "the current issues the Company is facing are directly related to an employee who actively concealed his actions to defraud the Company." The letter stated that the Independent Trustee had advised former stockholders who sold their shares to the ESOP in June 2016 about "the need to adjust the stock purchase price to reflect any adjustments into stock value." In the same letter, Thalhimer's counsel again denied that Brincefield had stated any proper purpose for requesting information, but he nonetheless volunteered to provide certain records (referring to the records that were sent on February 2, 2017).

---

[3]     Thalhimer did not assert that any of the documents were confidential.

95.     In addition to disclosing that Thalhimer made material misstatements in its 2014 financial statements, the records that the Company produced on February 2, 2017, revealed that the Director Defendants were attempting to hide numerous ERISA violations from Brincefield.

96.     For example, the December 16, 2016, Unanimous Consent of the Board of Directors revealed that the Director Defendants admitted that the company's financials were materially misleading, and that the Defendants consequently decided to modify the Purchase Agreements relating to the 2016 ESOP Transaction (the "Modification") because the ESOP paid more than fair market value for the stock. Notably, the December 16, 2016, Unanimous Consent misrepresented that the Non-Director Sellers had mutually agreed that the Modification was in the best interests of all parties. In fact, the Non-Director Sellers were not made aware of the overpayment until the following month.

97.     Although the modified Purchase Agreements had been attached to and made part of the December 16, 2016, Unanimous Consent, they (along with many other important attachments and documents) were not included among the handful of records that were sent to Brincefield's counsel.

98.     The December 16, 2016, Unanimous Consent also revealed that unnamed Director Defendants (later admitted to be Silver and Bisger) made loans to the Company to refinance the $3 million SunTrust Bank loan that funded the 2016 ESOP Transaction. The Director Defendants' loans are prohibited transactions under ERISA.

99.    The December 28, 2016,[4] Unanimous Consent revealed that an unnamed lender (later admitted to be Magrill and Warfield) made a second loan of $1.3 million to the Company. This loan is a prohibited transaction under ERISA.

100.    The December 30, 2016,[5] Unanimous Consent revealed that the Director Defendants approved adjustments to the financial statements of the Corporation in order to remove financial accruals pertaining to non-qualified deferred compensation benefits for the participants for prior years. Upon information and belief, the Defendant Directors made this decision because their deferred compensation (synthetic equity), along with their ownership of stock outright (until 2016) and their shares owned through the ESOP, resulted in them being disqualified persons who own at least 50% of all shares of the Company in violation of ERISA.

101.    Thalhimer's counsel never replied to the February 6, 2017, letter from Brincefield's counsel. Instead, the Defendants responded by deciding to reverse the entire 2016 ESOP Transaction in an attempt to protect themselves.

102.    On or about February 13, 2017, Brincefield's Former Colleague learned from Warfield that a special meeting was going to be held with the former minority stockholders who had sold their stock to the ESOP in June 2016. The meeting was being convened to update the former stockholders about the impact of recent events on the 2016 ESOP Transaction. Brincefield, the sole remaining shareholder other than the ESOP, was not invited to the meeting, either in his capacity as the sole remaining shareholder, or in his capacity as an ESOP beneficiary.

---

[4]    The Consent inaccurately states the effective date is December 23, 2016. It was signed by Silver on December 28, 2016, making December 28 the true effective date.

[5]    The Consent inaccurately states the effective date is December 23, 2016. It was signed by the directors on December 30, 2016, making December 30 the true effective date.

103.     Brincefield's Former Colleague met with Warfield in person on February 14, 2017. During that meeting, Warfield told Brincefield's Former Colleague about the general topics for the upcoming meeting of former shareholders. Warfield stated:

a.      Thalhimer is in a very difficult situation, and the matter "changes daily" between the auditors and lawyers.

b.      Silver, Bisger, Magrill, and Warfield loaned money to Thalhimer (purportedly to pay back the SunTrust loan).

c.      The selling stockholders from the 2016 ESOP Transaction may be required to return the money they were paid and take their stock back.

104.     Warfield also acknowledged to Brincefield's Former Colleague that Warfield and others could be personally liable. Warfield said that the Company's lawyers were working to get things covered and fixed.

105.     Brincefield's Former Colleague has told both Warfield and Magrill that he would not have sold his stock at the lower share price. They informed him that the 2013 purported shareholder agreement would have required them to enter into a "forced sale."

106.     According to Brincefield's Former Colleague, the meeting of former shareholders was held on February 16, 2017. Warfield, Magrill, and Dustin made presentations at the meeting, revealing that MGT Construction did not pay construction expenses for at least the past three years. The former shareholders were told that accounting records had been distorted to cover the diversion, and that losses were in the millions of dollars. The former stockholders were asked to be prepared to buy stock back from the ESOP (a complete reversal of the sale).

107.     Defendants did not hold a meeting of the current shareholders, Brincefield and the ESOP, or the ESOP participants.

**G. Before The 2016 ESOP Transaction Closed Defendants Knew Or Should Have Known That The 2016 ESOP Transaction Was Not Fair To The ESOP**

108.    Setting aside the issue of MGT Construction's fraudulent activities, the Defendants knew or should have known the ESOP was paying more than fair market value for the stock.

109.    Even though the ESOP already controlled over 75% of the Company's stock and was purchasing minority shareholder interests, the Director Defendants made it clear - the sales price was based on the value a majority interest, not disparate minority interests.

110.    The Defendants ignored the impact the Minimum Distributions would have on the Company's ability to meet its obligations under the SunTrust Bank loans. Silver and Bisger were original parties to the 1998 Stockholder Agreement and it was filed in the corporate records. Moreover, Thalhimer always treated the Minimum Distributions as "capital expenditures." The documents produced on February 2, 2017, revealed that after Brincefield reminded Magrill of the Company's obligations to make the Minimum Distributions on June 20, 2016, the Defendant Directors concocted a Board Resolution which they executed on June 27, 2016, stating the 1998 Stockholder Agreement "lapsed." They agreed to "suspend any distributions" to Thalhimer's shareholders for the initial three years of the SunTrust Bank loan, because the terms of the loan prohibited them from making any distributions during the first three years of the loan term. This is contrary to the express terms of the 1998 Stockholder Agreement which provided that the agreement would not terminate unless the Company were to lose its status as an S Corporation, and which prohibited any modification or amendment to the agreement unless signed by the parties.

111.    It is not plausible that the Director Defendants were unaware of the fraudulent scheme being carried out at MGT Construction. They approved Logan's excessive bonus payments and oversaw the fraudulent financial statements. Magrill is the Chairman of MGT Construction

and Dustin is a director and CFO of MGT Construction. Silver, Bisger, and Warfield all served as officers and directors of MGT Construction for many years. Logan has been the long-time President of MGT Construction. Logan had a reputation for questionable accounting activities at MGT Construction and Thalhimer's Board of Directors had to keep a careful watch over the financial statements of MGT Construction.

112.   It is not plausible that Director Defendants did not recognize the major negative impact MGT Construction's finances were having on Thalhimer's finances well before the June 30, 2016, closing. At the Shareholder Meetings held over the past several years, the Director Defendants regularly reported issues with MGT Construction's financial statements that should have been "red flags" to Defendants, such as the need to "focus on accounts receivable"; looking forward we will need to have a "reduction in MGT Construction accounts receivable/working capital"; MGT Construction has "volatile cash flow" and cash is needed for growth (and thus is not available for distributions); and that MGT Construction is "a cash drain" with "delayed profits." The Director Defendants had stated that the accounts receivable at MGT Construction were to blame for the lack of distributions above the minimum tax requirements in 2014-2015.

113.   The financial statements for the year ending December 31, 2015, indicated that the value of the company was decreasing (*e.g.*, the backlog of jobs for MGT Construction were plummeting, MGT Construction's receivables were increasing, and significant revenue loss due to the closing of offices in North Carolina).

114.   The financial statements identified conflicted transactions involving MGT Construction and entities owned by Director Defendants. For example, the 2015 financial statements note that construction services are provided to entities relating to certain shareholders

and the related accounts receivable on these projects are $6.5 million including a retainage of $2.5 million. Director Defendants are part owners of some and perhaps most of those entities.

115.    The financial reports from the Board of Directors Meetings reflect that the Director Defendants knew there were problems with MGT Construction's finances in early 2016 that negatively impacted Thalhimer, long before the closing of the 2016 ESOP Transaction.

116.    For example, on February 3, 2016, Dustin (MGT Construction's CFO) reported:

      a.    MGT Construction cash flow was negative ($2.5 million); and

      b.    MGT Construction makes up the majority of the firm's $23.6 million accounts receivable, $20.9 million, an increase of $6.3 million in 2015.

117.    On March 31, 2016, Dustin reported, in the first quarter of 2016, the Company had a budget shortfall of $4.1 million (16%) and is $3.2 million (13%) under the prior years, and MGT Construction accounts for the majority of the shortfall.

118.    One month after closing the 2016 ESOP Transaction, at the Board meeting on July 25, 2016, Dustin reported that the financials for the first half of 2016 were falling short of budget by $6.6 million (13%) and $5.7 (11%) under last year, and MGT Construction accounted for the majority of the shortfall. Dustin also reported that cash flow was negative ($5.4) million to-date, which includes MGT Construction's negative cash flow of $2.4 million. This information was no surprise to Director Defendants.

119.    Notably, the October 24, 2016, Board Meeting Minutes state that Dustin presented the financial report, but the report was not produced. The minutes state generally that Dustin "offered comments regarding MGT Construction, noting the profit fade and negative cash flow during the year." Given his recurring reports during the year on MGT's negative performance, this

was not news to Dustin or any of the Director Defendants in October 2016 and it should not have been news to Studdard either.

120.    There were additional "red flags" that should have led to further analysis of the Company's stock's fair market value by Defendants. For example:

      a.    The Company's audited financial statements for at least the last three years contained qualified opinions due to accounting procedures that do not comply with generally accepted accounting principles and which impact the valuation of the Company.

      b.    The accounting errors that occurred in 2014 -2015 made no sense.

      c.    The Company's audited financials noted many conflicted transactions carried out between the Director Defendants and Thalhimer.

121.    Additionally, the various valuations referred to throughout the 2016 Board meeting minutes rendered a $37 per share value highly suspect, including the $34 per share majority share value that was presented to the shareholders one month before closing.

122.    For all of these reasons, the Defendants knew or should have known that $37 per share was above the actual fair market value of Thalhimer's stock.

123.    As set forth herein, Defendants did not conduct an adequate investigation of the stock price.

124.    Studdard should not have relied on the same valuation firm, Sheldrick, McGeehee & Kohler, Inc. ("SMK"), that had appraised the stock on behalf of the conflicted Director Defendants since the inception of the ESOP in 2004. He should have reviewed Thalhimer's financial statements and seen the declining trend in value and the "red flags" noted above.

125.    The Director Defendants' overall plan from 2003 forward was always to benefit themselves at the expense of the ESOP. They diligently followed through each step of the plan for the last 16 years until Brincefield's questions brought the scheme crashing down around them.

126.    The Director Defendants used their dominion and control over the ESOP (and, thus, the Company) to funnel money to themselves in a number of ways.

127.    The Director Defendants abused their positions as ESOP fiduciaries and breached their fiduciary duties as officers and directors of the Company by usurping numerous corporate opportunities from the Company by making lucrative investments in real estate entities for themselves while using loans from Thalhimer to finance the deals, thereby decreasing the value of Thalhimer and the value of the ESOP. This includes the limited liability company that is Thalhimer's landlord for the Company's headquarters.

128.    The Director Defendants caused MGT Construction to provide services to those real estate entities without causing it to timely collect payment from those entities, running up millions of dollars in past due accounts receivable to the detriment of the Company.

129.    In March 2017, the Director Defendants caused Thalhimer to sell its membership interest in Wellesley Center LLC to Silver, who was also a member, at heavily discounted price to raise funds to cover up and unwind the prohibited 2016 ESOP Transaction, which was unfair to Thalhimer.

130.    The Director Defendants paid themselves excessive compensation, including excessive bonus payments and executive benefits, including deferred compensation for their positions at the Company. They also used other real estate entities controlled by Thalhimer, and owned in part by them, to funnel additional money to themselves.

131.    Studdard should have recognized the Directors Defendants' self-dealing transactions and should have recognized that the Director Defendants wanted the 2016 ESOP Transaction to close at an inflated price to benefit Magrill, Warfield, and Dustin, who were all selling their stock.

132.    Studdard did not communicate with the ESOP participants before the transaction was consummated. Studdard did not communicate with the ESOP participants regarding his decision to "unwind" the transaction. Instead, Studdard and the Director Defendants concocted the plan to unwind the transaction behind closed doors and at the expense of the ESOP and Thalhimer to endeavor to avoid personal liability for the prohibited ERISA transactions.

133.    Studdard and the Director Defendants are all beset by conflicts of interest. They caused the Company and the ESOP to enter into the 2016 ESOP Transaction, which was a prohibited transaction under ERISA. They orchestrated the "unwinding" after Brincefield began asking questions. They have an interest in escaping personal liability and shifting all of the liability to the Company to avoid their liability as ERISA fiduciaries.

134.    The ESOP has not been made whole by the "unwinding" of the 2016 ESOP Transaction. Thalhimer's stock value has plummeted and the net asset value of the ESOP has dropped by millions of dollars.

135.    The ERISA beneficiaries, including Brincefield, have lost a large percentage of their retirement savings due to the Director Defendants' decision to put their interests ahead of the Company's interests and the ESOP's interests.

## COUNT I - ERISA

**Defendants Violated ERISA Section 406(a): By Causing The ESOP To Purchase Company Stock For More Than Adequate Consideration; By Making Loans To The ESOP; And By Using The ESOP's Assets For The Benefit Of The Director Defendants.**

136.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Verified Complaint as if set forth fully herein.

137.    Thalhimer was a party in interest to the ESOP because it is the employer whose employees are covered by the ESOP.  ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C).

138.    The Director Defendants were fiduciaries and parties in interest to the ESOP because they were employees, officers, and/or directors of Thalhimer.  ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

139.    Studdard was a fiduciary for the ESOP because he was the Special Trustee responsible for deciding on behalf of the ESOP with respect to the 2016 ESOP Transaction.

140.    ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary, in this case, the Defendants, from causing a plan, in this case, the ESOP, to engage in a sale or exchange of any property, in this case, Thalhimer stock, with a party in interest, in this case, Magrill, Warfield, Bisger, Silver, and Dustin.

141.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits a plan fiduciary, in this case, the Defendants, from causing the plan, in this case, the ESOP, to borrow money from a party in interest, in this case, Silver, Bisger, Warfield and Magrill.

142.    ERISA § 406(b)(2) and (3), 29 U.S.C. § 1106(b)(2) and (3), provide that a fiduciary for a plan shall not –

> (2) in his individual or in any other capacity act in any transaction
> involving the plan on behalf of a party (or represent a party) whose

> interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

143. The 2016 ESOP Transaction between the ESOP and the parties in interest, namely Magrill, Warfield, and Dustin, were prohibited transactions under ERISA.

144. In violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), in approving the 2016 ESOP Transaction, Defendants acted for the benefit of the Magrill, Warfield, and Dustin in a transaction in which Magrill, Warfield, and Dustin were adverse to the ESOP, by approving a purchase price for Thalhimer stock that vastly exceeded its fair market value, which greatly benefitted Magrill, Warfield, and Dustin at the expense of the ESOP.

145. In violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in the course of the 2016 ESOP Transaction, Studdard received payment from Thalhimer for serving as the Special Trustee on behalf of the ESOP with respect to the 2016 ESOP Transaction.

146. The loans between the ESOP and the parties in interest, namely Silver, Bisger, Warfield, and Magrill, were prohibited transactions.

147. The Modification Agreement between the ESOP and the selling shareholders, including Magrill, Warfield, and Dustin, were prohibited transactions.

148. The Director Defendants were highly compensated employees under ERISA. They paid themselves executive benefits, including deferred compensation (more than $2 million since 2012), which was not permissible under ERISA and which devalued the value of Thalhimer's stock.

149. ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), permits a plan beneficiary to bring a suit for relief under ERISA § 409, 29 U.S.C. § 1109.

150.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from such breach, and additionally is subject to such other equitable or remedial relief as this Court may deem appropriate, including the removal of the fiduciary.

151.    The Defendants are all conflicted with respect to the ESOP because they have engaged in Prohibited Transactions. They should be removed as fiduciaries to prevent additional harm to the ESOP.

152.    The Defendants have caused millions of dollars in losses to the ESOP by the prohibited transactions, in an amount to be proven more specifically at trial. These losses include, but are not limited to: reduction in value of the Thalhimer stock; attorneys' fees, consulting fees, bank fees, and other transaction fees related to the 2016 ESOP Transaction and subsequent cover-up and unwinding transactions; lost corporate opportunities; excessive deferred compensation; life insurance and other loans with the Director Defendants; and other damages.

## COUNT II - ERISA

**Defendants Violated ERISA Section 404(a) And Their Fiduciary Duties Of Prudence And Loyalty To The ESOP In Connection With The 2016 ESOP Transaction. The Director Defendants Violated The Same Duties In Connection With Numerous Corporate Opportunities They Usurped.**

153.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Verified Complaint as if set forth fully herein.

154.    In connection with the 2016 ESOP transaction, Defendants breached their duties to the plan, of which they are fiduciaries, to act solely in the interests of participants and beneficiaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

man acting in a like capacity and familiar with such matters would use in conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(A) and(B), by among other things: (1) failing to notice and address the ESOP's obvious overpayment for the Company's stock in the 2016 ESOP Transaction; (2) causing the ESOP to enter into loans with interested parties; and (3) using their position to hide their breaches of fiduciary duty from Brincefield and the other ESOP beneficiaries.

155.    Moreover, the Director Defendants abused their positions as ESOP fiduciaries by usurping numerous corporate opportunities from Thalhimer (by making lucrative investments in real estate entities for themselves while using loans from Thalhimer to finance the deals), thereby decreasing the value of Thalhimer and damaging the ESOP.

156.    The Director Defendants were highly compensated employees under ERISA. In breach of their fiduciary duties, they paid themselves executive benefits, including deferred compensation (more than $2 million since 2012), which was not permissible under ERISA and which devalued Thalhimer's stock.

157.    The Defendants have caused millions of dollars in losses to the ESOP by their actions in an amount to be proven more specifically at trial. These losses include, but are not limited to: reduction in value of Thalhimer's stock; attorneys' fees, consulting fees, bank fees, and other transaction fees related to the 2016 ESOP Transaction and subsequent cover-up and unwinding transactions; lost corporate opportunities; excessive deferred compensation; life insurance and other loans with the Director Defendants; and other damages.

## COUNT III - CONVERSION

### (Derivatively On Behalf Of Thalhimer Against Director Defendants)

158.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Verified Complaint as if set forth fully herein.

159.    The Company is the rightful owner of the Company's property including, but not limited to cash and other assets.

160.    The Director Defendants have wrongfully exercised dominion and control over the Company's property including, but not limited to cash and other assets.

161.    The Director Defendants have converted the Company's cash by paying themselves excessive salaries, bonuses, and benefits grossly in excess of the value of the services they have rendered to the Company.

162.    The Director Defendants have converted the Company's cash by causing the Company to pay them interest on illegal loans they made to the Company.

163.    The Director Defendants have converted the Company's cash by causing it to pay loan fees and interest on the money they caused the Company to borrow in order to close the prohibited 2016 ESOP Transaction.

164.    The Director Defendants have converted the Company's cash by causing it to pay fees to the Special Trustee, attorneys, accountants, and other professionals relating to the prohibited 2016 ESOP Transaction.

165.    The Director Defendants have converted the Company's cash by causing it to pay fees to the Special Trustee, attorneys, accountants, and other professionals relating to the unwinding of the 2016 ESOP Transaction.

166.    Through their actions, the Director Defendants directly and proximately caused millions of dollars in damages to the Company.

167.     Because the Director Defendants' actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

168.     Pursuant to VA. CODE ANN. § 13.1-672.5, Brincefield is entitled to recover his attorneys' fees, costs of bringing suit, and expenses incurred in this proceeding.

169.     The Company is entitled to recover pre-judgment and post-judgment interest at the legal rate of 6% per annum.

170.     Wherefore, the Director Defendants are jointly and severally liable to the Company in an amount to be determined at trial, plus punitive damages, in addition to attorneys' fees, costs of bringing suit, and expenses, plus pre- and post-judgment interest.

## COUNT IV - STATUTORY CONSPIRACY

### (Brincefield On Behalf Of The ESOP And Derivatively On Behalf Of Thalhimer)

171.     Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Verified Complaint as if set forth fully herein.

172.     Defendants Silver, Bisger, Magrill, Warfield, and Dustin combined, associated, agreed, mutually undertook, concerted and conspired, each with the other, to willfully and maliciously injure Thalhimer and the ESOP in their reputations, trades, businesses, and professions. This wrongful combination included, among other things, Defendants' agreement, desire, and action to convert millions of dollars of the Company's assets to their own personal use, which rightfully belong to the Company, and to breach their fiduciary duties to the Company and to the ESOP.  Overt acts of the conspiracy include the following, among others:

   a.   All of the actions listed in Paragraphs 32-135, 144-148, 151-152, 154-157, 160-166, 189-218 of this Verified Complaint.

173.    Defendants Studdard, Silver, Bisger, Magrill, Warfield, and Dustin combined, associated, agreed, mutually undertook, concerted and conspired, each with the other, to willfully and maliciously injure Thalhimer and the ESOP in their reputations, trades, businesses, and professions. This wrongful combination included, among other things, Defendants' agreement, desire, and action to close the prohibited 2016 ESOP Transaction even though they knew the price the ESOP was paying for the shares was above fair market value and then to "unwind" the transaction in attempt to shield themselves from liability. Overt acts of the conspiracy include the following, among others:

>    a.    All of the actions listed in Paragraphs 32-135, 144-148, 151-152, 154-157, 160-166 of this Verified Complaint.

174.    The conspiratorial actions of the Defendants, by their very nature, are outside the scope of their agency for the Company and the ESOP.

175.    The actions of the Defendants have directly and proximately caused millions of dollars in damages to the Company and the ESOP in an amount to be determined at trial.

176.    Pursuant to VA. CODE ANN. §§ 18.2-499 and -500, Thalhimer and the ESOP are entitled to recover three-fold the damages sustained as a result of the joint actions of the Defendants, as well as the costs of bringing this suit, including reasonable attorneys' fees.

177.    As a proximate result of the Defendants' wrongful actions, Thalhimer and the ESOP have suffered and will continue to suffer irreparable harm for which it does not have an adequate remedy at law. For the reasons set forth herein, Thalhimer and the ESOP are entitled to temporary and permanent injunctive relief.

178.    Additionally, pursuant to VA. CODE ANN. § 13.1-672.5, Plaintiff is entitled to recover his reasonable expenses, including attorneys' fees, incurred in this proceeding.

179.     WHEREFORE, Defendants are jointly and severally liable to Thalhimer and the ESOP, in an amount to be proven at trial, plus treble damages, plus reasonable attorneys' fees and the costs of bringing this suit, plus pre- and post-judgment interest.

## COUNT V - COMMON LAW CONSPIRACY

### (Brincefield On Behalf Of The ESOP and Derivatively On Behalf Of Thalhimer)

180.     Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Verified Complaint as if set forth fully herein.

181.     Defendants Silver, Bisger, Magrill, Warfield, and Dustin combined, associated, agreed, mutually undertook, concerted and conspired, each with the other, to willfully and maliciously injure Thalhimer and the ESOP in their reputations, trades, businesses, and professions. This wrongful combination included, among other things, the Defendants' agreement, desire, and action to convert millions of dollars of the Company's assets to their own personal use, which rightfully belong to the Company, and to breach their fiduciary duties to the Company and to the ESOP. Overt acts of the conspiracy include the following, among others:

    a.   All of the actions listed in Paragraphs 32-135, 144-148, 151-152, 154-157, 160-166, 189-218 of this Verified Complaint.

182.     Defendants Studdard, Silver, Bisger, Magrill, Warfield, and Dustin combined, associated, agreed, mutually undertook, concerted and conspired, each with the other, to willfully and maliciously injure Thalhimer and the ESOP in their reputations, trades, businesses, and professions. This wrongful combination included, among other things, the Defendants' agreement, desire, and action to close the prohibited 2016 ESOP Transaction even though they knew the price the ESOP was paying for the shares was above fair market value and then to "unwind" the

transaction in attempt to shield themselves from liability. Overt acts of the conspiracy include the following, among others:

    a.   All of the actions listed in Paragraphs 54-135, 144-148, 151-152, 154-157, 160-166 above.

183.   The conspiratorial actions of the Defendants, by their very nature, are outside the scope of their agency for the Company and the ESOP.

184.   The actions of the Defendants have directly and proximately caused millions of dollars in damages to the Company and the ESOP in an amount to be determined at trial.

185.   Because the Director Defendants' actions were willful, malicious, and unlawful, the Company and the ESOP are entitled to recover punitive damages, plus all costs and expenses of this suit.

186.   As a proximate result of the Defendants' wrongful actions, Thalhimer and the ESOP have suffered and will continue to suffer irreparable harm for which it does not have an adequate remedy at law. Thalhimer and the ESOP are entitled to temporary and permanent injunctive relief.

187.   Additionally, pursuant to VA. CODE ANN. § 13.1-672.5, Plaintiff is entitled to recover his reasonable expenses, including attorneys' fees, incurred in this proceeding.

188.   WHEREFORE, Defendants are jointly and severally liable to Thalhimer and the ESOP, in an amount to be proven at trial, plus punitive damages, in addition to reasonable attorneys' fees and the costs of bringing this suit, plus pre- and post-judgment interest.

## COUNT VI - BREACH OF FIDUCIARY DUTY

### (Derivatively On behalf Of Thalhimer)

189.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Verified Complaint as if set forth fully herein.

190.    The officers and directors of Thalhimer each owe the Company fiduciary duties, including the duty of care and the duty of loyalty.

**<u>Defendant Paul Silver</u>**

191.    Silver has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times.

192.    Silver engaged in numerous breaches of the duty of loyalty that benefitted himself and the other Director Defendants to the detriment of Thalhimer including, but not limited to:

     a.     Causing the value of Thalhimer to plummet;

     b.     Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the Sun Trust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

     c.     Making loans to Thalhimer with unfair terms;

     d.     Covering up the illegality of the 2016 ESOP Transaction;

     e.     Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

     f.     Usurping corporate opportunities;

     g.     Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

> h.   Causing the Company to make false and misleading representations claiming that the 1998 Stockholder Agreement expired;
>
> i.   Causing the Company to make false and misleading representations claiming that the 2013 purported Stockholder Agreement is valid;
>
> j.   Causing Thalhimer to sell its membership interest in Wellesley Center, LLC to Silver at an unfair price; and
>
> k.   Refusing to provide information to Brincefield.

193.   Silver's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

194.   No independent Board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Silver because Silver was acting in his self-interest to the detriment of the Company.

195.   Silver's self-dealing transactions are presumed invalid and are voidable.

196.   Because the Silver's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

197.   Through his actions, Silver has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

**Defendant Evan Magrill**

198.   Magrill has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times.

199.    Magrill has engaged in numerous breaches of the duty of loyalty that benefit himself to the detriment of Thalhimer including, but not limited to:

      a.     Causing the value of Thalhimer to plummet;

      b.     Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the Sun Trust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

      c.     Making loans to Thalhimer with unfair terms;

      d.     Covering up the illegality of the 2016 ESOP Transaction;

      e.     Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

      f.     Usurping corporate opportunities;

      g.     Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

      h.     Causing the Company to make false representations claiming that the 1998 Stockholder Agreement expired;

      i.     Causing the Company to make false representations claiming that the 2013 purported stockholder agreement is valid;

      j.     Causing Thalhimer to sell its membership interest in Wellesley Center, LLC to Silver at an unfair price; and

      k.     Refusing to provide information to Brincefield.

200.    Magrill's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

201.    No independent Board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Magrill because Magrill was acting in his self-interest to the detriment of the Company.

202.    Magrill's self-dealing transactions are presumed invalid and are voidable.

203.    Because the Magrill's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

204.    Through his actions, Magrill has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

**Defendant Lee Warfield**

205.    Warfield has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times.

206.    Warfield has engaged in numerous breaches of the duty of loyalty that benefit himself to the detriment of Thalhimer including, but not limited to:

   a.    Causing the value of Thalhimer to plummet;

   b.    Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the Sun Trust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

   c.    Making loans to Thalhimer with unfair terms;

   d.    Covering up the illegality of the 2016 ESOP Transaction;

e.      Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

f.      Usurping corporate opportunities;

g.      Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

h.      Causing the Company to make false representations claiming that the 1998 Stockholder Agreement expired;

i.      Causing the Company to make false representations claiming that the 2013 purported stockholder agreement is valid;

j.      Causing Thalhimer to sell its membership interest in Wellesley Center, LLC to Silver at an unfair price; and

k.       Refusing to provide information to Brincefield.

207.    Warfield's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

208.    No independent board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Warfield because Warfield was acting in his self-interest to the detriment of the Company.

209.    Warfield's self-dealing transactions are presumed invalid and are voidable.

210.    Because the Warfield's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

211.    Through his actions, Warfield has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

**Defendant David Dustin**

212.    Dustin has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times. Dustin has engaged in numerous breaches of the duty of loyalty that benefit himself to the detriment of Thalhimer including, but not limited to:

    a.    Causing the value of Thalhimer to plummet;

    b.    Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the Sun Trust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

    c.    Approving the other Director Defendants loans to Thalhimer with unfair terms;

    d.    Covering up the illegality of the 2016 ESOP Transaction;

    e.    Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

    f.    Usurping corporate opportunities;

    g.    Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

    h.    Causing the Company to make false representations claiming that the 1998 Stockholder Agreement expired;

    i.    Causing the Company to make false representations claiming that the 2013 purported stockholder agreement is valid;

      j.      Causing Thalhimer to sell its membership interest in Wellesley Center, LLC to Silver at an unfair price; and

      k.      Refusing to provide information to Brincefield.

213.    Dustin's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

214.    No independent Board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Dustin because Dustin was acting in his self-interest to the detriment of the Company.

215.    Dustin's self-dealing transactions are presumed invalid and are voidable.

216.    Because the Dustin's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

217.    Through his actions, Dustin has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

**Defendant Jeffrey Bisger**

218.    Bisger has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times.

219.    Bisger has engaged in numerous breaches of the duty of loyalty that benefit himself to the detriment of Thalhimer including, but not limited to:

      a.      Causing the value of Thalhimer to plummet;

b.  Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the Sun Trust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

c.  Making loans to Thalhimer with unfair terms;

d.  Covering up the illegality of the 2016 ESOP Transaction;

e.  Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

f.  Usurping corporate opportunities;

g.  Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

h.  Causing the Company to make false representations claiming that the 1998 Stockholder Agreement expired;

i.  Causing the Company to make false representations claiming that the 2013 purported stockholder agreement is valid;

j.  Causing Thalhimer to sell its membership interest in Wellesley Center, LLC to Silver at an unfair price; and

k.  Refusing to provide information to Brincefield.

220.  Bisger's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

221.  No independent Board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Bisger because Bisger was acting in his self-interest to the detriment of the Company.

222.  Bisger's self-dealing transactions are presumed invalid and are voidable.

223.   Because the Bisger's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

224.   Through his actions, Bisger has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

225.   Pursuant to VA. CODE ANN. 13.1-672.5, Plaintiff is entitled to recover his reasonable expenses, including attorney's fees, incurred in this proceeding.


## COUNT VII - BREACH OF CONTRACT

### (Brincefield Direct And On Behalf Of The ESOP Against Warfield, Magrill, And Dustin)

226.   Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Verified Complaint as if set forth fully herein.

227.   The 1998 Stockholder Agreement is a valid contract between the stockholders, including Brincefield, Silver, Warfield, Magrill, Dustin, and Bisger.

228.   The 1998 Stockholder Agreement provides that:

    a.   Thalhimer is required to make minimum tax distributions quarterly for each calendar year during which the Company is an S Corporation (the "Minimum Distribution").

    b.   The shareholders are required to vote their stock so as to cause the Company to make the Minimum Distribution.

    c.   It is binding upon, and inures to the benefit of, the parties and their respective legal representatives, successors, and assigns.

    d.    It "shall not be amended or modified in any way except by a written instrument executed by the parties hereto."

    e.    It shall be terminated in any year in which the Company is not an S Corporation. But, if the Company loses its S Corporation status inadvertently, the 1998 Shareholder Agreement will be fully reinstated should the Company again become an S Corporation.

229.    Thalhimer became an S Corporation in 1998, and remains an S corporation today. Its status as an S corporation has never changed since 1998. The Company always classified the Minimum Distributions as one of its major capital expenditures, and it consistently made the Minimum Distributions, without exception, from the inception of the 1998 Stockholder Agreement until June 30, 2016.

230.    Defendants Warfield, Magrill, and Dustin are bound to the 1998 Stockholder Agreement as successors-in-interest individually, and as ESOP Trustees.

231.    Defendants Warfield, Magrill, and Dustin materially breached the 1998 Stockholder Agreement by failing to vote their stock and/or the ESOP stock so as to cause Thalhimer to make the proper payment of the Minimum Distribution to Brincefield and the ESOP in 2014 and 2015.

232.    Defendants Warfield, Magrill, and Dustin materially breached the 1998 Stockholder Agreement by failing to pay the Minimum Distributions in 2016. Warfield has stated that the Company will _not_ make any Minimum Distributions in 2017.

233.    Defendants Silver, Warfield, Magrill, Dustin, and Bisger have directly and proximately caused damage to Brincefield and the ESOP in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, by his undersigned counsel, respectfully requests that this Court grant the following relief:

(1)   Declare that the Defendants engaged in prohibited transactions and caused the ESOP to engage in prohibited transactions under ERISA;

(2)   Enjoin the Defendants from further violations of ERISA and their fiduciary duties;

(3)   Remove Defendant Studdard as the Special Trustee;

(4)   Remove Defendants Magrill, Warfield, and Dustin as ESOP Trustees and appoint an Independent Trustee;

    a.   Void the appointment of the current Board of Directors of Thalhimer and by Magrill, Warfield, and Dustin as ESOP Trustees and direct the Independent Trustee to elect independent directors to Thalhimer;

    b.   Void the appointment of the officers of Thalhimer by the current Board of Directors

(5)   Order the Defendants to pay the ESOP for all losses resulting from their breaches and restore any profits they have made through the use of the assets of the ESOP;

(6)   Order the Defendants to pay Thalhimer for all its losses relating to the 2016 ESOP Transaction and the unwinding of the transaction;

(7)   Order the Director Defendants to pay Thalhimer for all damages caused by their conversion of assets.

(8)   Impose a constructive trust over the Director Defendants' ownership interests in companies for which they usurped Thalhimer's opportunities to participate;

(9)  Order the Defendants to provide other appropriate equitable relief to the ESOP including, but not limited to, a surcharge, an accounting for profits, and impose a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

(10) Order Defendants Warfield, Magrill, and Dustin to pay Brincefield damages for their breaches of contract;

(11) Award Plaintiff reasonable attorneys' fees and the costs of bringing this suit pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the benefit obtained for the common fund;

(12) Award Plaintiff reasonable attorneys' fees and the costs of bringing this suit pursuant to Va. Code §§ 8.01 -499 and 500.

(13) Award Plaintiff reasonable attorneys' fees and the costs of bringing this suit pursuant to Va. Code §13.1-672.5.

(14) Order the Defendants to disgorge any fees they received in conjunction with their services as Trustee for the ESOP as well as earnings and profits thereon;

(15) Order the Defendants to pay prejudgment interest; and

(16) Award such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff respectfully demands a TRIAL BY JURY for all issues so triable.

Respectfully submitted,

Steven B. Brincefield


_____/s/_____
John H. Craddock, Jr., Esq. (VSB # 41366)
Michele Burke Craddock, Esq. (VSB # 65314)
Attorneys for Plaintiff
CRADDOCK LAW PLC
2304 West Main Street
Richmond, Virginia 23220
Telephone: (804) 309-4200
Facsimile:  (804) 254-3990
jcraddock@craddocklawfirm.com
mcraddock@craddocklawfirm.com

Kevin P. Roddy (VSB # 22364)
Attorney for Plaintiff
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey 07095
Telephone: (732) 855-6066
Facsimile:  (732) 726-6686

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 24, 2017.

_____

Steven B. Brincefield, on behalf of the Morton G. Thalhimer, Inc. Employee Stock Ownership Plan, and derivatively on behalf of Morton G. Thalhimer, Inc. as Trustee of the Steven B. Brincefield Revocable Trust