**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| Steven B. Brincefield, Individually, and on behalf of the Morton G. Thalhimer, Inc. Employee Stock Ownership Plan, and derivatively on behalf of Morton G. Thalhimer, Inc. as Trustee of the Steven B. Brincefield Revocable Trust; | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:17-cv-00718 |
| Lance T. Studdard, | ) ) | |
| Paul F. Silver, | ) ) | |
| C. Lee Warfield, III, | ) ) | |
| Evan M. Magrill, | ) ) | |
| David R. Dustin, Jr., | ) ) | |
| Jeffrey S. Bisger, | ) ) | |
| Cherry Bekaert LLP, | ) ) | |
| Corporate Capital Resources, LLC, | ) ) | |
| W. William Gust, | ) ) | |
| Michael A. Coffey, and | ) ) | |
| Sheldrick, McGehee & Kohler, LLC; | ) ) | |
| Defendants, and | ) ) | |
| Morton G. Thalhimer, Inc., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED AMENDED COMPLAINT

Plaintiff, Steven B. Brincefield ("Brincefield"), individually, on behalf of the Morton G. Thalhimer, Inc. Employee Stock Ownership Plan ("ESOP" or "Plan"), derivatively on behalf of Morton G. Thalhimer, Inc. ("Thalhimer" or the "Company"), and as Trustee of the Steven B. Brincefield Revocable Trust, by his undersigned counsel, states as follows for his Verified Amended Complaint against Defendants.

## <u>INTRODUCTION</u>

1.      Plaintiff filed the Verified Complaint in this case on October 26, 2017.

2.      The Court granted Plaintiff leave to file this Verified Amended Complaint ("Amended Complaint") by Order dated April 10, 2018.

3.      This action is filed under the Employee Retirement Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*, and is brought by Plaintiff under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109 and 1132(a)(2) and (a)(3) against the fiduciaries of the ESOP sponsored by Thalhimer to enjoin acts and practices that violate the provisions of Title I of ERISA; to require Defendants to reimburse the ESOP for the losses resulting from their violations of ERISA; to restore to the ESOP any profits and fees made and received by or on behalf of Defendants; to enjoin Defendants from further depleting the value of the ESOP; to remove Defendants Studdard, Magrill, Warfield and Dustin as ESOP Trustees; and to obtain other appropriate equitable and legal remedies in order to redress the Defendants' violations of Title I of ERISA and enforce its provisions against parties in interest to the ESOP who benefitted at the ESOP's expense.

4.      The ERISA violations alleged herein arise from the ESOP's imprudent purchase of the Company's stock for more than 70% over and above the stock's fair market value and without a proper valuation of the stock. The ESOP stock purchase benefitted Defendants at the expense of the ESOP.

5.      This action is also a shareholder derivative action asserting claims on behalf of Thalhimer pursuant to Rule 23.1 of the Federal Rules of Civil Procedure to redress the damages to Thalhimer relating to the ERISA violations, and other damages relating to the officers' and directors' conversion of the Company's assets, breaches of fiduciary duty, and the Defendants' common law conspiracy and statutory conspiracy against Thalhimer. Plaintiff also asserts derivative claims on behalf of the Company and the ESOP as well as direct claims of professional malpractice against Cherry Bekaert and direct equitable claims against all Defendants.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the events or omissions giving rise to the claims occurred in this District, the ESOP is administered in this District, and Thalhimer is headquartered in this District.

## PARTIES

9.      Brincefield brings this action on behalf of the ESOP. Thalhimer, along with two of its wholly-owned subsidiaries, MGT Construction Management, Inc. ("MGT Construction")[1] and TGM Realty Investors, Inc. (now known as Thalhimer Realty Partners, Inc. ("TRP")), adopted the Plan effective January 1, 2003. The Plan was amended and restated effective January 1, 2011. After Brincefield pressed the Director Defendants for Thalhimer's financials, and after the Director Defendants purportedly "discovered" the fraudulent accounting practices of MGT Construction, they attempted to restate the Plan on December 16, 2016 and backdate it to an asserted effective date of January 1, 2016.  There are approximately 407 participants or beneficiaries of the ESOP. The ESOP owns the controlling interest in Thalhimer.  Thalhimer is the named Plan Administrator of the ESOP.  Therefore, Thalhimer is a party in interest with respect to the Plan pursuant to ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C), and a fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Thalhimer is a Nominal Defendant.

10.      Plaintiff brings the shareholder derivative claims on behalf of Thalhimer, a Virginia corporation with its principal offices located in Henrico County, Virginia. Thalhimer is the region's leading commercial real estate firm, doing business as Cushman & Wakefield / Thalhimer. Thalhimer has four wholly-owned subsidiaries, MGT Construction, TRP, Thalhimer Sullivan, L.L.C. ("Thalhimer Sullivan"), and Thalhimer Copty Real Estate L.L.C. ("Thalhimer Copty") (collectively the "Company"), and additional ownership interests in numerous other real estate companies. Thalhimer has one class of stock – namely, the common stock.

11.      Brincefield was an employee of Thalhimer for 38 years. He participated in the ESOP and was vested in shares of Thalhimer common stock as a participant. Brincefield retired

---

[1] MGT Construction filed a Voluntary Petition for Bankruptcy on February 22, 2018.

from Thalhimer in 2012 and remains a participant in the ESOP. He has received some distributions from the ESOP since retiring, and he is still vested in shares of Thalhimer common stock through the ESOP. Brincefield has owned Thalhimer common stock outright since 1985, and he owns 17,460 shares of Thalhimer common stock as the trustee of the Steven B. Brincefield Revocable Trust. Brincefield never sold any of his common stock to the ESOP. Brincefield was a shareholder at the time of the actions complained of in this Amended Complaint.

12.     Defendant, Lance T. Studdard ("Studdard") is named as a trustee of the ESOP. He is the purported "Independent Trustee" of the ESOP, also known as the "Special Trustee." He was hired by Thalhimer's Board of Directors (the remaining Defendants) for the purpose of assessing the fairness of the purchase of Company stock from minority shareholders in 2016. The Board of Directors re-hired Studdard later in 2016 to oversee the ESOP's sale of stock back to those former minority shareholders in an attempt to protect Defendants from personal liability under ERISA, to oversee the restatement of the Company's financial statements, and to re-appoint the board of directors, and other roles. Therefore, Studdard is not independent and is conflicted. Studdard is a fiduciary with respect to the ESOP, pursuant to ERISA § 3(21)(A); 29 U.S.C. § 1002(21)(A), and is a party in interest pursuant to ERISA 3(14)(A) and (B), 29 U.S.C. § 1002(14)(A) and (B). Studdard holds himself out as an expert in fiduciary duties of ESOP trustees and other fiduciaries.

13.     Defendant, Paul F. Silver ("Silver"), was an officer and director of the Company at all relevant times. He was Thalhimer's President during 1995-2011, its Chief Executive Officer ("CEO") during 1997-2016, and the Company's Chairman during 2011-2017. Silver was also an officer and/or director of MGT Construction from on or before 2002 until 2012. Silver was a Trustee of the ESOP during 2004-2011. He approved and controlled the three-step ESOP scheme at issue in this case and that was attempted to be completed in 2016. *See* paragraphs 40 to 81, *infra*.

He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times. Silver is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and is a party in interest pursuant to ERISA § 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H). Silver is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2004, Silver sold 136,188 shares of Thalhimer stock to the ESOP for $5,146,544.50. In 2011, Silver sold 47,142 shares of Thalhimer stock to the ESOP for $1,237,477.50 and loaned money to Thalhimer and the ESOP at 10% interest to fund the transaction.  Silver entered into a loan agreement with Thalhimer in December 2016 to refinance the SunTrust loan for the 2016 ESOP transaction.  His loan is one of the prohibited transactions at issue in this case.

14.     Defendant, C. Lee Warfield, III ("Warfield"), was an officer and director of the Company at all relevant times. Warfield has been Thalhimer's President since 2011. He was promoted to CEO in December 2016 and remains the President. Warfield was also an officer and/or director of MGT Construction from on or before 2004 until 2013. Warfield has been a Trustee of the ESOP since 2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times. Warfield is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and is a party in interest pursuant to ERISA § 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H). Warfield is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2016, Warfield sold 47,142 shares of Thalhimer stock to the ESOP for $1,744,254.00.  Warfield entered into a loan agreement with Thalhimer  in December 2016 to

refinance the SunTrust loan 2016 ESOP transaction.  His loan is one of the prohibited transactions at issue in this case.

15.     Defendant, Evan M. Magrill ("Magrill"), was an officer and director of the Company at all relevant times. Magrill is Thalhimer's Executive Vice President. Magrill has been an officer and/or director of MGT Construction from 2007 until 2018.[2] Magrill has been a Trustee of the ESOP since 2011.  Magrill has been an officer and director of TRP since 2013.  He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times. Magrill is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and is a party in interest pursuant to ERISA § 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H). Magrill is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2016, Magrill sold 47,142 shares of Thalhimer stock to the ESOP for $1,744,254.00.  Magrill also entered into a loan agreement with Thalhimer in December 2016 to refinance the SunTrust loan for the 2016 ESOP transaction.  His loan is one of the prohibited transactions at issue in this case.

16.     Defendant, David R. Dustin ("Dustin"), was an officer and director of the Company at all relevant times. Since 1999, Dustin has held various accounting positions at the Company, including Corporate Controller and Chief Financial Officer ("CFO"). He was a Senior Vice President and Treasurer during 2011 – 2014 and has been Thalhimer's Chief Financial Officer since 2014. Dustin also has been an officer and director of MGT Construction from 2011 until 2018. Dustin has been an officer and director of TRP since 2013.  Dustin has been a Trustee of the

---

[2] P. Michael Kain became the sole director and officer of MGT Construction on or about February 20, 2018 immediately before MGT Construction filed bankruptcy.

ESOP since 2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times. Dustin is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) and is a party in interest pursuant to ERISA § 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H). Dustin is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2016, Dustin sold 1,500 shares of Thalhimer stock to the ESOP for $55,500.00.

      17.    Defendant, Jeffrey S. Bisger ("Bisger"), was a director of Thalhimer during 1995-2012. Bisger is an officer and director of TRP.  Bisger was a Trustee of the ESOP during 2004-2011 or 2012.  He approved and controlled the three-step ESOP scheme at issue in this case and that was attempted to be completed in 2016. *See* ¶¶ 40 to 81, *infra*. Bisger has exercised discretionary authority and/or discretionary control respecting management of the ESOP. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan. Bisger is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and a party in interest pursuant to ERISA § 3(14)(A) and (H), 29 U.S.C. §§ 1002(14)(A) and (H). Bisger is an ESOP participant and a Highly-Compensated Employee under the terms of the ESOP. In 2004, Bisger sold 136,188 shares of stock to the ESOP for $5,146,544.50. In 2011, Bisger sold 47,142 shares of stock to the ESOP for $1,237,477.50 and loaned the money at a 10% interest rate to Thalhimer and the ESOP to fund the transaction.  Bisger entered into a loan agreement with Thalhimer in December 2016 to refinance the SunTrust loan for the 2016 ESOP transaction.  His loan is one of the prohibited transactions at issue in this case. Bisger has played a key role in Defendants' attempt to cover up Director Defendants' wrongdoings

as fiduciaries by using his position as officer and director of TRP to try to bolster the finances of Thalhimer by selling some of its assets to a group of insiders including Silver.

18.     For purposes of this Amended Complaint, Defendants Silver, Warfield, Magrill, Dustin, and Bisger are referred to collectively as the "Director Defendants."

19.     Defendant, Cherry Bekaert LLP ("Cherry Bekaert"), is a North Carolina limited liability partnership.  Cherry Bekaert has provided accounting, audit, and tax services to Thalhimer and the ESOP since 2014.  Cherry Bekaert is a party in interest pursuant to ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because it provided accounting services to the ESOP.

20.     Defendant, Corporate Capital Resources, LLC ("Corporate Capital"), is a Virginia limited liability company.  Corporate Capital has continually provided consulting services to Thalhimer and the ESOP since the inception of the ESOP in 2003.  Corporate Capital is one of the architects of the ESOP three-part plan, including the 2016 ESOP Transaction. Director Defendants were unable to develop the plan or implement it without Corporate Capital's intimate involvement. Corporate Capital is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and a party in interest pursuant to ERISA § 3(14)(A) and (B), 29 U.S.C. §§ 1002(14)(A) and (B). Corporate Capital participated in and benefited from the prohibited transactions at issue in this case.

21.     Defendant, W. William Gust ("Gust"), is a lawyer and consultant with Corporate Capital.  Gust has provided consulting and legal services to Thalhimer and the ESOP since the inception of the ESOP in 2003. Gust is one of the architects of the ESOP three-part plan, including the 2016 ESOP Transaction. Director Defendants were unable to develop the plan or implement it without Gust's intimate involvement.   Gust holds the ESOP's investment in Thalhimer's stock. Gust is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), and a party in interest pursuant to ERISA § 3(14)(A) and (B), 29 U.S.C. §§ 1002(14)(A) and (B). Gust participated in and benefited from the prohibited transactions at issue in this case.

22.     Defendant, Michael A. Coffey ("Coffey") is a consultant with Corporate Capital. Coffey has provided consulting services to Thalhimer and the ESOP since the inception of the ESOP in 2003. Coffey is one of the architects of the ESOP three-part plan, including the 2016 ESOP Transaction. Director Defendants were unable to develop the plan or implement it without Coffey's intimate involvement.  Coffey is a fiduciary with respect to the ESOP pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and a party in interest pursuant to ERISA § 3(14)(A) and (B), 29 U.S.C. §§ 1002(14)(A) and (B).  Coffey participated in and benefited from the prohibited transactions at issue in this case.

23.     Defendant, Sheldrick, McGehee & Kohler, LLC. ("SMK") is a Florida limited liability company.  SMK has provided valuation services to the ESOP since 2004.  SMK is party in interest pursuant to ERISA § 3(14)(B), 29 U.S.C. §§ 1002(14)(B) because it provided valuation services to the ESOP. SMK participated in and benefited from the prohibited transactions at issue in this case.

## BACKGROUND INFORMATION

### A.  The Director Defendants Have Absolute Dominion And Control Over Thalhimer

24.     Plaintiff Brincefield joined Thalhimer in 1974 after obtaining a Master of Science Degree in Real Estate and Urban Land Development from Virginia Commonwealth University ("VCU").

25.     Brincefield's success at Thalhimer was recognized quickly. Less than seven years after he started working for the Company, he was named Vice President. Three years later, in 1984,

10

he was named Senior Vice President, became a stockholder, and was appointed to the Board of Directors. After 38 extraordinarily successful years, Brincefield retired from Thalhimer in 2012.

26.    At his retirement celebration, Thalhimer recognized that Brincefield, through his tenacity, wisdom, and leadership, grew Thalhimer's Property Management division to over 20 million square feet of space under management and generated many millions of dollars in revenue for the Company.

27.    At all relevant times, Thalhimer had no independent directors or officers. Defendants Silver and Bisger dominated the Company during 2002-2011. They consolidated control in the executive committee and the CEO. They controlled the appointment of the executive committee, and the directors and officers. Before 2004, Defendants Silver and Bisger owned a controlling interest in the Company (collectively they owned 77% of the Company's stock). In 2004, Silver and Bisger sold the majority interest (50.2%) of the common stock in the Company to the ESOP, but continued to control the Company as ESOP Trustees. In 2011, Silver and Bisger transitioned some control over the Company to Defendants Magrill, Warfield, and Dustin by appointing them ESOP Trustees. However, Magrill, Warfield, and Dustin remain beholden to Silver and Bisger. Now Silver, Bisger, Magrill, Warfield, and Dustin dominate the Company and control the decisions relating to the ESOP.

### B.  Thalhimer Elects "S" Corporation Status

28.    In 1998, Thalhimer elected "S" Corporation status. The election required the consent of all Thalhimer stockholders.

29.    Thalhimer entered into a Stockholder Agreement on February 26, 1998, with all of its stockholders, including Silver, Bisger, and Brincefield (the "1998 Stockholder Agreement"). A copy of the 1998 Stockholder Agreement is attached as Exhibit A.

30.     The 1998 Stockholder Agreement provides that:

- Thalhimer is required to make minimum tax distributions quarterly for each calendar year during which the Company is an "S" Corporation (the "Minimum Distribution").

- The shareholders are required to vote their stock so as to cause the Company to make the Minimum Distribution.

- It is binding upon, and inures to the benefit of, the parties and their respective legal representatives, successors, and assigns.

- It "shall not be amended or modified in any way except by a written instrument executed by the parties hereto."

- It shall be terminated in any year in which the Company is not an "S" Corporation. But, if the Company loses its S Corporation status inadvertently, the 1998 Shareholder Agreement will be fully reinstated should the Company again become an S Corporation.

31.     When the company transmitted copies of the fully-executed 1998 Stockholder Agreement to the shareholders, it attached a memorandum that advised: "This agreement should be kept in your permanent file regarding the corporation's election as a Subchapter S Corporation and the Corporation's commitment to distribute to each stockholder, or pay on behalf of each stockholder, estimated Federal and State income taxes on a quarterly basis." The memorandum was placed in the Company's permanent file.

32.     Thalhimer became an S Corporation in 1998 and remains an S corporation today. Its status as an S corporation has never changed since 1998. The Company always classified the Minimum Distributions as one of its major capital expenditures, and it consistently made the

Minimum Distributions, without exception, from the inception of the 1998 Stockholder Agreement until June 30, 2016.

### C.  The ESOP Was Established To Benefit The Director Defendants

33.     Effective January 1, 2003, Thalhimer adopted the ESOP. The purpose represented to the employees in the Plan -- "to enable you to share in the growth of the Company and to accumulate a beneficial interest in stock of the Company" -- was not the ESOP's true purpose. There were several purposes of the ESOP, all aimed at enriching the Director Defendants.

34.     One purpose of the ESOP was to create a market and a financing mechanism to buy out the Director Defendants' shares of Company stock at favorable prices.

35.     Another purpose of the ESOP was to redirect the cash "liberated by ESOP tax favors" to key Thalhimer executives (including Defendants Silver, Bisger, Magrill, and Warfield) through discriminatory executive benefits, such as the stock incentive plan, life insurance policies, and deferred compensation packages. Those benefits would be tied to performance. Also, if the Company became 100% ESOP-owned, the Company would no longer have to make the Minimum Distributions required by the 1998 Stockholder Agreement. Then, cash could accumulate in the Company rather than in the ESOP, which would further enhance the key executives' performance and, thus, their monetary benefits.

36.     Another benefit for Defendants Silver, Bisger, Magrill, and Warfield was that they became ESOP beneficiaries with the additional advantage of being highly-compensated and early participants (meaning they would obtain a larger percentage of the ESOP than other employees).

37.     Put simply, the goal was for Thalhimer to become a "Tax-Free Cash Warehouse" for the benefit of Defendants Silver, Bisger, Magrill, and Warfield.

38.     Gust and Coffey of Corporate Capital were the architects of the plan.   They emphasized all of these financial benefits Silver, Bisger, Magrill, and Warfield would receive if the directors followed the plan.

39.     The Director Defendants used their positions as controlling shareholders and directors to amend Thalhimer's Articles of Incorporation and Bylaws to effectuate the plan and to ensure they maintained tight control of the Company, including decisions relating to the price the ESOP would pay for their shares of stock, their compensation and executive benefits, their loans to and from the Company, and the Company's investment in other real estate entities which they owned.

40.     Defendants Silver, Bisger, Magrill, and Warfield implemented the plan with the assistance of Gust.   At some point, Dustin was brought into the fold and helped implement the plan. All of the Director Defendants participated in and benefitted from the "Tax-Free Cash Warehouse" to the detriment of the ESOP. This was accomplished via a three-step process, each of which caused separate and distinct injuries to the Company:

- In the first step, in 2004, the ESOP purchased approximately 51% of the shares of common stock in the Company from Silver and Bisger for approximately $10 million. After this leveraged ESOP transaction, the ESOP owned a controlling interest in the Company, and Silver and Bisger remained in control of the Company as the ESOP Trustees.

- In the second step, in 2011, the ESOP accumulated cash, tax-free, from distributions the Company was required to make to all shareholders pursuant to the 1998 Stockholders Agreement. After approximately seven years, the ESOP used the accumulated cash to purchase Silver's and

Bisger's remaining shares of Company stock, at which time Silver and Bisger transitioned control of Thalhimer to Magrill, Warfield, and Dustin by appointing them as ESOP Trustees. Silver and Bisger remained active executive employees of the Company. The plan included stock incentives for Magrill and Warfield that vested in 2011.

- In the third step, in 2016, after the ESOP accumulated additional cash over approximately five more years, Magrill, Warfield, and Dustin sold their shares of Thalhimer stock to the ESOP and continued to control the Company as ESOP Trustees.

### (a) The 2004 ESOP Transaction (Step 1)

41.     In June 2004, Defendants Silver and Bisger pressured Plaintiff Brincefield to sell his shares of Thalhimer stock to the ESOP. Bisger warned that the value of Brincefield's stock would drop significantly due to the loan that would be taken out to fund the forthcoming ESOP transaction. Nevertheless, Brincefield declined to sell his stock. In retaliation, Silver and Bisger removed Brincefield from the Executive Committee.

42.     In September 2004, the ESOP acquired 272,376 shares of Thalhimer common stock from Silver and Bisger at a price of $37.79 per share, totaling $10,293,089 (the "2004 ESOP Transaction").

43.     Silver and Bisger appointed themselves as Trustees of the ESOP.

44.     Upon completion of the 2004 ESOP Transaction, the ESOP became bound to the 1998 Stockholder Agreement as a successor-in-interest to Silver and Bisger. The Trustees were required to comply with the 1998 Stockholder Agreement.

45.     Since completion of the 2004 ESOP Transaction, the ESOP has owned the majority interest of common stock in Thalhimer.

46.     Under the terms of the Plan, the ESOP is administered by Trustees who are appointed by the Company's Board of Directors. The ESOP Trustees exercise most of the voting rights of the ESOP, the controlling stockholder, including the right to vote to elect the Board of Directors. ESOP participants and former participants, however, are entitled to direct the manner in which the voting rights on the allocated stock are to be exercised with respect to a few major vote pass-through issues, such as a corporate merger or dissolution.

47.     Thalhimer established a Restricted Stock Plan in 2004 to benefit key executives in conjunction with the 2004 ESOP Transaction, including Magrill and Warfield.

48.     Thalhimer also entered into deferred compensation agreements with key executives, including Magrill and Warfield in conjunction with the 2004 ESOP Transaction. The Company purchased life insurance to provide for future payments under the deferred compensation agreements.

### (b) The 2011 ESOP Transaction (Step 2)

49.     After purchasing Silver's and Bisger's stock in the 2004 ESOP Transaction, the ESOP accumulated cash, tax-free, as planned.

50.     On November 7, 2008, the ESOP purchased 18,939 Thalhimer shares (from the Company) for $796,006 (a price of $42.03 per share).

51.     In September 2011, Silver and Bisger sold their remaining shares of Thalhimer stock (94,284 total shares) to the ESOP at a price of $26.25 per share, for a total value of $2.47 million (the "2011 ESOP Transaction"). Silver and Bisger loaned money to the Company to fund this transaction. The ESOP issued 10-year notes to Silver and Bisger at a high interest rate (10%),

and the Company unconditionally guaranteed payment and pledged substantially all of the Company's assets as collateral for the notes.

52.     In tandem with the 2011 ESOP Transaction, a shift in power occurred:  Silver and Bisger stepped down as Trustees, appointing Magrill, Warfield, and Dustin to replace them as the new ESOP Trustees. However, Silver maintained his position as Chairman and CEO of Thalhimer, and Bisger maintained his position as Executive Vice President of Thalhimer and Chairman of TRP. Both Silver and Bisger continued to substantially influence the decisions of the Board of Directors (now comprised of Silver, Warfield, Magrill, and Dustin) and the ESOP Trustees.

53.     Thalhimer, MGT Construction, and TRP amended and restated the ESOP on July 12, 2011, made retroactively effective on January 1, 2011.

54.     As part of the 2011 ESOP Transaction, the Company entered into new deferred compensation agreements with key executives including Magrill and Warfield. As it had done in 2004, the Company purchased life insurance to provide for future payments under the new deferred compensation agreements.

55.     Following the purchase of Silver's and Bisger's remaining shares of stock, the ESOP continued to accumulate cash to eventually purchase Magrill and Warfield's shares of stock, all in accordance with the 2003 plan.

### (c) The 2016 ESOP Transaction – Thalhimer Attempts To Become 100% ESOP-Owned (Step 3)

56.     In March 2016, Magrill informed Brincefield that Thalhimer was considering becoming 100% ESOP-owned, supposedly because the Company could save $2 million per year in tax distributions. Magrill told Brincefield that if Brincefield did not sell his stock, Brincefield could wake up one day and find his stock worth one-half its value.

57.     Brincefield told Magrill that he was not interested in selling his stock.

58.     On April 6, 2016, Silver, Magrill, and Warfield appointed Studdard as the "Special Independent Trustee" of the ESOP for the sole purpose of assessing the fairness of the stock sale to the ESOP.

59.     On April 19, 2016, 

60.

61.     On May 11, 2016,

62.     On May 19, 2016, Thalhimer held a Stockholder Meeting. At that time, there were 11 individual stockholders remaining, including Magrill, Warfield, Dustin, and Brincefield. At the meeting, Magrill informed the stockholders that the ESOP planned to purchase the remaining minority stockholders' shares, thereby making the ESOP a 100% owner of the Thalhimer stock (the "2016 ESOP Transaction"). He identified June 30, 2016, as the target date for closing the 2016 ESOP Transaction

63.     Magrill also informed the stockholders that the Board of Directors had hired an "Independent Trustee" to represent the ESOP for the transaction. Magrill did not tell the stockholders the name of the "Independent Trustee." He told them the next steps involved

Thalhimer providing 2016 financial information to the "Independent Trustee" who would then negotiate the transaction price and related terms with Magrill, the ownership representative.

64.      Also, at the May 19, 2016, Stockholder Meeting, Warfield informed the minority shareholders that it was a good time for them to sell their stock because, among other things, the share price was strong ($34.42 per share) and they would be "selling minority interest at a majority ownership price" (the ESOP was the clear majority owner already owning 71% of the outstanding shares). Put simply, to persuade the minority shareholders to sell their stock, Warfield pitched that they would be getting more than fair market value for their shares (*i.e.*, no discounts for lack of control). In order to induce the shareholders to sell their stock, Warfield also emphasized the risks of continued ownership.

65.      Brincefield could not attend the May 19, 2016, Stockholder Meeting. He met with Magrill on or about June 6, 2016, to discuss the proposed sale. During their discussion, Magrill told Brincefield that the Company would not pay any more tax distributions after the sale was completed. Brincefield reminded Magrill that the Company was obligated to make the Minimum Distributions under the 1998 Stockholder Agreement. Brincefield, as Trustee of the Steven B. Brincefield Revocable Trust, is the successor-in-interest to Brincefield, individually, pursuant to the 1998 Stockholder Agreement.

66.      Later that day, Magrill reiterated in an e-mail message that the Company would not make any distributions for any reason.

67.      █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

68.   ████████████████████████████████████████████████████████

69.   However, Defendants all knew SMK was not independent because SMK performed valuations for the Director Defendants since 2004.

70.   ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████

71.   On June 15, 2016, Dustin sent a letter to Brincefield reporting: "we have received an offer of $37.00 / share from the Independent ESOP Trustee to acquire the outstanding Thalhimer stock owned by the minority stockholders." Dustin's letter stated that the "offer" was 7.5% above the December 31, 2015, per share valuation. Brincefield (and the other non-director shareholders) received no information as to how the price was determined. Dustin did not provide Brincefield with a copy of the Stock Purchase Agreement. Instead, he stated that Brincefield would have an opportunity to review it at closing. Dustin gave Brincefield a five-day deadline expiring on June 20, 2016, to decide whether to sell his shares at the offered price.

72.   The fact that the Trustee made an offer for 7.5% more than the $34.42 majority per share price, which the Director Defendants stated was "strong" and a "majority ownership price" one month earlier, indicates that the Defendants did not actually negotiate the sales price.

73.   Brincefield informed Dustin that he was not interested in selling his stock. The remaining minority shareholders agreed to sell their stock ("Non-Director Sellers").

74.   On June 16, 2016, Magrill again tried to convince Brincefield to sell his shares, warning that the loan Thalhimer planned to obtain to finance the ESOP stock purchase would significantly devalue Brincefield's stock. Magrill again threatened that Thalhimer would stop making quarterly tax distributions to Brincefield after the 2016 ESOP Transaction because if it

continued making the distributions to Brincefield, it would also have to make millions of dollars in corresponding distributions to the ESOP. Magrill also threatened that if Brincefield did not sell his stock to the ESOP, Brincefield would be personally responsible for paying income taxes on his share of Thalhimer's profits (because the Company is an S corporation).

75.     Brincefield responded that he was not interested in selling his shares, and that Thalhimer was required to continue making the Minimum Distributions pursuant to the 1998 Stockholders Agreement. His attorney sent Thalhimer's attorney a copy of the 1998 Stockholders Agreement on June 20, 2016.

76.     Thalhimer's attorney, Gust, responded the same day and incorrectly asserted that the 1998 Stockholders Agreement had expired by operation of statute because it was an agreement among shareholders that "contains no express intention that the term of the Agreement remain valid in excess of 10-year period set forth in Va. Code § 13.1-671.1 (I) [*sic*] and would, therefore, be no longer in effect. Over the past several years the Company has made distributions to its shareholders sufficient to cover quarterly taxes but is not required to do so." Gust then confirmed Magrill's threat to Brincefield about halting the required Minimum Distributions, informing counsel for Brincefield that the Company would not make any future Form K-1 distributions to Brincefield.

77.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████ █████████████████████████████

██████████████████████████████████████████████████

████████

78.    █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████

79.    On June 30, 2016, the ESOP purchased the Company stock held by all of the remaining minority stockholders except Brincefield. The three ESOP Trustees (Magrill, Warfield, and Dustin) were among the stockholders who sold their stock to the ESOP.

80.    All of the Defendants knew the purchase price was above fair market value, including Gust and Coffey who were involved in the negotiations.  All of the Defendants knew or

---

[3] SMK, as the long-time partner of the Director Defendants and Gust in valuing the company, like Cherry Bekaert, should have picked up on the myriad red flags in the company's financial statements that were known to the Director Defendants and caused by the MGT/Thalhimer accounting fraud.

should have known of the precarious financial condition of MGT Construction (and therefore Thalhimer) and purposefully ignored all of the red flags in the reports, board minutes, presentations, and financials regarding MGT Construction/Thalhimer's fraudulent accounting practices. They did so in order to justify a higher share price for the 2016 ESOP Transaction, all in an attempt to rid the company of non-ESOP shareholders and to enrich themselves in the process.

81.     After the 2016 ESOP Transaction closed, Brincefield and the ESOP were the only remaining common stockholders of Thalhimer.

### D.  After The 2016 ESOP Transaction Closed, The Director Defendants Refused To Pay The Minimum Distributions To Brincefield And The ESOP

82.     To increase the pressure on Plaintiff Brincefield to sell his stock, Magrill followed through on his threat to stop paying Brincefield the Minimum Distributions. As a result, Brincefield was forced to pay $40,000 for estimated quarterly taxes on his *pro rata* share of Thalhimer's profits in September and December 2016; otherwise, he risked incurring significant tax penalties.

83.     Despite Brincefield's numerous requests, Thalhimer did not provide Brincefield with the financial information that Brincefield needed to determine the correct amount of the tax liability.

84.     The ESOP would have benefitted from the millions of dollars in Minimum Distributions that it should have continued receiving after July 2016. It could have accumulated that money tax-free, and used it to invest in marketable securities, or to pay to vest additional shares of stock.

85.     By discontinuing the Minimum Distributions, the cash that would otherwise have been distributed to the ESOP instead accumulated in the Company tax-free. This, of course, would

result in higher performance results for each of the Director Defendants which, in turn, would enable them to meet the performance goals of their key executive incentives (such as the deferred compensation plan) which were established in 2003 as part of their scheme. The artificially-enhanced performance results would also likely correspond with higher salaries and bigger bonuses.

86.     The Director Defendants personally benefitted from the decision to cease making the Minimum Distributions,[4] in contravention of the 1998 Stockholder Agreement, to the detriment of Brincefield and the other ESOP beneficiaries.

### E.   <u>Thalhimer Refused To Provide Brincefield With Critical Information And Misled Him</u>

87.     After the 2016 ESOP transaction was complete, Magrill continued to attempt to convince Brincefield to sell his stock.

88.     In order to negotiate the purchase price, Brincefield needed accurate information about the value of the Company. He also needed financial information relating to accounting errors the Company made in 2014 and 2015, which caused him to incur additional tax liabilities, so that Brincefield's accountant could determine his proper tax situation. Brincefield also needed information about the Director Defendants' decision to cease making the Minimum Distributions, despite the clear requirement of the 1998 Stockholder's Agreement.

89.     On September 13, 2016, Brincefield made a formal request for this information to Thalhimer pursuant to his rights as a shareholder. Among other things, Brincefield specifically requested the financial information from 2014 and 2015.

---

[4] Notably, the Director Defendants waited to stop making the Minimum Distributions until after they were no longer stockholders.

90.     On September 23, 2016, Thalhimer responded to Brincefield's request through Gust, its counsel. The Company refused to provide any records outside of a few select documents that, in accordance with the Virginia Stock Corporation Act, must be provided to a shareholder upon request.[5] Despite the fact that obtaining information to value one's shares of stock, obtaining information from an S Corporation to address tax issues, and obtaining information relating to distributions are widely recognized as "proper purposes" for inspecting corporate records under corporate law, Thalhimer, through Gust, disingenuously argued it was not providing any other records because Brincefield did not make his request in "good faith," and because Brincefield did not have "a proper purpose" for requesting the records.

91.     In his September 23, 2016, letter, counsel for Thalhimer (Gust) reiterated his earlier assertion that the 1998 Stockholder Agreement "expired" under VA. CODE ANN. § 13.671.1(I).[6] This assertion made no sense because the 1998 Stockholder Agreement expressly provides that the duration of the Agreement is as long as Thalhimer is an S Corporation – and Thalhimer has remained an S Corporation at all times since 1998.

92.     The September 23, 2016, letter from Thalhimer's attorney, Gust, also presented a new argument: The Company had made tax distributions to shareholders after the 1998 Shareholder Agreement had purportedly expired, pursuant to a purported 2013 stockholder agreement; however, Gust admitted that Brincefield did not execute that agreement. His new assertion was that because the shareholders who were parties to the purported 2013 stockholder agreement were no longer shareholders (due to the 2016 ESOP Transaction), no further tax

---

[5] Thalhimer did not assert that any of the documents were confidential.

[6] VA. CODE ANN. § 13.671.1(I) provides: "The duration of an agreement authorized by this section shall be as set forth in the agreement, except that the duration of an agreement that became effective prior to July 1, 2015, remains 10 years unless the agreement provided otherwise or is subsequently amended to provide otherwise."

distributions were required. This argument made no sense for several reasons:  (1) the Company had always made the Minimum Distributions, including during 2008-2012 when the 1998 Stockholder Agreement, at least according to Gust, was supposedly expired; (2) Brincefield was not a party to the 2013 Stockholder Agreement; therefore, the purported 2013 stockholder agreement is invalid under VA. CODE ANN. § 13.671.1(B), which requires that all shareholders who are shareholders at the time of the agreement must sign the agreement; and (3) in each year during 1998-2015, the Company had classified the amount necessary to pay the Minimum Distributions as a "Capital Requirement."

93.     Thalhimer and Gust refused to provide Brincefield with the purported 2013 shareholder agreement, despite Brincefield's (and his counsel's) several requests and undeniably proper purposes.

94.     On September 30, 2016, by and through his counsel, Brincefield responded to Thalhimer's illogical arguments.

95.     On October 10, 2016, Thalhimer, by its counsel Gust, doubled down on its previously made illogical assertions.

96.     The nonsensical assertions made by Thalhimer's counsel made one thing clear: the Director Defendants who were responsible for providing the information were giving Brincefield the proverbial "run-around."

97.     The following week, Magrill revealed to Brincefield that the SunTrust loan to the Company for the 2016 ESOP Transaction prohibited any distributions, including tax distributions. However, the Director Defendants and Gust did not provide a copy of the 1998 Stockholders Agreement to SunTrust before closing on the loan on June 30, 2016, even though Brincefield's attorney had provided it to Thalhimer's attorney over one week before closing on June 20, 2016.

Instead, in order to obtain the loan, they misrepresented to SunTrust that the purported 2013 stockholder agreement was the valid shareholder agreement under Virginia Code Section 13.1-671.1 even though they knew Brincefield was a shareholder and did not sign the agreement.

### F.  **Brincefield Discovers Some Of The Information The Director Defendants Concealed From Him**

98.    During January and February 2017, Brincefield learned that the Director Defendants were hiding critical information from him (at that time the sole shareholder other than the ESOP, which is controlled by the Director Defendants) and the other ESOP beneficiaries. This information included, but is not limited to: (1) the fact that the value of Brincefield's stock and the ESOP's stock had plummeted by at least 30%; (2) the ESOP paid at least 30% more than fair market value for the stock in the 2016 ESOP Transaction (Defendants have now admitted the ESOP paid more than 70% of fair market value for the stock); and (3) the Defendants were engaging in conflicted transactions with the ESOP in order to cover up their wrongdoing.

99.    On or about January 7, 2017, an employee who had sold his stock to the ESOP in the 2016 ESOP Transaction ("Brincefield's Former Colleague") informed Brincefield that the appraisal for the stock for the 2016 ESOP transaction was overvalued by at least 30%. He stated that all of the shareholders who had sold their stock to the ESOP were now being required to return 30% of the proceeds they received from that sale. Even though the Non-Director Sellers had relied on Director Defendants' representations as to the stock value and had relied on Magrill to represent them in the sale, they were being required to sign agreements stating that they would return the money within 10 days because they were (supposedly) jointly and severally liable under the Purchase Agreement (which they were not permitted to review until closing). Although Logan admitted his knowledge of the scheme to the Director Defendants, the Director Defendants publicly blamed the problem on one employee, Patrick Lindsay, who they said admitted to

participating in accounting schemes that were designed to enhance his bonus payments relative to receivables that were not actually collected, but were presented as having been collected in the subsidiary's accounting records. The Director Defendants stated they discovered the fraudulent scheme in October 2016 (after Brincefield's September 13, 2016, request for records relating to accounting errors in 2014-2015).

100.    All of the decision makers (the Defendants) who created the cover-up plan were conflicted ESOP Fiduciaries who sought to avoid personal liability at the expense of the ESOP and Thalhimer. Gust, and upon information and belief, Coffey and Corporate Capital, assisted in creating the plan. The Director Defendants used their control as conflicted directors to implement the plan on behalf of Thalhimer, and Studdard used his power to vote as the conflicted ESOP Trustee and controlling shareholder of Thalhimer. The cover-up plan was not fair to Thalhimer or the ESOP. Defendants shut out Brincefield and gave him false and misleading information.

101.    On January 11, 2017, Dustin e-mailed Brincefield with a very different story than what the Director Defendants had told Brincefield's Former Colleague. Dustin simply stated: "As information for your 2016 tax planning, Thalhimer is now forecasting a tax loss in 2016. We had several construction projects that have been unprofitable. We are sorting through the issues and overall impact. We plan to have your [Form] K-1 to you at the end of March and expect audited financials completed around the end of April."

102.    On January 30, 2017, Brincefield telephoned Magrill and inquired about the extent of MGT Construction's financial problems and Thalhimer's anticipated 2016 loss. Magrill's responses were vague at best; he stated only that there were construction losses on a couple of jobs, and that the Company was looking into things. At the end of their telephone call, Magrill said

Brincefield should make a formal request for information if he wanted to know more (ignoring the fact that Brincefield had previously made a formal request which Defendants refused to honor).

103.     That evening, Brincefield, by and through his counsel, made another shareholder demand to inspect Thalhimer's corporate records in light of the 30% (now admittedly 70%) reduction in the value of the Company, the Defendants' ERISA violations, and the false and misleading statements made by Dustin and Magrill. Brincefield also reiterated his previous request for records in the new demand letter.

104.     On February 3, 2017, Thalhimer's counsel sent additional copies of some records that the Company had previously provided, along with a small selection of Board of Directors records from 2016 (just 48 out of 270 pages) that the Company had not previously produced.[7]

105.     The newly-produced Board Meeting Minutes stated that Thalhimer had made significant and material misstatements in its financial statements. Despite this revelation, Thalhimer produced <u>no</u> financial information for the period after May 2016, other than the vague references to overstatement of profits and ["an under reporting"] of liabilities contained in a few carefully word-smithed Board of Directors' meeting minutes.

106.     On February 6, 2017, counsel for Brincefield sent a letter to counsel for Thalhimer demanding additional information and pointing out that the Company's directors and their advisors should have known that the $37 per share valuation was above fair market value, notwithstanding the alleged "recent discovery" of the accounting fraud.

107.     In response, on February 6, 2017, counsel for Thalhimer (Gust) sent a letter that apparently was intended to be the cover letter for the documents he had sent on February 3, 2017. In the cover letter, he denied any wrongdoing by Thalhimer's officers and directors, and stated the

---

[7] Thalhimer did not assert that any of the documents were confidential.

current "issues that the Company is facing are directly related to an employee of the Company who actively concealed his actions to defraud the Company." The letter stated that the Independent Trustee had advised former stockholders who sold their shares to the ESOP in June 2016 about "the need to adjust the stock purchase price to reflect any adjustments [in]to stock value." In the same letter, Thalhimer's counsel again denied that Brincefield had stated any proper purpose for requesting information, but he nonetheless volunteered to provide certain records (referring to the records that were sent on February 3, 2017).

108.    In addition to disclosing that Thalhimer made material misstatements in its 2014 financial statements, the records that the Company produced on February 3, 2017, revealed that the Director Defendants were attempting to hide numerous ERISA violations from Brincefield.

109.    For example, the December 16, 2016, Unanimous Consent of the Board of Directors revealed that the Director Defendants admitted that the company's financials were materially misleading, and that the Defendants were considering "modifying" the purchase price (the "Modification").  Notably, the December 16, 2016, Unanimous Consent misrepresented that the Non-Director Sellers had mutually agreed that the Modification was in the best interests of all parties. In fact, the Non-Director Sellers were not made aware of the overpayment until the following month.

110.    Although the unsigned modified Purchase Agreements had been attached to and made part of the December 16, 2016, Unanimous Consent, they (along with many other important attachments and documents) were not included among the handful of records that were sent to Brincefield's counsel.

111.    The December 16, 2016, Unanimous Consent also revealed that unnamed Director Defendants (later admitted to be Silver and Bisger) made loans to the Company to refinance the

$3 million SunTrust Bank loan that funded the 2016 ESOP Transaction. The Director Defendants' loans are prohibited transactions under ERISA.

112.    The December 28, 2016,[8] Unanimous Consent revealed that an unnamed lender (later admitted to be Magrill and Warfield) made a second loan of $1.3 million to the Company. This loan is a prohibited transaction under ERISA.

113.    These prohibited loans were secured by all of Thalhimer's assets, which would include the promissory note the ESOP made to Thalhimer as part of the 2016 Prohibited Transaction, where the ESOP pledged all of the ESOP's unallocated company stock to Thalhimer.

114.    The December 30, 2016,[9] Unanimous Consent revealed that the Director Defendants approved adjustments to the financial statements of the Corporation in order to remove financial accruals pertaining to non-qualified deferred compensation benefits for the participants for prior years. Upon information and belief, the Director Defendants made this decision because their deferred compensation (synthetic equity), along with their ownership of stock outright (until 2016) and their shares owned through the ESOP, resulted in them being disqualified persons who own at least 50% of all shares of the Company in violation of ERISA.

115.    Thalhimer's counsel never replied to the February 6, 2017, letter from Brincefield's counsel.

116.    On or about February 13, 2017, Brincefield's Former Colleague learned from Warfield that a special meeting was going to be held with the former minority stockholders who had sold their stock to the ESOP in June 2016. The meeting was being convened to update the

---

[8] The Consent inaccurately states the effective date is December 23, 2016. It was signed by Silver on December 28, 2016, making December 28 the true effective date.

[9] The Consent inaccurately states the effective date is December 23, 2016. It was signed by the directors on December 30, 2016, making December 30 the true effective date.

former stockholders about the impact of recent events on the 2016 ESOP Transaction. Brincefield, the sole remaining shareholder other than the ESOP, was not invited to the meeting, either in his capacity as the sole remaining shareholder, or in his capacity as an ESOP beneficiary.

117.   Brincefield's Former Colleague met with Warfield in person on February 14, 2017. During that meeting, Warfield told Brincefield's Former Colleague about the general topics for the upcoming meeting of former shareholders. Warfield stated:

- Thalhimer is in a very difficult situation, and the matter "changes daily" between the auditors and lawyers.

- Silver, Bisger, Magrill, and Warfield loaned money to Thalhimer (purportedly to pay back the SunTrust loan).

- The selling stockholders from the 2016 ESOP Transaction may be required to return the money they were paid and take their stock back.

118.   Warfield also acknowledged to Brincefield's Former Colleague that Warfield and others could be personally liable. Warfield said that the Company's lawyers were working to get things covered and fixed.

119.   Brincefield's Former Colleague has told both Warfield and Magrill that he would not have sold his stock at the lower share price. They informed him that the purported 2013 shareholder agreement would have required them to enter into a "forced sale."

120.   According to Brincefield's Former Colleague, the meeting of former shareholders was held on February 16, 2017. Warfield, Magrill, and Dustin made presentations at the meeting, revealing that MGT Construction did not pay construction expenses for at least the past three years. The former shareholders were told that accounting records had been distorted to cover the diversion, and that losses were in the millions of dollars. The former stockholders were told to be

prepared to buy stock back from the ESOP. Defendants did not hold a meeting of the current shareholders, Brincefield and the ESOP, or the ESOP participants.

G. **Before The 2016 ESOP Transaction Closed, Defendants Knew Or Should Have Known That The 2016 ESOP Transaction Was Not Fair To The ESOP**

121.    Setting aside the issue of MGT Construction/Thalhimer's fraudulent activities, the Defendants knew or should have known the ESOP was paying more than fair market value for the stock.

122.    Even though the ESOP already controlled over 75% of the Company's stock and was purchasing minority shareholder interests, the Director Defendants made it clear - the sales price was based on the value of a majority interest, not disparate minority interests.

123.    The Defendants ignored the impact the Minimum Distributions would have on the Company's ability to meet its obligations under the SunTrust Bank loans. Silver and Bisger were original parties to the 1998 Stockholder Agreement and it was filed in the corporate records. Moreover, Thalhimer always treated the Minimum Distributions as "capital expenditures." The documents produced on February 3, 2017, revealed that after Brincefield reminded Magrill of the Company's obligations to make the Minimum Distributions on June 20, 2016, the Director Defendants concocted a Board Resolution which they executed on June 27, 2016, stating the 1998 Stockholder Agreement "lapsed." They agreed to "suspend any distributions" to Thalhimer's shareholders for the initial three years of the SunTrust Bank loan, because the terms of the loan prohibited them from making any distributions during the first three years of the loan term. This is contrary to the express terms of the 1998 Stockholder Agreement which provided that the agreement would not terminate unless the Company were to lose its status as an S Corporation, and which prohibited any modification or amendment to the agreement unless signed by the parties.

**Director Defendants Knew Or Should Have Known About The Accounting Fraud At MGT Construction/Thalhimer**

124.    Thalhimer performed all of the accounting for its subsidiaries, including MGT Construction, and created its financial statements.

125.    Thalhimer handled the accounting functions for MGT Construction for a fee of $30,000 per month.  MGT Construction did not control the money in or out of MGT Construction – Thalhimer did. Thalhimer sent the invoices to the owners, collected payment from the owners, paid the subcontractors, and paid the suppliers. Thalhimer and MGT Construction used the same accounting software, Timberline.  MGT entered the data into Timberline and Thalhimer did everything else.  Timberline is a sophisticated construction accounting software capable of creating detailed profit and loss and cash flow reports at all levels, including project level.

126.    Although Logan was president of MGT Construction, he had no authority to sign a check.  Logan's authority was limited to  "approving" invoices.  Logan did not have authority to authorize the actual payment of the invoices. That was Dustin's responsibility.  During 2014-2016 Dustin limited the total amount of invoices Logan could approve, and ignored MGT Construction's obligation to ensure payments received from owners were properly allocated to subcontractors and suppliers on the owner's particular project.

127.    It is not plausible that the Director Defendants were unaware of the fraudulent scheme being carried out at MGT Construction. They approved Logan's excessive bonus payments and oversaw the fraudulent financial statements. Magrill is the Chairman of MGT Construction and Dustin is a director and CFO of MGT Construction. Silver, Bisger, and Warfield all served as officers and directors of MGT Construction for many years. Logan has been the long-time President of MGT Construction. Logan had a reputation for questionable accounting activities at

MGT Construction and Thalhimer's Board of Directors had to keep a careful watch over the financial statements of MGT Construction.

128.    The fraudulent accounting practices at MGT Construction/Thalhimer were common by 2008 and rampant by 2013.

129.    Thalhimer's auditors alerted Director Defendants to many accounting failures at MGT Construction such as lack of controls, incomplete documentation, unsigned contracts, and unsigned work orders as part of their audit of the 2013 financials.  In May 2014, Dustin and Magrill exchanged emails regarding the issues raised in the auditor's report.  Dustin and Magrill recognized they needed to effectuate change at MGT Construction and not let Logan "rope dope us" but did nothing to effectuate change or correct Logan's actions.  Magrill simply printed the email and gave it to Logan.

130.    Dustin worked a deal with Logan under which MGT Construction remodeled parts of Dustin's residence for far less than market value.

131.    When MGT Construction received payments from owners of projects it regularly did not use those funds to pay the subcontractors on the same project and it often did not pay for materials required for the project.  Instead, it paid subcontractors on other projects whose payments were past due or for materials on other projects which were past due.  This scheme was only sustainable as long as MGT Construction continued to win new projects.

132.    MGT Construction "bundled" invoices in some instances when a subcontractor complained of non-payment.  Rather than paying the subcontractor from the funds previously received from the owner of the project, MGT Construction would offer the subcontractor the opportunity to work on a new project from a different owner and "bundle" the past due invoice into the new project for that owner to pay.

133.    MGT Construction purposefully underbid to win contracts to keep the money flowing.  Its financial model depended on winning new projects to keep the money flowing to pay the subcontractor and supplier of the older projects.

134.    This was how MGT Construction did business and all of the employees knew it. Thalhimer's accounting personnel had to know it too, as they collected all the money and paid all the bills for MGT Construction.  If Director Defendants or the auditors (including Cherry Bekaert) had asked any of the project managers questions they would have quickly learned the magnitude of the problem.  Very simple reports run from the Timberline software would have demonstrated the scheme.

135.    Thalhimer's wholly-owned subsidiary, TRP is a development company.   TRP purchases properties and establishes single purpose limited liability companies ("Affiliated LLCs") to own the properties. TRP is the manager of the Affiliated LLCs.  Silver and Bisger decide who can invest in the LLCs and at what percentage.[10]  Director Defendants own significant stakes in the Affiliated LLCs, especially Silver and Bisger.  Logan owns an interest in many of the Affiliated LLCs as well.

136.    Director Defendants have complete oversight over TRP.  All of TRP's books and records are stored at Thalhimer's corporate headquarters.  Silver requires employees of TRP to meet with him on a regular basis to discuss his investments. Bisger personally manages many of the Affiliated LLCs, in addition to his oversight of other TRP employees as an officer, director,

---

[10] Silver and Bisger allowed higher level employees to invest in some of the Affiliated LLCs. Brincefield owns a small percentage of several of them.  After Brincefield refused to sell his stock to the ESOP in 2016, Silver and Bisger retaliated by recanting their offer to allow Brincefield to invest in a new Affiliated LLC.

and Chairman of TRP from 2000 to present. Magrill and Dustin have been directors since 2011 and Warfield was a director during 2011-2014.

137.    Silver and Bisger directed TRP to use MGT Construction for the Affiliated LLCs' projects without requiring MGT Construction to submit bids and often without negotiating the contracts.  This model was extremely lucrative for Director Defendants for years.

138.    The Affiliated LLCs owed MGT Construction millions of dollars in accounts receivable for years (through 2015).  However, when cash flow became a problem, new TRP projects became the source of cash flow for MGT Construction to keep the scheme afloat.  Past due subcontractor invoices were "bundled" and charged to new TRP projects.    For example, numerous past due subcontractor invoices on many other projects were billed to the Reynolds South (a very large development) project after work was barely started.  TRP approved payment of MGT Construction's invoices as the manager of the Affiliated LLCs (the owners of the new projects).    Director Defendants had complete information regarding MGT Construction's accounting practices through their various management positions at Thalhimer, MGT Construction, and TRP.[11]

### Red Flags In The Financial Statements Should Have Caused Director Defendants To Take Action

139.    It is not plausible that Director Defendants did not recognize the major negative impact MGT Construction's finances were having on Thalhimer's finances well before the June 30, 2016, closing of the 2016 ESOP Transaction. At the Shareholder Meetings held over the past several years, the Director Defendants regularly reported issues with MGT Construction's

---

[11] Director Defendants never informed Brincefield (who was a member of some of these LLCs) of any of these practices. Notably, Director Defendants refused to allow Brincefield to inspect the books and records of one of these LLCs after they charged the LLC with questionable fees.

financial statements that should have been "red flags" to Defendants, such as the need to "focus on accounts receivable"; looking forward we will need to have a "reduction in MGT Construction accounts receivable/working capital"; MGT Construction has "volatile cash flow" and cash is needed for growth (and thus is not available for distributions); and that MGT Construction is "a cash drain" with "delayed profits." The Director Defendants had stated that the accounts receivable at MGT Construction were to blame for the lack of distributions above the minimum tax requirements in 2014-2015.

140. The financial statements for the year ending December 31, 2015, indicated that the value of the company was decreasing (*e.g.*, the backlog of jobs for MGT Construction were plummeting, MGT Construction's receivables were increasing, and there was significant revenue loss due to the closing of offices in North Carolina).

141. The financial statements identified conflicted transactions involving MGT Construction and entities owned by Director Defendants. For example, the 2015 financial statements note that construction services are provided to entities relating to certain shareholders and the related accounts receivable on these projects are $6.5 million including a retainage of $2.5 million. Director Defendants are part owners of some and perhaps most of those entities.

142. The financial reports from the Board of Directors Meetings reflect that the Director Defendants knew there were problems with MGT Construction's finances in early 2016 that negatively impacted Thalhimer, long before the closing of the 2016 ESOP Transaction.

143. For example, on February 3, 2016, Dustin (MGT Construction's CFO) reported:

- MGT Construction cash flow was negative ($2.5 million); and

- MGT Construction makes up the majority of the firm's $23.6 million accounts receivable, $20.9 million, an increase of $6.3 million in 2015.

144.    On March 31, 2016, Dustin reported, in the first quarter of 2016, the Company had a budget shortfall of $4.1 million (16%) and is $3.2 million (13%) under the prior years, and MGT Construction accounts for the majority of the shortfall.

145.    There were additional "red flags" that should have led to further analysis of the Company's stock's fair market value by Defendants. For example:

- The Company's audited financial statements for at least the last three years contained qualified opinions due to accounting procedures that do not comply with generally accepted accounting principles and which impact the valuation of the Company.

- The accounting errors that occurred in 2014 -2015 made no sense.

- The Company's audited financials noted many conflicted transactions carried out between the Director Defendants and Thalhimer.

146.    Additionally, the various valuations referred to throughout the 2016 Board meeting minutes rendered a $37 per share value highly suspect, including the $34 per share majority share value that was presented to the shareholders one month before closing.

147.    For all of these reasons, the Defendants knew or should have known that $37 per share was above the actual fair market value of Thalhimer's stock.

148.    As set forth herein, Defendants did not conduct an adequate investigation of the stock price.

149.    Studdard should not have relied on the same valuation firm, Sheldrick, McGehee & Kohler, Inc. ("SMK"), that had appraised the stock on behalf of the conflicted Director Defendants since the inception of the ESOP in 2004. He should have reviewed Thalhimer's financial statements and seen the declining trend in value and the "red flags" noted above.

H. **Director Defendants Enrich Themselves At The Expense Of Thalhimer And The ESOP**

150.    The Director Defendants' overall plan from 2003 forward was always to benefit themselves at the expense of the ESOP. They diligently followed through each step of the plan for the last 16 years until Brincefield's questions brought the scheme crashing down around them.

151.    The Director Defendants used their dominion and control over the ESOP (and, thus, the Company) to funnel money to themselves in a number of ways.

152.    The Director Defendants abused their positions as ESOP fiduciaries and breached their fiduciary duties as officers and directors of the Company by usurping numerous corporate opportunities from the Company by making lucrative investments in real estate entities for themselves while using loans from Thalhimer to finance the deals, thereby decreasing the value of Thalhimer and the value of the ESOP. This includes the limited liability company that is Thalhimer's landlord for the Company's headquarters.

153.    The Director Defendants caused MGT Construction to provide services to those real estate entities without causing it to timely collect payment from those entities, running up millions of dollars in past due accounts receivable to the detriment of the Company.

154.    In March 2017, the Director Defendants (particularly Bisger) caused Thalhimer to sell its membership interest in Wellesley Center LLC at heavily discounted price to raise funds to cover up and unwind the prohibited 2016 ESOP Transaction, which was unfair to Thalhimer.

155.    The Director Defendants paid themselves excessive compensation, including excessive bonus payments and executive benefits, including deferred compensation for their positions at the Company. They also used other real estate entities controlled by Thalhimer, and owned in part by them, to funnel additional money to themselves.

156.    Studdard should have recognized the Directors Defendants' self-dealing transactions and should have recognized that the Director Defendants wanted the 2016 ESOP Transaction to close at an inflated price to benefit Magrill, Warfield, and Dustin, who were all selling their stock.

157.    Studdard did not communicate with the ESOP participants before the transaction was consummated. Studdard did not communicate with the ESOP participants regarding his decision to "unwind" the transaction. Instead, Studdard and the Director Defendants concocted the plan to unwind the transaction behind closed doors and at the expense of the ESOP and Thalhimer to endeavor to avoid personal liability for the prohibited ERISA transactions.

158.    Although Director Defendants appointed Studdard as the purported "Independent Trustee," Silver, Warfield, Magrill, Dustin, Corporate Capital, Gust, and Coffey were intimately involved in structuring the transaction (Studdard did not structure the transaction) and exercised control over Studdard.   They were able to control Studdard by including provisions in the transactional documents (drafted by Gust) that were intended to protect Studdard from liability, such as broad representations and warranties by the Company, and indemnification by the sellers.

159.    This allowed Studdard to rely on the Director Defendants' long time go-to expert, SMK, and to conduct little, if any, independent analysis.   Therefore, Silver, Warfield, Magrill, Dustin, Corporate Capital, Gust, and Coffey were ESOP fiduciaries for purposes of the 2016 ESOP Transaction.

160.    Studdard and the Director Defendants are all beset by conflicts of interest. They caused the Company and the ESOP to enter into the 2016 ESOP Transaction, which was a prohibited transaction under ERISA. They orchestrated the "unwinding" after Brincefield began

asking questions. They have an interest in escaping personal liability and shifting all of the liability to the Company to avoid their liability as ERISA fiduciaries.

161.    The ESOP has not been made whole by the "unwinding" of the 2016 ESOP Transaction. Thalhimer's stock value has plummeted and the net asset value of the ESOP has dropped by millions of dollars.

162.    Director Defendants further sunk the value of the Company by pouring millions of dollars into MGT Construction after they purportedly discovered the fraud.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████  before they caused it to file for  bankruptcy on February 22, 2018 making Thalhimer MGT Construction's largest creditor.

163.    The ERISA beneficiaries, including Brincefield, have lost a large percentage of their retirement savings due to the Director Defendants' decision to put their interests ahead of the Company's interests and the ESOP's interests.

## I.   Cherry Bekaert Should Also Have Identified the Fraudulent Activity

164.    Cherry Bekaert is ranked among the nation's largest accounting firms.  Its roster of more than 1,100 professionals assists clients with accounting, audit, tax, and consulting needs. Cherry Bekaert has substantial real estate and construction accounting experience.  Its Real Estate & Construction Group serves more than 2,400 real estate and construction clients in the areas of audit, accounting, tax and advisory.

165.    Cherry Bekaert provided numerous accounting services to the Company.  Cherry Bekaert entered into agreements to audit the Company's financial statements in 2015 and 2016.

Cherry Bekaert provided other accounting services to the Company, such as tax services. Additionally, the Company, as the ESOP administrator, engaged Cherry Bekaert to audit the ESOP's financials.

166.



167. Cherry Bekaert did not discover the fraudulent accounting practices at MGT Construction. Cherry Bekaert did not discover the massive purposeful misallocation of invoices and massive losses caused by MGT Construction underbidding virtually all of its major construction projects, which resulted in material misrepresentations on the Company's financial statements.

168. If Cherry Bekaert had discovered the massive fraud and reported it to the Company:

- the Company could have prevented the Company's massive losses.

- The Director Defendants would have been unable to continue to ignore the growing problems at MGT Construction from 2013 through 2016 and claim the problems were merely "cash flow" and "profit fade problems" in order to push through the closing of the 2016 ESOP transaction.

- Director Defendants could not have relied on the false profits to justify their executive compensation.

- Director Defendants would have been forced to fix the lack of controls in its accounting department that allowed the fraud to continue for so long unabated (beginning in at least from 2013). Significantly, Director Defendants' failure to implement proper controls at MGT Construction has exposed Thalhimer to direct liability relating to MGT Construction.[12]

169.    It is no coincidence that Director Defendants attempted to force Brincefield to sell his shares to the ESOP and when he wouldn't sell, Director Defendant acted as if the 1998 Shareholder Agreement were invalid. If the Company were 100% ESOP owned, Director Defendants could use the $2 million per year it was required to pay in tax distributions to alleviate the problems at MGT Construction. Additionally, there would be no individual shareholders left to question their actions.

170.    If Cherry Bekaert had discovered the fraud, Defendants could not have relied on the materially misleading financial statements to support the value of the 2016 ESOP Transaction and SunTrust would never have loaned money to Thalhimer for the transaction. Thus, the 2016 ESOP Transaction would never have closed, and the Company would never have spent huge sums of money (likely well over $1 million) to purportedly "reverse" the transaction.

171.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[12] The Plaintiff in the Oklahoma lawsuit, see *infra*, ¶ 251, amended its Federal complaint to add Thalhimer as a defendant based on Thalhimer's complete control of MGT Construction's accounting and finances. Additionally, the Federal Bankruptcy Court has granted the Bankruptcy Trustee leave to hire special counsel to investigate claims against the officers and directors of MGT Construction and claims against Thalhimer.

█████████████████████████████████████████

████ [13]

172.    Defendants Directors and the Trustee, in an attempt to shift blame from themselves and their knowledge and constructive knowledge of the fraud, claim Cherry Bekaert should have found the fraud before the massive losses occurred.  They claim this under the ruse that they relied on the financials that Cherry Bekaert audited.

173.    While Cherry Bekaert should indeed have caught the fraud, the Director Defendants' attempts to shift the blame to Cherry Bekaert are hollow at best, and purposefully disingenuous at worst.  Both are responsible.

174.    Cherry Bekaert should have discovered the fraud and reported it in the audited financial statements it prepared for the ESOP.  ESOP beneficiaries are entitled to little information from the Company.  The Trustee is required to keep the beneficiaries informed, but in cases such as this where the Trustees are conflicted, the beneficiaries' only reliable source of information is the ESOP financial statements, which they are entitled to obtain.  However, in this case the auditor of the ESOP financial statements, Cherry Bekaert is also conflicted.  In preparing the ESOP's financial statements, Cherry Bekaert relied on the materially misleading audited financial statements it prepared for the Company.  For the reasons stated above, it should have known those financial statements were misleading and disclosed the problem on the ESOP's audited financial statements.

---

[13] ██████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████

175.    Thalhimer, as the administrator of the ESOP is required to engage, on behalf of all plan participants, an independent qualified public accountant, to audit and prepare an opinion of the ESOP's financial statements pursuant to 29 U.S.C. Section 1023(a)(3).

176.    Thalhimer, as the administrator of the ESOP and on behalf of the plan participants, engaged Cherry Bekaert to audit the ESOP's financial statements in 2015 and 2016.

177.    Cherry Bekaert received direct compensation from the ESOP pursuant to those engagements.

178.    The plan participants, including Brincefield, are intended third party beneficiaries of the agreement between Cherry Bekaert and Thalhimer, the plan administrator.

179.    Cherry Bekaert prepared  audited financial statements and reports for the ESOP. Dustin, as plan administrator, attached those audited financial statements to the ESOP's Form 5500s which he filed with the DOL, while identifying Cherry Bekaert as an independent qualified public accountant.  The documents Cherry Bekaert prepared include:

- ESOP Financial Statements and Supplemental Schedule as of December 31, 2014 and 2013 and for year ended December 31, 2014 and Report of Independent Auditor ("2014 ESOP Auditor Report"); attached to Form 5500 filed by Dustin on September 10, 2015.

- ESOP Financial Statements and Supplemental Schedule as of December 31, 2015 and 2014 and for year ended December 31, 2015 and Report of Independent Auditor ("2015 ESOP Auditor Report"); attached to Form 5500 filed by Dustin on September 6, 2016.

- ESOP Financial Statements and Supplemental Schedule as of December 31, 2016 and 2015 and for year ended December 31, 2016 and Report of

Independent Auditor ("2016 ESOP Auditor Report"); attached to Form 5500 filed by Dustin on October 16, 2017.

180.    For each year, Cherry Bekaert's opinion was unqualified.

181.    

182.

183.

184.

185.    Notably, the DOL had sent a letter to Thalhimer earlier that month, on November 4, 2016, informing the Director Defendants of the DOL's investigation of the ESOP.

186.    Director Defendants did not refile the Form 5500s for 2014 or 2015 or otherwise report to DOL or the beneficiaries that the information they reported was materially misleading.

187.    Director Defendants did not cause Cherry Bekaert or any other accounting firm to restate the ESOP's 2014 Audit Report or the 2015 Audit Report even though they knew the audit reports were materially misleading.

188.    Cherry Bekaert did not  inform the DOL or the beneficiaries that it knew their audit reports were materially misleading.

189.    Defendants did not provide any information to the beneficiaries until February 5, 2018 (long after this lawsuit was filed) , when Dustin sent the updated statements for plan years

2014 and 2015, and 2016 statements (for the first time) to the beneficiaries.  The massive losses to the ESOP are reflected in those statements.

190.     When Cherry Bekaert submitted the 2016 ESOP Auditor Report in 2017, it knew Thalhimer's financial statements were unreliable and the value of Thalhimer was unreliable and incomplete.  By this time Director Defendants were complaining that Cherry Bekaert should have discovered the fraud.  They had also re-engaged Cherry Bekaert to re-state the audited financial statements as of and for the years ended for 2014-2015, and 2016.

191.     Dustin submitted the Form 5500 for January 1, 2016 through December 31, 2015, (attaching the 2016 ESOP Auditor Report) to the DOL on October 16, 2017.  Dustin made the following misrepresentations to the DOL:

- There were no non-exempt transactions with any party-in-interest (at the time Dustin submitted this statement he and the other Defendants knew the ESOP had grossly overpaid for the stock in June 2016 and the ESOP still owned the stock as of December 31, 2016 and it was a prohibited transaction)

- The plan did not suffer any loss (at the time, Dustin and the other Defendants knew the losses to the Company were approximately $20 million; and the ESOP statements they sent to the beneficiaries a few months later, in January 2018, reflected an approximate 70% drop in the ESOP value).

- The plan did not hold any assets whose current value was neither readily determinable on an established marked nor set by an independent third-party appraiser.  (Dustin and Director Defendants informed the beneficiaries

during this time that they could not issue their annual statements because the appraiser was not finished with the valuation of the Company; additionally, SMK was the appraiser in 2016 and it was not independent).

- No plan transactions or series of transaction in excess of 5% of the current value of plan assets had occurred (the 2016 ESOP Transaction exceeded the value Dustin reported on the Form 5500 by well over 5%).

- The plan has not failed to provide any benefit due under the plan (The ESOP did not pay any beneficiaries in 2016 and it did not issue any statements to the beneficiaries in 2016).

192.    Upon information and belief, all of the Defendants were aware of Dustin's misrepresentations to the DOL and condoned them as part of the plan to make the 2016 ESOP Transaction "disappear" in order to protect themselves from liability under ERISA.

193.    When Cherry Bekaert issued the 2015 ESOP Auditor Report, it knew or should have known Thalhimer's audited financial statements were not reliable.

## **DERIVATIVE STANDING**

194.    Pursuant to VA. CODE ANN. § 13.1-672.1, Plaintiff gave the directors of Thalhimer the first opportunity to obtain the desired action from the directors and institute suit against Silver, Bisger, Warfield, Magrill, and Dustin, as directors and officers of the Company and its subsidiary corporations and as managers and officers of the Company's subsidiary limited liability companies, to recover damages to the Company caused by their actions. Plaintiff, through his counsel, sent a detailed demand letter to the President of Thalhimer, Defendant Warfield, on April 19, 2017 ("First Derivative Demand Letter"). *See* Exhibit B.

195.    Specifically, Brincefield made a written demand upon the Company to investigate and take appropriate legal action against Director Defendants for their mismanagement of the Company and their self-dealing transactions, including the massive drop in the value of the Company, causing the Company to incur substantial debt and otherwise participating in the June 2016 ESOP transaction where the ESOP paid over 30 percent more than fair market value for the stock, causing the Company to pay millions of dollars to "unwind" the transaction, overcompensating themselves, misrepresenting the value of the Company to shareholders to entice them to sell their stock to the ESOP so they could use the resulting accumulated cash to further over-compensate themselves, usurping corporate opportunities, engaging in self-dealing loans, and providing shareholders with false and misleading information. The demand letter contained more than enough information for the Board of Directors to begin their investigation because it attached a draft copy of the complaint containing the vast majority of the facts in the Amended Complaint.

196.    Plaintiff did not demand the Company investigate and take appropriate legal action against Cherry Bekaert in the First Derivative Demand letter, because Plaintiff was unaware of the claims at the time.

197.    Fifty-eight days after receiving the First Derivative Demand Letter, Defendants Magrill, Warfield, and Dustin (as ESOP Trustees with controlling vote) appointed a new board of directors:  Warfield, Magrill, Christopher E. Rouzie ("Rouzie"), John L. Vincie, III ("Vincie") and Michael N. Mulkey ("Mulkey").

198.    The new board of directors appointed Vincie and Mulkey to the Special Litigation Committee.

199.    On July 17, 2017, one day before the 90-day statutory period expired, counsel for Brincefield, John Craddock, Esq., received a letter from counsel for the special litigation

committee ("SLC"), Gary Bryant, requesting specific information regarding some of the self-dealing transactions contained in the derivative demand letter. During a telephone conversation, John Craddock informed Gary Bryant that the financial statements contained the information he was seeking and that the Director Defendants have all of the requested information.

200.    More than 90 days have passed since service of the demand letter and the commencement of this lawsuit.

201.    The SLC issued a report on January 8, 2018.  The SLC concluded ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████

202.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████  The SLC did not determine whether a derivative proceeding against Cherry Bekaert was in the best interests of the corporation.

203.    As explained in detail  below,  the review and evaluation conducted by the SLC did not comply with Virginia Code Section 13.1-672.4(A) for the following reasons:

- •    Vincie and Mulkey are not disinterested or independent.  They are long-time colleagues of Gust, the chief architect of the ESOP, including the three-

step implementation of the plan and the goal of enriching Director Defendants.

- The SLC did not exercise due care and it did not conduct a good faith investigation into whether the claims should be pursued.

- The SLC's investigation was inadequate.  Thus, it was not adequately informed when it conducted its review and evaluation of the circumstances, of the allegations made in the demand.

- The SLC did not determine in good faith that the maintenance of the derivative proceeding is not in the best interests of the corporation.

204.    Plaintiff, through his counsel, sent a second demand letter to the President of Thalhimer, Defendant Warfield, on April 20, 2018 ("Second Derivative Demand Letter") pursuant to the Amended Pretrial Order. *See* Exhibit C.

205.    In the Second Derivative Demand Letter, Brincefield demanded that the Company take action to sue Cherry Bekaert and any of its individual employees who are responsible for the Company's audited financial statements for accountant malpractice and any other legal or equitable claims the Company may have against Cherry Bekaert.   *See* Exhibit C.

206.    The Company rejected Brincefield's second derivative demand by letter from its counsel dated July 13, 2018.  The Company argued Brincefield's demand was unnecessary and improper because the Company communicated its intent to pursue claims against Cherry Bekaert and because Brincefield cannot dictate when the Company must initiate litigation.  The Company stated it retained Wilcox Savage[14] as counsel to investigate and pursue claims against Cherry Bekaert who made a formal demand that Cherry Bekaert mediate the Company's claims.  The

---

[14] Wilcox Savage is counsel to the SLC.

Company also stated it directed Wilcox Savage to keep Studdard, the "Independent" Trustee informed of any settlement discussions and it would consult with Studdard on any settlement.

207.   The board of directors has purposefully stalled in pursuing any claims against Cherry Bekaert to protect themselves and the other Defendants from liability in this lawsuit. The board of directors has blamed Cherry Bekaert for not discovering the fraud at MGT Construction/Thalhimer since November 2016. The SLC, whose members are Certified Public Accountants, opined █████████████████████████████████ The Company has taken no action against Cherry Bekaert except to demand mediation.

208.   The board of directors are not independent and disinterested. Magrill and Warfield are defendants. Rouzie is a long term Thalhimer employee and is beholden to Director Defendants. Rouzie could be named as a defendant because he participated in some of the prohibited transactions at issue, Rouzie sold his stock to the ESOP as part of the 2016 ESOP Transaction for $210,900 and purchased the same number of shares from the ESOP in 2017. As explained below, Vincie and Mulkey are not independent or disinterested due to their relationships with Gust. Notably, Studdard reappointed these directors in June 2018 as part of his expanded role as the supposed "Independent Trustee" Studdard is not independent, he is a defendant in this lawsuit.

209.   The board of directors is aware that Cherry Bekaert's chief defense will be to blame Defendants for not disclosing the accounting fraud at MGT Construction/Thalhimer to Cherry Bekaert. Additionally, the damages the Company claims against Cherry Bekaert would establish the floor of damages against the Defendants. Thus, it is in the Defendants' best interest to obtain a confidential settlement from Cherry Bekaert, even if the settlement amount is very low and to the detriment of the Company and the ESOP.

210. The Company has suffered tens of millions of dollars in damages. It is in the Company's best interest to pursue claims for joint and severable liability against Cherry Bekaert.

211. It is in the Company's best interest for Brincefield to pursue the claims against Cherry Bekaert derivatively because the board of directors is conflicted, the controlling shareholder (the ESOP) is held captive by Defendants, and Brincefield is the only independent individual shareholder of the Company. The other minority shareholders participated in the prohibited transactions and, under the Stock Purchase Agreements related to the 2016 ESOP Transaction, are required to indemnify the Company and the ESOP for any losses related to the Company's misrepresentations (even though they had not access to the information).

212. In the alternative, if the Court finds the Company's July 13, 2018 response to the Second Derivative Demand Letter was not an actual rejection, more than ninety days have passed since service of the Second Derivative Demand Letter and the filing of this Amended Complaint.

213. This action is not a collusive one to confer jurisdiction on this Court.

214. Plaintiff Brincefield can and will fairly and adequately represent the interests of the other shareholders who are similarly situated, including the ESOP.

**The Special Litigation Committee Is Not Independent/Disinterested**

215. Vincie and Mulkey are not disinterested or independent. They are long time colleagues of Gust, the chief architect of the three-step ESOP Transaction who (as a consultant for Corporate Capital) encouraged Director Defendants to implement his plan because it was to their financial benefit and who has been intimately involved at all relevant times. Gust and his firm,

Gentry Locke, represent Director Defendants personally in this matter and at the same time continue their role as "corporate counsel."[15]

216.    Gust recommended Vincie and Mulkey for the positions as "temporary and independent board members."

217.    Vincie is not a disinterested director because he has a professional relationship with Gust who has a financial interest in the matters before the SLC and in all the issues raised in the First Derivative Demand Letter.

218.    Vincie has "worked with Gust on mutual ESOP clients over the last 25-30 years." Vincie's extensive working relationship with Gust on mutual ESOP clients can reasonably be expected to have adversely effected Vincie's objectivity in conducting the SLC investigation and drafting the SLC report.  The Company is paying Vince ▮▮▮ per hour for his work on the SLC. It is likely paying Vincie the same amount it is paying Mulkey to serve on the board of directors, ▮▮▮ per meeting.  Given Vincie's high rates and his extensive work with Gust, they have likely assisted each other in earning significant amounts of money on their other joint matters.  The close professional relationship and mutual financial benefit Vincie and Gust bring to each other has an adverse effect on Vince's objectivity especially because nothing clouds one's judgement more than his personal finances.

219.    Mulkey is not a disinterested director because he has a professional relationship with Gust who has a financial interest in the matters before the SLC and in all the issues raised in the First Derivative Demand Letter.

---

[15] Gentry Locke also represented the Company in this matter in early 2016 when Plaintiff's counsel provided Gust with a draft copy of the complaint and proposed mediation.

220.    Mulkey has worked with Gust on about 10 ESOP engagements where Gust generally serves as either counsel to the trustee or corporate counsel. Mulkey and Gust are currently working together on an ESOP termination where Mulkey is the ESOP trustee and Gust is corporate counsel. Mulkey lists Gust as a reference on his resume.

221.    Mulkey's extensive working relationship with Gust on mutual ESOP clients, including Gust serving as counsel to Mulkey can reasonably be expected to have adversely effected Mulkey's objectivity in conducting the SLC investigation and drafting the SLC report.   The Company is paying Mulkey ███████ per day for his work on the SLC and ███████ per meeting to serve on the Company's board of directors.   Given Mulkey's high rates and his extensive work with Gust, they have likely assisted each other in earning significant amounts of money on their other joint matters.   The close professional relationship and mutual financial benefit Mulkey and Gust bring to each other has an adverse effect on Mulkey's objectivity especially because nothing clouds one's judgement more than his personal finances.

222.    ████████████████████████████████████████████████████ ██████████████████████ Vincie and Mulkey did not disclose whether they have any relationships with the following agents of the ESOP and/or Thalhimer: Corporate Capital; Coffey; Gentry Locke, SMK; or Transition Finance Strategies, LLC (d/b/a Blue Ridge ESOP Associates), the financial administrator of the ESOP.  Additionally, Vincie did not disclose whether he has any relationship with Studdard.

223.    At a minimum, due to their admitted relationship with Gust on ESOP matters, Vincie and Mulkey likely have relationships with the two firms Gust works for, Gentry Locke and Corporate Capital (a wholly owned subsidiary of Gentry Locke), and Coffey.

**The SLC Did Not Exercise Due Care And It Did Not Conduct A Good Faith Investigation Into Whether The Claims Should Be Pursued, And Its Investigation Was Inadequate.**

<u>The SLC did not act diligently</u>

224.    The SLC did not act diligently.   It was appointed by the interested directors (including themselves) on June 16, 2017.  It waited almost a month to hold its first meeting, one week before the 90-day statutory period for filing the Complaint expired.

225.    The day before the 90-day statutory period expired, Plaintiff's counsel received a letter from the SLC's counsel demanding information.  The letter demanded Counsel for Plaintiff: (1) specifically identify each corporate opportunity the Defendants usurped and the related damages to the Company; (2) specifically identify each conflicted loan between the Director Defendants and the Company and the related damages; (3) the damages relating to Director Defendants failing to inform SunTrust Bank of its obligations to pay tax distributions under the 1998 Stockholder Agreement.   The demand was unreasonable because the Director Defendants control the records and the draft Complaint the Plaintiff attached to the derivative demand letter contained the specific details available to Plaintiff at the time. Therefore, Plaintiff's counsel referred the SLC counsel to the Company's financial statements and the documents the Defendants control.   At the Company's request, Plaintiff delayed filing the Complaint to give the SLC additional time (an additional 90 days).

226.    The SLC did not hold its first meeting until July 11, 2017, and ████████████
██████████████████████   its second meeting on August 15, 2017.  The SLC conducted just one interview (Patrick Lindsay on October 12, 2017) before Plaintiff filed the Complaint on October 26, 2017.  It did not interview any other witnesses until November and December 2017.

227.    ███████████████████████████████████████████████████████████████
███████████████████████████████   The SLC report demonstrates the SLC (likely

purposefully) delayed acting.  The delay benefitted the Defendants because it allowed them additional time to completely control the Company and posture their defense.  It also allowed them to control the decision to bankrupt MGT Construction and allow the loss of potentially relevant documents.[16]

> The SLC purposefully ignored or (grossly) negligently failed to consider many highly relevant and material facts

228.    The SLC's investigation was grossly inadequate and is fundamentally flawed and biased.

229.    The investigation is _so inadequate_ that the SLC members were either grossly negligent in their duties or purposefully and selectively ignored and/or failed to consider myriad relevant and material facts that directly contradict its statement of facts, all readily apparent to them or any reasonable independent and similarly situated person.  This section outlines many of the material facts the SLC either purposefully ignored or (grossly) negligently failed to consider.  For the sake of brevity, both allegations are intended and incorporated in each of the paragraphs below.

230.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

231.    The SLC did not interview Director Defendants or any other Company employees regarding where relevant records are stored, whether electronic or paper.

---

[16] Counsel for the Bankruptcy Trustee examined witnesses regarding records that appeared to be missing.  Patrick Logan, Jr. testified that when MGT closed its doors "Thalhimer" told MGT Construction employees to keep the furniture and throw everything else away.  Logan, Sr. testified the administrative assistants decided what records to retain.

232. 

It did not secure the communications with Gust, Coffey, Corporate Capital, Gentry Locke, SunTrust, internal communications among the Director Defendants, or communications with minority shareholders who sold their stock to the ESOP in 2016.

233.   The SLC did not consider Gust's, Coffey's or Corporate Capital's records.

234.

The SLC did not request key terms such as:  Brincefield, Studdard, Department of Labor, DOL investigation, SMK, and the names of the minority shareholders who sold their stock.

235.

The SLC did not obtain the data to verify the spreadsheets.

The SLC did not obtain Director Defendants K-1s, which would show the millions of dollars Directors Defendants made through their control of TRP and its affiliated entities, especially Bisger and Silver.

236.   The SLC did not consider the records relating to the development of the three-step ESOP plan developed by Corporate Capital (Gust and Coffey), which laid out the details of how the Directors Defendants would cash out, own the majority of the ESOP's shares, receive deferred compensation, and otherwise benefit from the "tax free cash warehouse."

237.   The SLC did not consider the total value Director Defendants received by the implementation of the ESOP, e.g. ownership percentage of the ESOP, stock incentives, cash buy-out of stock, deferred compensation.

███████████████████ The SLC did not analyze whether Director Defendants returned the shares because the restatement of the financial statements rendered the Director Defendants "unqualified" under ERISA.

238.    The SLC did not analyze the validity of the 1998 Stockholder Agreement or the invalidity of the purported 2013 stockholder agreement.

239.    The SLC did not analyze whether Defendants disclosed the 1998 Stockholder Agreement to SunTrust or whether the disclosure of the 1998 Stockholder Agreement to SunTrust would have resulted in SunTrust refusing to close the loan on June 30, 2016.

240.    The SLC did not analyze how the 100% ESOP company concept was designed to save $2 million in taxes and provide more opportunities for executive compensation.

241.    The SLC did not consider why the TRP affiliated LLCs owed MGT Construction millions of dollars or MGT Construction's losses relating to those projects.

242.    The SLC did not hire an independent compensation expert to analyze Director Defendants' compensation. ████████████████████████████
████████████████████████████████████████████████
█████████

243.    ██████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████ The SLC also did not analyze how MGT Construction's $20 million overstatement of revenue would undermine ███████████████████.

244.    The SLC did not consider ██████████████████████.

245. 

246.

247.    The SLC did not consider how much Bisger is paid for managing various TRP projects,

248.    The SLC focused on                                                    instead of focusing on the manner in which Director Defendants ran TRP (particularly Silver and Bisger) as a personal wealth vehicle for themselves and how they used Thalhimer's assets to do so.

249.    The SLC did not consider the loan guarantee fees Bisger and Silver receive due to their control of the TRP affiliated LLCs or the payments Bisger and Silver receive when the LLCs received construction financing or when the LLCs sell properties.

250.    The SLC did not consider the MGT Bankruptcy filings, which reveal work performed by MGT Construction for Director Defendants' personal investments.  For example: a commercial building owned by Silver's family in Richmond or his Beth Sholom project; Bisger's property in Wintergreen Resort, or Dustin's house in Mechanicsville.

251.    The SLC was unaware of or failed to consider the many lawsuits filed against MGT Construction, which demonstrate Director Defendants knew or should have known of the fraudulent business practices at MGT Construction/Thalhimer, especially in light of the auditors' repeated concerns.   For example, an owner filed a complaint in  Federal Court in Oklahoma in October 2015 against MGT Construction and alleged the same fraudulent business practices (e.g., the owner paid MGT Construction, but MGT construction did not use the money to pay the sub-contractors on the job, and MGT Construction falsely reported job completion rates) as are being alleged here.  Notably, Dustin is the registered agent of MGT Construction.

### The SLC's interviews were insufficient

252.    The SLC interviewed: Director Defendants; Studdard; Patrick Lindsay ("Lindsay"); the former employee of MGT Construction who Director Defendants blame for the over $20 million accounting fraud at MGT Construction; and Michael Logan, Sr.  ("Logan Sr."), former President of MGT Construction who is potentially liable for the demise of MGT Construction along with Director Defendants.

253.    The SLC interviewed only two witnesses who are not potentially liable, two employees in Thalhimer's accounting department.

254.    The SLC did not interview any MGT Construction employees other than Lindsay and Logan.  If the SLC had interviewed employees at MGT Construction, it would have learned facts that contradicted the SLC's "facts" and demonstrated that their reliance on Director Defendants was misplaced.  For example:

- Lindsey was not the only employee at MGT Construction familiar with the Timberline accounting software.  Many of them knew how to use it.

- Many employees knew MGT Construction was manipulating invoices, creating false invoices, underbidding projects and falsifying job completion percentages for many years.

- One employee sent an email to Silver complaining of the accounting fraud at MGT Construction in April 2016, but Silver did not respond. The employee was fired a few weeks later.

- What employees described was like a "Ponzi scheme" that fell apart when MGT Construction ran out of jobs to fill the pipeline. The TRP projects were an important part of funding the scheme because Lindsay could always obtain change orders from TRP.

- Project managers suggested changes and many ultimately resigned because of the accounting fraud. In fact, turnover at all levels was high because of the fraud (Thalhimer handled all of MGT Construction's human resources but did no exit interviews).

- Thalhimer was responsible for MGT Construction' accounting and controlled all of its money, including accounts receivable and accounts payable. MGT Construction paid Thalhimer approximately $30,000 per month for the services.

- Thalhimer controlled all of MGT Construction's finances. Logan couldn't even write a check even though he was the president.

- MGT Construction and Thalhimer made no changes in response to the auditor's concerns.

- Magrill and Dustin never questioned the employees other than Logan, Sr. and Lindsay about business practices at MGT Construction, even after owners and subcontractors complained and even though there were many lawsuits filed against MGT Construction.

- Logan made payments directly to employees and subcontractors (totaling over $300,000) and someone at Thalhimer approved reimbursement of some of those payments.

- Dustin was conflicted because Logan arranged for MGT Construction to work on his residence for a steep discount.

- Director Defendants never criticized Logan; instead, they awarded him for his exceptional contributions to the Company, which surprised the employees.

**The SLC's Conclusion That ███████████████████████████████ Is Based On A Faulty Premise.**

255.    "The SLC concluded ██████████████████████████████████████ ███████████████████████████████████████████ The SLC's conclusion is erroneous.  Brincefield's challenge to the June 2016 ESOP Transaction is premised on the ESOP paying more than fair market value for the stock, notwithstanding the massive drop in value caused by fraud at MGT Construction, because the sale price was for a majority interest, not a minority interest.

256.    SMK's valuation report states: ████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████

257.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

258.   The SLC members are certified public accountants who serve as ESOP trustees. They know the ESOP paid over fair market value because the ESOP owned the majority of the Company's stock (over 75%), was purchasing minority interests, but the purchase price was for a majority interest.

259.   The SLC knows the ESOP paid more than adequate consideration for the stock in 2016.

260.   In their interviews of Director Defendants and Studdard, the SLC never asked ████

████████████████████████████████████████████

████████

261.   The SLC members did not interview SMK.

262.   The SLC's deliberate failure to acknowledge ████████████████████████

████████████████████████████████████ completely undermines its conclusions regarding the validity of Brincefield's claims relating to the 2016 ESOP Transaction and the purported "unwinding" of the transaction.

263.   This is clearly a per se prohibited transaction, which the SLC should have recognized and analyzed instead of attempting to legitimize it by selectively misstating ████

████

264.   The SLC also did not consider █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

265.   The SLC embraced the legal fiction Defendants are attempting to create, that the 2016 ESOP Transaction was "void ab initio." In doing so, the SLC did not consider:

- That the DOL informed Director Defendants and Gust it was investigating the 2016 ESOP Transaction in October 2016, long before the Defendants took steps to roll back the transaction (under ERISA fiduciaries are not permitted to "self-correct" prohibited transactions if the DOL has begun an investigation) and that too much time elapsed for Defendants to "self-correct" under ERISA.

- the ESOP owned the shares it purchased from the minority shareholders from June 2016  until the minority shareholders were forced to re-purchase the shares in March 2017.

266.   The SLC did not quantify the amount of money Director Defendants have caused the Company to spend in their attempts to complete the 2016 ESOP Transaction and in their attempt to "reverse" the transaction.

267.   The SLC relied ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The SLC relied on these statements despite the fact that TRP is a real estate investor and the Company's financial statements show the Company invested in numerous real estate LLCs after the date that █████████████████████████████████████████████ In fact,

Thalhimer invested in ███████████████████████████████████████

███████████████████████████████

268.    The SLC did not consider TRP engaged MGT Construction on virtually all of its projects in order to drive up MGT Construction's revenues and profits and thus the value of the Company.  The SLC did not analyze ████████████████████████████████

████████ and how that related to Thalhimer's $20 million drop in value.

269.    The SLC did not calculate the significant shares ████████████ Silver and Bisger took for themselves (and other "executive members") in the TRP projects.

270.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

271.    The SLC made no attempt to address the financial position of the ESOP after 2015 and it did not identify how much Thalhimer paid to the ESOP to redress the injuries caused by the MGT Construction/Thalhimer fraud.

272.    The SLC did not consider the misleading information Director Defendants provided to Brincefield or the DOL.

273.    The SLC did not consider the fact that Defendants provided no information to the ESOP beneficiaries until January 2018, a year after the SLC report was issued.

274.    ████████████████████████████████████████

████████████  The business judgment rule does not apply because most of the complained of transactions are self-dealing.

**The SLC Did Not Determine In Good Faith That** ███████████████████
███████████████████████████████████████:

275.    In addition to acting in a manner to protect their colleague Gust from personal liability under ERISA as explained above, the SLC failed to consider the overall interest of the Company when it determined ████████████████████████████████████████

████████████████████

276.    The SLC never considered the fact that the ERISA claims will proceed without the derivative claims.  Because the facts are completely intertwined, if Plaintiff prevails in the ERISA action he will also prevail on the derivative claims.  It is in the Company's best interest to allow Brincefield to pursue the derivative claims because the Company will take no financial risk to do so.   It will have discovery costs associated with the lawsuit either way, but no lawyer costs or expert fees unless the Company benefits from the lawsuit and the Court orders the Company to pay some or all of Brincefield's attorneys' fees.

277.    If Brincefield prevails and the Court appoints an independent ESOP trustee, that trustee will hire a new board of directors who would then have to file a new lawsuit against the Director Defendants to recoup the Company's damages.  By that time the statute of limitation will likely have run on the breach of fiduciary duty claims and perhaps others.  The Company will also have to bear the expense of the litigation.

278.    The SLC should have considered this from the outset rather than spending hundreds of thousands of dollars (early on it was $300,000) on a biased report.

## COUNT I – ERISA § 406(A)

**Defendant ESOP Fiduciaries Violated ERISA § 406(a) By Causing The ESOP To Engage in Non-Exempt Prohibited Transactions.**

279.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if set forth fully herein.

280.    Thalhimer was a party in interest to the ESOP because it is the employer whose employees are covered by the ESOP.  ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C).

281.    ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary from causing a place to engage in a sale or exchange of any property with a party in interest.

282.    Magrill, Warfield, Bisger, Silver, Dustin, and the other minority employee stockholders, who sold their stock to the ESOP on June 30, 2016 and later purchased stock from the ESOP in March 2017, are parties in interest.

283.    The 2016 ESOP Transaction involving the sale of stock from the Magrill, Warfield, Dustin, and the other minority employee stockholders to the ESOP on June 30, 2016 is a non-exempt prohibited transaction under ERISA because the ESOP paid more than adequate consideration (more than fair value).

284.    The sale of stock from the ESOP to Magrill, Warfield, Dustin, Rouzie, and the other minority employee stockholders in March 2017 is a non-exempt prohibited transaction under ERISA because the buyers paid more than adequate consideration (more than fair value).  This transaction was not a "reversal" of the 2016 ESOP transition as Defendants claim.  The fiduciaries were prohibited from attempting to "self-correct" the prohibited transaction due to the DOL's notice of investigation and because too much time had elapsed to "self-correct."

285.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits a plan fiduciary from causing the plan to borrow money from a party in interest.

286.    The 2011 loan from Silver and Bisger, each a party in interest, to fund the buy-out of their shares was a non-exempt prohibited transaction because the interest rate (10%) was more than adequate consideration.  Each interest payment the ESOP paid on the loan is a prohibited transaction because the ESOP paid more than adequate consideration (10% interest).

287.    The loans in December 2016 from Bisger, Silver, Magrill, and Warfield, all parties in interest, to re-finance the 2016 ESOP Transaction are prohibited transactions because the ESOP paid more than adequate consideration (a vague "maximum" interest rate under the law).  Each interest payment the ESOP made related to these loans are prohibited transactions because the ESOP paid more than adequate consideration (the "maximum" interest is not fair market value).

288.    ERISA § 406(b)(2) and (3), 29 U.S.C. § 1106(b)(2) and (3), provide that a fiduciary for a plan shall not –

> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

289.    The Defendants Silver, Bisger, Warfield, Magrill, Dustin, Studdard, Gust, Coffey and Corporate Capital, as particularized below, were fiduciaries and parties in interest to the ESOP because they were officers, and/or directors of the Company at all relevant times and/or named Trustees and/or they had substantial influence over the fiduciaries and were intricately involved in the transactions (the "ESOP Fiduciaries").  Through their actions outlined below they violated ERISA § 406(b)(2) and (3), 29 U.S.C. § 1106(b)(2) and (3).

<u>Silver:</u>

290.    Silver was a fiduciary and a party in interest because:

- He was a named Trustee from 2004 through 2011. He approved, controlled, and participated in the implementation of the three-step ESOP scheme at issue in this case, including the 2016 ESOP Transaction;

- He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times;

- He was Thalhimer's President during 1995-2011, its CEO during 1997-2016, and the Company's Chairman during 2011-2017;

- He was an officer and/or director of MGT Construction from on or before 2002 until 2012; and

- He was intricately involved in the 2016 transaction and attempts to unwind it and exerted influence and control over Studdard, the so-called "independent" trustee.

291.   Silver caused the ESOP to enter into the following non-exempt prohibited transactions:

- The 2016 ESOP Transaction;

- The March 2017 sale of stock from the ESOP to the parties in interest;

- The loan interest payments to Silver and Bisger related to their sale of stock to the ESOP in 2011; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

Bisger:

292.  Bisger was a fiduciary and a party in interest because:

- He a director of Thalhimer during 1995-2012;

- He was an officer and director of TRP at all relevant times;

- He was a Trustee of the ESOP during 2004-2011 or 2012 and approved and controlled and participated in the implementation of the three-step ESOP scheme at issue in this case; and

- Bisger has exercised discretionary authority and/or discretionary control respecting management of the ESOP and responsibility in the administration of the Plan at all relevant times through 2011, and with respect to the March 2017 sale of stock from the ESOP to the parties in interest.

293.  Bisger caused the ESOP to enter into the following non-exempt prohibited transactions:

- The March 2017 sale of stock from the ESOP to the parties in interest;

- The loan interest payments to Silver and Bisger related to their sale of stock to the ESOP in 2011; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

Warfield:

294.  Warfield was a fiduciary and a party in interest because:

- He was an officer and director of the Company at all relevant times;

- He has been Thalhimer's President since 2011. He was promoted to CEO in December 2016 and remains the President;

- He was also an officer and/or director of MGT Construction from on or before 2004 until 2013;

- He has been a Trustee of the ESOP since 2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times; and

- He was intricately involved in the 2016 transaction and attempts to unwind it and exerted influence and control over Studdard, the so-called "independent" trustee.

295.   Warfield caused the ESOP to enter into the following non-exempt prohibited transactions:

- The 2016 ESOP Transaction;

- The March 2017 sale of stock from the ESOP to the parties in interest;

- The loan interest payments to Silver and Bisger related to their sale of stock to the ESOP in 2011; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

Magrill:

296.   Magrill was a fiduciary and a party in interest because:

- He was an officer and director of the Company at all relevant times;

- He is Thalhimer's Executive Vice President;

- He has been an officer and/or director of MGT Construction from 2007 until 2018;

- He has been an officer and director of TRP since 2013;

- He has been a Trustee of the ESOP since 2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times; and

- He was intricately involved in the 2016 transaction and attempts to unwind it and exerted influence and control over Studdard, the so-called "independent" trustee.

297.    Magrill caused the ESOP to enter into the following non-exempt prohibited transactions:

- The 2016 ESOP Transaction;

- The March 2017 sale of stock from the ESOP to the parties in interest;

- The loan interest payments to Silver and Bisger related to their sale of stock to the ESOP in 2011; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

<u>Dustin:</u>

298.    Dustin was a fiduciary and a party in interest because:

- He was an officer and director of the Company at all relevant times;

- Since 1999, he has held various accounting positions at the Company, including Corporate Controller and Chief Financial Officer ("CFO"). He was a Senior Vice President and Treasurer during 2011 – 2014 and has been Thalhimer's Chief Financial Officer since 2014;

- He also has been an officer and director of MGT Construction from 2011 until 2018;

- He has been an officer and director of TRP since 2013;

- He has been a Trustee of the ESOP since 2011. He has exercised discretionary authority and/or discretionary control respecting management of the ESOP at all relevant times. He also has exercised discretionary authority and/or discretionary responsibility in the administration of the Plan at all relevant times; and

- He was intricately involved in the 2016 transaction and attempts to unwind it and exerted influence and control over Studdard, the so-called "independent" trustee.

299.   Dustin caused the ESOP to enter into the following non-exempt prohibited transactions:

- The 2016 ESOP Transaction;

- The March 2017 sale of stock from the ESOP to the parties in interest;

- The loan interest payments to Silver and Bisger related to their sale of stock to the ESOP in 2011; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

Studdard:

300.    Studdard was a fiduciary for the ESOP and a party in interest because he was a Trustee with respect to the 2016 ESOP Transaction, and from December 2016 forward, Studdard served as a trustee on a variety of matters for the ESOP including attempting to "unwind" the 2016 ESOP transaction and electing the board of directors.

301.    Studdard caused the ESOP to enter into the following non-exempt prohibited transactions:

- The 2016 ESOP Transaction;

- The March 2017 sale of stock from the ESOP to the parties in interest; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

Gust:

302.    Gust was a fiduciary and a party in interest because:

- He was a consultant and lawyer to the Company and the ESOP at all relevant times;

- He was the chief architect of the three-step ESOP scheme at issue in this case and that was attempted to be completed in 2016;

- He was the chief architect of the 2016 transaction and attempts to unwind it and exerted influence and control over Studdard, the so-called "independent" trustee, the officers and directors named above, and the SLC members;

- He represented the Company and the ESOP in communications and representations to the DOL; and

- Without Gust's involvement the Director Defendants and Studdard would have been unable to develop and implement the plan or orchestrate the implementation of and attempted unwinding of the 2016 transaction.

303.    Gust caused the ESOP to enter into the following non-exempt prohibited transactions:

- The 2016 ESOP Transaction;

- The March 2017 sale of stock from the ESOP to the parties in interest;

- The loan interest payments to Silver and Bisger related to their sale of stock to the ESOP in 2011; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

Coffey:

304.    Coffey was a fiduciary and a party in interest because:

- He was a consultant to the Company and the ESOP at all relevant times;

- He was an architect of the three-step ESOP scheme at issue in this case and that was attempted to be completed in 2016;

- He was an architect of the 2016 transaction and attempts to unwind it; and

- Without Coffey's involvement the Director Defendants and Studdard would have been unable to develop and implement the plan or orchestrate the implementation of and attempted unwinding of the 2016 transaction.

305.    Coffey caused the ESOP to enter into the following non-exempt prohibited transactions:

- The 2016 ESOP Transaction;

- The March 2017 sale of stock from the ESOP to the parties in interest;

- The loan interest payments to Silver and Bisger related to their sale of stock to the ESOP in 2011; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

Corporate Capital:

306.    Corporate Capital was a fiduciary and a party in interest because:

- It was a consultant to the Company and the ESOP at all relevant times;

- Through Gust and Coffey, it an architect of the three-step ESOP scheme at issue in this case and that was attempted to be completed in 2016;

- Through Gust and Coffey, it was an architect of the 2016 transaction and attempts to unwind it; and

- Without Corporate Capital's involvement the Director Defendants and Studdard would have been unable to develop and implement the plan or orchestrate the implementation of and attempted unwinding of the 2016 transaction.

307.    Corporate Capital caused the ESOP to enter into the following non-exempt prohibited transactions:

- The 2016 ESOP Transaction;

- The March 2017 sale of stock from the ESOP to the parties in interest;

- The loan interest payments to Silver and Bisger related to their sale of stock to the ESOP in 2011; and

- The loans from Silver, Bisger, Warfield, and Magrill for the purpose of refinancing the 2016 ESOP Transaction.

308. In violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in the course of the prohibited transactions named above, Studdard received payments from the Thalhimer for serving as the Trustee on behalf of the ESOP.

309. In violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in the course of the prohibited transactions named above, Gust, Coffey, Corporate Capital, received payment from Thalhimer and/or other entities (such as Gentry Locke and Corporate Capital) for their actions related to the ESOP and prohibited transactions.

310. The Director Defendants were highly compensated employees under ERISA. They paid themselves executive benefits, including deferred compensation (more than $2 million since 2012), which was not permissible under ERISA and which devalued the value of Thalhimer's stock.

311. The Defendant ESOP Fiduciaries are all conflicted with respect to the ESOP because they have engaged in prohibited transactions. They should be removed as fiduciaries to prevent additional harm to the ESOP.

312. The Defendant ESOP Fiduciaries have caused millions of dollars in losses to the ESOP by the prohibited transactions, in an amount to be proven more specifically at trial. These losses include but are not limited to: reduction in value of the ESOP; attorneys' fees, consulting fees, bank fees, and other transaction fees related to the 2016 ESOP Transaction and subsequent cover-up and unwinding transactions; lost and/or usurped corporate opportunities; excessive deferred compensation; life insurance and loans with the Director Defendants; and other damages.

## COUNT II – ERISA SECTION 404(A)

**The Defendant ESOP Fiduciaries Violated ERISA Section 404(a) And Their Fiduciary Duties Of Prudence And Loyalty To The ESOP.**

313.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if set forth fully herein.

314.    In connection with the 2016 ESOP transaction, Defendant ESOP Fiduciaries (as defined above) breached their duties to the plan, of which they are fiduciaries, to act solely in the interests of participants and beneficiaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(A) and(B), by among other things: (1) causing the ESOP to enter into the non-exempt prohibited transactions described in Count I; (2) using their position to attempt to hide their breaches of fiduciary duty from Brincefield, the other ESOP beneficiaries and the DOL; (3) using their position to vote the ESOP's stock to maintain and entrench their control over the Company and ESOP, by among other things, voting themselves into power as officers and directors, and voting clearly conflicted alternate board members into power and onto the SLC to enrich themselves and protect themselves; (4) failing to monitor their co-fiduciaries; (5) engaging Cherry Bekaert to prepare audited financial statements for the ESOP even after they blanked Cherry Bekaert for failing to discover the fraudulent accounting scheme; and (6) failing to investigate and bring an action (direct and/or derivative) against the Defendants on behalf of the ESOP and Thalhimer.

315.    The Defendant ESOP Fiduciaries have caused millions of dollars in losses to the ESOP by the prohibited transactions, in an amount to be proven more specifically at trial. These losses include but are not limited to: reduction in value of the ESOP; attorneys' fees, consulting

fees, bank fees, and other transaction fees related to the 2016 ESOP Transaction and subsequent cover-up and unwinding transactions; lost and/or usurped corporate opportunities; excessive deferred compensation; life insurance and loans with the Director Defendants; and other damages.

## COUNT III – ERISA SECTION 502(A)(3)

316.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if set forth fully herein.

317.    Plaintiff seeks equitable relief under ERISA 502(a)(3), 29 U.S.C. 1132(a)(3), against Defendants to remedy the losses and injuries suffered by Brincefield and the ESOP resulting from the prohibited transactions, as Defendants were unjustly enriched, in violation of ERISA.

318.    Director Defendants were unjustly enriched through their actions and breaches of fiduciary duty and by their participation in the non-exempt prohibited transactions as stated in Counts I and II.  In the alternative, should the Court find that any of the Director Defendants are not fiduciaries under ERISA, they, as parties in interest, knowingly participated in the non-exempt prohibited transactions and were unjustly enriched.  Because they received substantial benefits and/or compensation for their actions, those benefits, compensation and/or profits or fruits thereof should be disgorged and returned to the Company and the ESOP.

319.    Studdard was unjustly enriched through his actions and breaches of fiduciary duty and by his participation in the non-exempt prohibited transactions as stated in Counts I and II.

320.    Gust, Coffey and Corporate Capital ("Consultant Fiduciaries") were unjustly enriched through their actions and breaches of fiduciary duty and by their participation in the non-exempt prohibited transactions as stated in Counts I and II.  In the alternative, should the Court find that any of the Consultant Fiduciaries are not fiduciaries under ERISA, they, as parties in

interest, knowingly participated in the non-exempt prohibited transactions and were unjustly enriched. Because they received substantial benefits and/or compensation for their actions, those benefits, compensation and/or profits or fruits thereof should be disgorged and returned to the Company and the ESOP.

321. SMK, as a party in interest, knowingly participated in the non-exempt prohibited transactions and was unjustly enriched. Because it received substantial benefits and/or compensation for its actions, those benefits, compensation and/or profits or fruits thereof should be disgorged and returned to the Company and the ESOP.

322. Cherry Bekaert, as a party in interest, knowingly participated in the non-exempt prohibited transactions and was unjustly enriched. Because it received substantial benefits and/or compensation for its actions, those benefits, compensation and/or profits or fruits thereof should be disgorged and returned to the Company and the ESOP.

323. Plaintiff seeks the following equitable relief from the Court:

- Surcharge / equitable estoppel to put the ESOP in the position it would have been but for Defendants actions;

- An accounting from each Defendant of the compensation or other remuneration each received, and profits derived therefrom, directly or indirectly, as a result of their breaches of fiduciary and other violations of ERISA;

- Declare that the Defendants caused the ESOP to engage in non-exempt prohibited transactions under ERISA;

- Enjoin the Defendants from further violations of ERISA and their fiduciary duties;

- Remove Defendant Studdard as the Trustee;

- Remove Defendants Magrill, Warfield, and Dustin as ESOP Trustees and appoint an Independent Trustee acceptable to Plaintiff;

- Void the appointment of the Board of Directors of Thalhimer by Studdard, Magrill, Warfield, and Dustin as ESOP Trustees and direct the Independent Trustee to elect independent directors to Thalhimer;

- Void the appointment of the officers of Thalhimer by the Board of Directors;

- Void all self-dealing transactions between the Director Defendants and the Company;

- Appoint a neutral and independent accountant to forensically analyze the Company's and ESOP's financial statements and restate the financials, if necessary, to amend the Company's tax returns and ESOP filings, if necessary, and to perform independent valuations of the Company and the ESOP, and order the Defendants to pay the associated costs and expenses;

- Order the Defendants to reimburse Plaintiff and other stockholders and/or ESOP beneficiaries (other than themselves) for all costs and expenses (including accounting and attorney's fees) related to filing and revising any tax returns or other required filings, and any associated interest and penalties; and

- All such other equitable relief as the Court deems just and proper.

## COUNT IV - CONVERSION

### (Derivatively On Behalf Of Thalhimer Against Director Defendants)

324.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if set forth fully herein.

325.    The Company is the rightful owner of the Company's property including, but not limited to cash and other assets.

326.    The Director Defendants have wrongfully exercised dominion and control over the Company's property including, but not limited to cash and other assets.

327.    The Director Defendants have converted the Company's cash by paying themselves excessive salaries, bonuses, and benefits grossly in excess of the value of the services they have rendered to the Company.

328.    The Director Defendants have converted the Company's cash by causing the Company to pay them interest on illegal loans they made to the Company.

329.    The Director Defendants have converted the Company's cash by causing it to pay loan fees and interest on the money they caused the Company to borrow in order to close the prohibited 2016 ESOP Transaction and attempts to cover it up and unwind it.

330.    The Director Defendants have converted the Company's cash by causing it to pay fees to Studdard, attorneys, accountants, and other professionals relating to the prohibited 2016 ESOP Transaction and attempts to cover it up and unwind it.

331.    The Director Defendants have converted the Company's cash by causing it to pay fees to the SLC and its attorneys, accountants, and other professionals relating to the prohibited 2016 ESOP Transaction and attempts to cover it up and unwind it, and the allegations in this lawsuit.

332.    Through their actions, the Director Defendants directly and proximately caused millions of dollars in damages to the Company.

333.    Because the Director Defendants' actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

334.    Pursuant to VA. CODE ANN. § 13.1-672.5, Brincefield is entitled to recover his attorneys' fees, costs of bringing suit, and expenses incurred in this proceeding.

335.    The Company is entitled to recover pre-judgment and post-judgment interest at the legal rate of 6% per annum.

336.    Wherefore, the Director Defendants are jointly and severally liable to the Company in an amount to be determined at trial, plus punitive damages, in addition to attorneys' fees, costs of bringing suit, and expenses, plus pre- and post-judgment interest.

## COUNT V - STATUTORY CONSPIRACY

### (Brincefield On Behalf Of The ESOP And Derivatively On Behalf Of Thalhimer)

337.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if set forth fully herein.

338.    Defendants Silver, Bisger, Magrill, Warfield, and Dustin, combined, associated, agreed, mutually undertook, concerted and conspired, each with the other, to willfully and maliciously injure Thalhimer and the ESOP in their reputations, trades, businesses, and professions. This wrongful combination included, among other things, Defendants' agreement, desire, and action to convert millions of dollars of the Company's assets to their own personal use, which rightfully belong to the Company, and to breach their fiduciary duties to the Company and to the ESOP.

339.    Defendants Silver, Bisger, Magrill, Warfield, Dustin, Studdard, Gust, Coffey, and Corporate Capital, combined, associated, agreed, mutually undertook, concerted and conspired, each with the other, to willfully and maliciously injure Thalhimer and the ESOP in their reputations, trades, businesses, and professions. This wrongful combination included, among other things, Defendants' agreement, desire, and action to close the prohibited 2016 ESOP Transaction even though they knew the price the ESOP was paying for the shares was above fair market value and then to "unwind" the transaction in attempt to shield themselves from liability.

340.    Overt acts of the conspiracy include the following, among others:

- All of the actions listed in Paragraphs 33-162, 172, and 181-192 of this Amended Complaint.

341.    The conspiratorial actions of the Defendants, by their very nature, are outside the scope of their agency for the Company and the ESOP.

342.    The actions of the Defendants have directly and proximately caused millions of dollars in damages to the Company and the ESOP in an amount to be determined at trial.

343.    Pursuant to VA. CODE ANN. §§ 18.2-499 and -500, Thalhimer and the ESOP are entitled to recover three-fold the damages sustained as a result of the joint actions of the Defendants, as well as the costs of bringing this suit, including reasonable attorneys' fees.

344.    As a proximate result of the Defendants' wrongful actions, Thalhimer and the ESOP have suffered and will continue to suffer irreparable harm for which it does not have an adequate remedy at law. For the reasons set forth herein, Thalhimer and the ESOP are entitled to temporary and permanent injunctive relief.

345.     Additionally, pursuant to VA. CODE ANN. § 13.1-672.5, Plaintiff is entitled to recover his reasonable expenses, including attorneys' fees and expert witness and consultant fees, incurred in this proceeding.

346.     WHEREFORE, these Defendants are jointly and severally liable to Thalhimer and the ESOP, in an amount to be proven at trial, plus treble damages, plus reasonable attorneys' fees and the costs of bringing this suit, plus pre- and post-judgment interest.

## COUNT VI - COMMON LAW CONSPIRACY

### (Brincefield On Behalf Of The ESOP and Derivatively On Behalf Of Thalhimer)

347.     Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if set forth fully herein.

348.     Defendants Silver, Bisger, Magrill, Warfield, and Dustin combined, associated, agreed, mutually undertook, concerted and conspired, each with the other, to willfully and maliciously injure Thalhimer and the ESOP in their reputations, trades, businesses, and professions. This wrongful combination included, among other things, the Defendants' agreement, desire, and action to convert millions of dollars of the Company's assets to their own personal use, which rightfully belong to the Company, and to breach their fiduciary duties to the Company and to the ESOP.

349.     Defendants Silver, Bisger, Magrill, Warfield, Dustin, Studdard, Gust, Coffey, and Corporate Capital, combined, associated, agreed, mutually undertook, concerted and conspired, each with the other, to willfully and maliciously injure Thalhimer and the ESOP in their reputations, trades, businesses, and professions. This wrongful combination included, among other things, the Defendants' agreement, desire, and action to close the prohibited 2016 ESOP

Transaction even though they knew the price the ESOP was paying for the shares was above fair market value and then to "unwind" the transaction in attempt to shield themselves from liability.

350.    Overt acts of the conspiracy include the following, among others:

- All of the actions listed in Paragraphs 33-162, 172, and 181-192 of this Amended Complaint.

351.    The conspiratorial actions of the Defendants, by their very nature, are outside the scope of their agency for the Company and the ESOP.

352.    The actions of the Defendants have directly and proximately caused millions of dollars in damages to the Company and the ESOP in an amount to be determined at trial.

353.    Because the Director Defendants' actions were willful, malicious, and unlawful, the Company and the ESOP are entitled to recover punitive damages, plus all costs and expenses of this suit.

354.    As a proximate result of the Defendants' wrongful actions, Thalhimer and the ESOP have suffered and will continue to suffer irreparable harm for which it does not have an adequate remedy at law. Thalhimer and the ESOP are entitled to temporary and permanent injunctive relief.

355.    Additionally, pursuant to Va. Code Ann. § 13.1-672.5, Plaintiff is entitled to recover his reasonable expenses, including attorneys' fees and expert witness and consultant fees, incurred in this proceeding.

356.    WHEREFORE, these Defendants are jointly and severally liable to Thalhimer and the ESOP, in an amount to be proven at trial, plus punitive damages, in addition to reasonable attorneys' fees and the costs of bringing this suit, plus pre- and post-judgment interest.

## COUNT VII - BREACH OF FIDUCIARY DUTY

### (Derivatively On behalf Of Thalhimer)

357.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if set forth fully herein.

358.    The officers and directors of Thalhimer each owe the Company fiduciary duties, including the duty of care and the duty of loyalty.

Silver:

359.    Silver has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times.

360.    Silver engaged in numerous breaches of the duty of loyalty that benefitted himself and the other Director Defendants to the detriment of Thalhimer including, but not limited to:

- Causing the value of Thalhimer to plummet;

- Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the SunTrust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

- Making loans to Thalhimer with unfair terms;

- Covering up the illegality of the 2016 ESOP Transaction;

- Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

- Usurping corporate opportunities and using the Company's assets to enrich himself and the other Director Defendants;

- Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

- Causing the Company to make false and misleading representations claiming that the 1998 Stockholder Agreement expired;

- Causing the Company to make false and misleading representations claiming that the purported 2013 Stockholder Agreement is valid;

- Causing the Company to engage Cherry Bekaert to restate the Company's financial statements after Director Defendants blamed Cherry Bekaert for not discovering the fraud at MGT Construction/Thalhimer;

- Appointing Studdard as the "Independent" Trustee, in December 2016, when he was clearly conflicted by causing the ESOP to pay more than adequate consideration in the 2016 ESOP Transaction;

- Causing Thalhimer to sell its membership interest in Wellesley Center, LLC at an unfair price; and

- Refusing to provide information to Brincefield.

361.    Silver's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

362.    No independent Board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Silver because Silver was acting in his self-interest to the detriment of the Company.

363.    Silver's self-dealing transactions are presumed invalid and are voidable.

364.    Because the Silver's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

365.    Through his actions, Silver has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

Magrill:

366.    Magrill has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times.

367.    Magrill has engaged in numerous breaches of the duty of loyalty that benefit himself to the detriment of Thalhimer including, but not limited to:

- Causing the value of Thalhimer to plummet;

- Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the SunTrust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

- Making loans to Thalhimer with unfair terms;

- Covering up the illegality of the 2016 ESOP Transaction;

- Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

- Usurping corporate opportunities and using the Company's assets to enrich himself and the other Director Defendants;

- Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

- Causing the Company to make false representations claiming that the 1998 Stockholder Agreement expired;

- Causing the Company to make false representations claiming that the purported 2013 stockholder agreement is valid;

- Causing the Company to engage Cherry Bekaert to restate the Company's financial statements after Director Defendants blamed Cherry Bekaert for not discovering the fraud at MGT Construction/Thalhimer;

- Appointing Studdard as the "Independent" Trustee, in December 2016, when he was clearly conflicted by causing the ESOP to pay more than adequate consideration in the 2016 ESOP Transaction;

- Causing Thalhimer to sell its membership interest in Wellesley Center, LLC at an unfair price; and

- Refusing to provide information to Brincefield.

368.    Magrill's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

369.    No independent Board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Magrill because Magrill was acting in his self-interest to the detriment of the Company.

370.    Magrill's self-dealing transactions are presumed invalid and are voidable.

371.    Because the Magrill's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

372.     Through his actions, Magrill has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

Warfield:

373.     Warfield has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times.

374.     Warfield has engaged in numerous breaches of the duty of loyalty that benefit himself to the detriment of Thalhimer including, but not limited to:

- Causing the value of Thalhimer to plummet;

- Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the SunTrust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

- Making loans to Thalhimer with unfair terms;

- Covering up the illegality of the 2016 ESOP Transaction;

- Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

- Usurping corporate opportunities and using the Company's assets to enrich himself and the other Director Defendants;

- Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

- Causing the Company to make false representations claiming that the 1998 Stockholder Agreement expired;

- Causing the Company to make false representations claiming that the purported 2013 stockholder agreement is valid;

- Causing the Company to engage Cherry Bekaert to restate the Company's financial statements after Director Defendants blamed Cherry Bekaert for not discovering the fraud at MGT Construction/Thalhimer;

- Appointing Studdard as the "Independent" Trustee, in December 2016, when he was clearly conflicted by causing the ESOP to pay more than adequate consideration in the 2016 ESOP Transaction;

- Causing Thalhimer to sell its membership interest in Wellesley Center, LLC at an unfair price; and

- Refusing to provide information to Brincefield.

375. Warfield's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

376. No independent board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Warfield because Warfield was acting in his self-interest to the detriment of the Company.

377. Warfield's self-dealing transactions are presumed invalid and are voidable.

378. Because the Warfield's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

379.    Through his actions, Warfield has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

Dustin:

380.    Dustin has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times. Dustin has engaged in numerous breaches of the duty of loyalty that benefit himself to the detriment of Thalhimer including, but not limited to:

- Causing the value of Thalhimer to plummet;

- Causing the Company to enter into the prohibited 2016 ESOP Transaction, and related contracts such as the SunTrust Loan, and contracts with law firms, professional advisors, accountants, and Studdard;

- Approving the other Director Defendants loans to Thalhimer with unfair terms;

- Covering up the illegality of the 2016 ESOP Transaction;

- Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

- Usurping corporate opportunities and using the Company's assets to enrich himself and the other Director Defendants;

- Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement;

- Causing the Company to make false representations claiming that the 1998 Stockholder Agreement expired;

- Causing the Company to make false representations claiming that the purported 2013 stockholder agreement is valid;

- Causing the Company to engage Cherry Bekaert to restate the Company's financial statements after Director Defendants blamed Cherry Bekaert for not discovering the fraud at MGT Construction/Thalhimer;

- Appointing Studdard as the "Independent" Trustee, in December 2016, when he was clearly conflicted by causing the ESOP to pay more than adequate consideration in the 2016 ESOP Transaction;

- Causing Thalhimer to sell its membership interest in Wellesley Center, LLC at an unfair price; and

- Refusing to provide information to Brincefield.

381.   Dustin's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

382.   No independent Board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Dustin because Dustin was acting in his self-interest to the detriment of the Company.

383.   Dustin's self-dealing transactions are presumed invalid and are voidable.

384.   Because the Dustin's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

385.    Through his actions, Dustin has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

Bisger:

386.    Bisger has breached his duty of care and duty of loyalty to the Company by failing to exercise business judgment. He ensured that there were no independent directors or officers capable of approving any transaction with which he was involved with the Company or any of the conflicted actions of the other Director Defendants at all relevant times.

387.    Bisger has engaged in numerous breaches of the duty of loyalty that benefit himself to the detriment of Thalhimer including, but not limited to:

- Causing the value of Thalhimer to plummet;

- Making loans to Thalhimer with unfair terms;

- Covering up the illegality of the 2016 ESOP Transaction;

- Causing Thalhimer to spend millions of dollars and to incur substantial debt to unwind the prohibited transactions;

- Usurping corporate opportunities and using the Company's assets to enrich himself and the other Director Defendants;

- Paying himself and the other Director Defendants excessive salaries and executive benefits, including supplemental retirement; and

- Causing Thalhimer to sell its membership interest in Wellesley Center, LLC at an unfair price.

388.    Bisger's self-dealing transactions were not open, fair, and honest, and the Company was not represented by competent and authorized agents.

389.    No independent Board members approved any of the self-dealing transactions. Each action constitutes willful misconduct by Bisger because Bisger was acting in his self-interest to the detriment of the Company.

390.    Bisger's self-dealing transactions are presumed invalid and are voidable.

391.    Because the Bisger's actions were willful, malicious, and unlawful, the Company is entitled to recover punitive damages, plus all costs and expenses of this suit.

392.    Through his actions, Bisger has caused millions of dollars in damages to the Company in an amount to be determined at trial, plus punitive damages, in addition to pre- and post-judgment interest, attorney's fees, costs, and expenses.

393.    Pursuant to VA. CODE ANN. 13.1-672.5, Plaintiff is entitled to recover his reasonable expenses, including attorney's fees, incurred in this proceeding.

## COUNT VIII - BREACH OF CONTRACT

### (Brincefield Direct And On Behalf Of The ESOP Against Warfield, Magrill, And Dustin)

394.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Complaint as if set forth fully herein.

395.    The 1998 Stockholder Agreement is a valid contract between the stockholders, including Brincefield Warfield, Magrill, Dustin, and the ESOP.

396.    The 1998 Stockholder Agreement provides that:

- Thalhimer is required to make minimum tax distributions quarterly for each calendar year during which the Company is an S Corporation (the "Minimum Distribution").

- The shareholders are required to vote their stock so as to cause the Company to make the Minimum Distribution.

- It is binding upon, and inures to the benefit of, the parties and their respective legal representatives, successors, and assigns.

- It "shall not be amended or modified in any way except by a written instrument executed by the parties hereto."

- It shall be terminated in any year in which the Company is not an S Corporation. But, if the Company loses its S Corporation status inadvertently, the 1998 Shareholder Agreement will be fully reinstated should the Company again become an S Corporation.

397.    Thalhimer became an S Corporation in 1998, and remains an S corporation today. Its status as an S corporation has never changed since 1998. The Company always classified the Minimum Distributions as one of its major capital expenditures, and it consistently made the Minimum Distributions, without exception, from the inception of the 1998 Stockholder Agreement until June 30, 2016.

398.    Defendants Warfield, Magrill, and Dustin are bound to the 1998 Stockholder Agreement as successors-in-interest individually, and as ESOP Trustees.

399.    Defendants Warfield, Magrill, and Dustin materially breached the 1998 Stockholder Agreement by failing to vote their stock and/or the ESOP stock so as to cause Thalhimer to make the proper payment of the Minimum Distribution to Brincefield and the ESOP in 2014 and 2015.

400.    Defendants Warfield, Magrill, and Dustin materially breached the 1998 Stockholder Agreement by failing to pay the Minimum Distributions in 2016. Warfield has stated that the Company will not make any Minimum Distributions in 2017.

401.    Defendants Silver, Warfield, Magrill, Dustin, and Bisger have directly and proximately caused damage to Brincefield and the ESOP in an amount to be determined at trial.

## COUNT IX – PROFESSIONAL MALPRACTICE

### (Brincefield Derivatively On Behalf Of Thalhimer Against Cherry Bekaert LLP)

402.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Verified Complaint as if set forth fully herein.

403.    Cherry Bekaert entered into engagement letters with the Company to audit the Company's financial statements in 2015 and 2016 and to restate the financial statements for 2014, 2015, and 2016.

404.    Cherry Bekaert agreed to perform audits of the Company's financial statements using procedures designed to obtain reasonable assurance of detecting misstatements due to errors or fraud that are material to the consolidated financial statements.  Cherry Bekaert also represented that the audits would provide reasonable assurance that illegal acts having a direct and material effect on the determination of financial statements amounts will be detected.

405.    At all relevant times, Cherry Bekaert owed a duty to the Company to exercise the degree of care and skill of a trained accountant of ordinary skill, and to perform its audits in accordance with Generally Accepted Auditing Standards ("GAAS").  Cherry Bekaert also had a duty to properly staff its audit engagements for the Company with auditors who were properly trained to perform audits in accordance with GAAS.

406.    In conducting its engagement for the Company, Cherry Bekaert failed to exercise and breached its duty to exercise the degree of care and skill of a trained accountant of ordinary skill.

407.    Cherry Bekaert failed to exercise the degree of care and skill it owed to the Company with respect to the work it performed for the Company, including but not limited to the work it performed in auditing the Company's financial statements, including the financials of MGT Construction.

408.    Cherry Bekaert breached the professional duty of care it owed to the Company by failing to take appropriate action to detect and address the misallocation of invoices at MGT Construction, the rampant fraud, misstatements, and improper accounting practices at MGT and the Company and in the preparation of incorrect, false and materially misleading consolidated financial statements on behalf of the Company.

409.    Cherry Bekaert breached the professional duty of care it owed to the Company by accepting the engagement to restate the Company's financial statements for 2014, 2015, and 2016 when it knew the Company blamed Cherry Bekaert for failing to discover the fraud at MGT Construction/Thalhimer.

410.    As a direct and proximate result of Cherry Bekaert's breach of the duty of care it owed to the Company, the Company has suffered and will continue to suffer enormous monetary damages, including but not limited to costs and expenses incurred in attempting to correct and restate the financial statements prepared by Cherry Bekaert, responding to lawsuits filed by creditors and/or other claimants of MGT Construction, executing and then reversing the 2016 ESOP Transaction and other related costs.

## COUNT X – PROFESSIONAL MALPRACTICE

**(Brincefield Directly on His Own Behalf and Derivatively On Behalf Of The ESOP Against Cherry Bekaert LLP)**

411.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of this Amended Verified Complaint as if set forth fully herein.

412.    As the Administrator of the ESOP, the Company, on behalf of all plan participants, is required under ERISA to engage an independent qualified public accountant to audit the ESOP's financial statements.  29 U.S.C. § 1023(a)(3)(A).

413.    The Company on behalf of the ESOP engaged Cherry Bekaert to audit the ESOP's financial statements for 2015 and 2016.

414.    Brincefield and each of the other ESOP plan participants are intended third party beneficiaries of the ESOP's engagement of Cherry Bekaert.  See 29 U.S.C. § 1023(a)(3)(A) (stating that the Administrator's retention of the independent qualified public accountant is on behalf of, and thus intended to benefit "all plan participants").  Cherry Bekaert understood its retention was on behalf of all of the ESOP participants at the time it was engaged to perform the audits, accepted that duty by entering into the engagement agreements, and provided audits of the ESOP's financial statements intending to benefit all ESOP participants, and individually, including but not limited to Brincefield.

415.    Cherry Bekaert agreed to perform audits of the ESOP's financial statements using procedures designed to obtain reasonable assurance of detecting misstatements due to errors or fraud that are material to the consolidated financial statements.  Cherry Bekaert also represented that the audits would provide reasonable assurance that illegal acts having a direct and material effect on the determination of financial statements amounts will be detected.

416.    At all relevant times, Cherry Bekaert owed a duty to the ESOP and to all of the ESOP participants, individually, to exercise the degree of care and skill of a trained accountant of ordinary skill and to conduct audits of the ESOP's financial statements in accordance with GAAS. Cherry Bekaert also had a duty to properly staff its audit engagements for the Company with auditors who were properly trained to perform audits in accordance with GAAS.

417.    In conducting its engagement, Cherry Bekaert failed to exercise and breached its duty to exercise the degree of care and skill of a trained accountant of ordinary skill.

418.    Cherry Bekaert breached the duties it owed to the ESOP and beneficiaries thereof by failing to exercise the required standard of care in failing to detect fraud, the misallocation of invoices pertaining to MGT Construction, by preparing erroneous, false and misleading financial statements for the Company, erroneous, false and misleading financial statements for the ESOP, and Reports of the Independent Auditor for the years 2014 through 2016.

419.    Cherry Bekaert breached the professional duty of care it owed to the ESOP by accepting the engagement to prepare the financial statements for 2016 when it knew the Company blamed Cherry Bekaert for failing to discover the fraud at MGT Construction/Thalhimer.

420.    As a direct and proximate result of Cherry Bekaert's breach of the duties it owed the ESOP and the beneficiaries thereof, including Brincefield, the ESOP and Brincefield have suffered and will continue to suffer enormous monetary damages, including but not limited to costs and expenses incurred in attempting to correct and restate the financial statements prepared by Cherry Bekaert, decrease in the per share value of the Company, and diminution in the value of ESOP participants' retirement benefits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, by his undersigned counsel, respectfully requests that this Court grant the following relief:

(1)    Declare that the Defendants engaged in non-exempt prohibited transactions and caused the ESOP to engage in prohibited transactions under ERISA;

(2)    Enjoin the Defendants from further violations of ERISA and their fiduciary duties;

(3)     Remove Defendants Studdard, Magrill, Warfield, and Dustin as ESOP Trustees and appoint an Independent Trustee;

      a.     Void the appointment of the Board of Directors of the Company;

      b.     Void the appointment of the officers of the Company by the Board of Directors;

(4)     Void all self-dealing transactions between the Director Defendants and the Company;

(5)     Order an accounting from each Defendant of the compensation or other remuneration each received, and profits derived therefrom, directly or indirectly, as a result of their breaches of fiduciary and other violations of ERISA;

(6)     Appoint a neutral and independent accountant to forensically analyze the Company's and ESOP's financial statements and restate the financials, if necessary, to amend the Company's tax returns and ESOP filings, if necessary, and to perform independent valuations of the Company and the ESOP, and order the Defendants to pay the associated costs and expenses and any associated interest and penalties;

(7)     Order the Defendants to pay the ESOP for all losses resulting from their breaches and restore any profits they have made through the use of the assets of the ESOP;

(8)     Order the Defendants to reimburse Plaintiff and other stockholders and/or ESOP beneficiaries (other than themselves) for all costs and expenses (including accounting and attorney's fees) related to filing and revising any tax returns or other required filings, and any associated interest and penalties;

(9)     Order the Defendants to pay Thalhimer for all its losses relating to the 2016 ESOP Transaction and the unwinding of the transaction;

(10)  Order the Director Defendants to pay Thalhimer for all damages caused by their conversion of assets.

(11)  Impose a constructive trust over the Director Defendants' ownership interests in companies for which they usurped Thalhimer's opportunities and/or use the Company's assets to enrich themselves;

(12)  Order the Defendants to provide other appropriate equitable relief to the ESOP including, but not limited to, a surcharge, an accounting for profits, and impose a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

(13)  Order Defendants Warfield, Magrill, and Dustin to pay Brincefield damages for their breaches of contract;

(14)  Order specific performance of the 1998 Stockholder Agreement;

(15)  Order Cherry Bekaert to pay the Company for all damages caused by its professional malpractice;

(16)  Order Cherry Bekaert to pay the ESOP for all damages caused by its professional malpractice;

(17)  Award Plaintiff reasonable attorneys' fees and the costs of bringing this suit pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or the benefit obtained for the common fund;

(18)  Award Plaintiff reasonable attorneys' fees and the costs of bringing this suit pursuant to Va. Code §§ 8.01 -499 and 500.

(19)  Award Plaintiff reasonable attorneys' fees and the costs of bringing this suit pursuant to Va. Code §13.1-672.5.

(20)   Order the Defendants to disgorge any fees they received in conjunction with their

services to the ESOP as well as earnings and profits thereon;

(21)   Order the Defendants to pay pre-judgment and post-judgment interest; and

(22)   Award such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff respectfully demands a TRIAL BY JURY for all issues so triable.


Respectfully submitted,

Steven B. Brincefield


_____/s/_____
John H. Craddock, Jr., Esq. (VSB # 41366)
Michele Burke Craddock, Esq. (VSB # 65314)
*Attorneys for Plaintiff*
CRADDOCK LAW PLC
2304 West Main Street
Richmond, Virginia 23220
Telephone: (804) 309-4200
Facsimile: (804) 254-3990
jcraddock@craddocklawfirm.com
mcraddock@craddocklawfirm.com

Kevin P. Roddy (VSB # 22364)
James E. Tonrey, Jr. (*Pro Hac Vice*)
*Attorneys for Plaintiff*
Wilentz, Goldman & Spitzer, P.A.
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey 07095
Telephone: (732) 636-7000 or (732) 855-6402
Facsimile: (732) 726-6686
kroddy@wilentz.com
jtonrey@wilentz.com

## CERTIFICATE OF SERVICE

I certify that on the 30th day of July, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Mary D. Hallerman, Esq.
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
mhallerman@mwe.com
*Attorneys for Lance T. Studdard*

J. Christian Nemeth, Esq. (admitted *Pro Hac Vice*)
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, Illinois 60606
jnemeth@mwe.com
*Attorneys for Lance T. Studdard*

Eliot T. Burriss, Esq. (admitted *Pro Hac Vice*)
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
eburriss@mwe.com
*Attorneys for Lance T. Studdard*

W. David Paxton, Esq.
H. David Gibson, Esq.
Michael J. Finney, Esq.
Scott A. Stephenson, Esq.
GENTRY LOCKE
10 Franklin Road, S.E., Suite 900
Roanoke, Virginia 24011
paxton@gentrylocke.com
gibson@gentrylocke.com
finney@gentrylocke.com
stephenson@gentrylocke.com
*Attorneys for Paul F. Silver, C. Lee Warfield, III,*
  *Evan M. Magrill, David R. Dustin, Jr. and Jeffrey S. Bisger*

Charles M. Sims, Esq.
Eve Grandis Campbell, Esq.
John J. Siegner, III, Esq.
O'HAGAN MEYER PLLC
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
csims@ohaganmeyer.com
ecampbell@ohaganmeyer.com
jsiegner@ohaganmeyer.com
*Attorneys for Morton G. Thalhimer, Inc.*

_____/s/_____
John H. Craddock, Jr., Esq. (VSB # 41366)
Michele Burke Craddock, Esq. (VSB # 65314)
Attorneys for Plaintiff
CRADDOCK LAW PLC
2304 West Main Street
Richmond, Virginia 23220
Telephone: (804) 309-4200
Facsimile: (804) 254-3990
jcraddock@craddocklawfirm.com
mcraddock@craddocklawfirm.com

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 30, 2018.

_____
Steven B. Brincefield, on behalf of the Morton G. Thalhimer, Inc. Employee Stock Ownership Plan, and derivatively on behalf of Morton G. Thalhimer, Inc. as Trustee of the Steven B. Brincefield Revocable Trust